**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **BOBBY HARDRICK,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | **CIVIL ACTION NO. 3:24-CV-00014-D** |
| **v.** | § | |
| | § | **JURY** |
| **WELLS FARGO BANK NATIONAL** | § | |
| **ASSOCIATION; RESOLVION, LLC;** | § | |
| **KEEL RECOVERY, INC.,** | § | |
| | § | |
| *Defendants*. | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

| EXHIBIT | DOCUMENT |
|---|---|
| A | Plaintiff's Complaint |
| B | Berkshire Medical Apts' Video of Shooting |
| C | Keel's Firearm Policy |
| D | Wells Fargo Default Notice to Chellette Corder, WELLS FARGO 000159-000167 |
| E | Plaintiff's Deposition Transcript |
| F | Daniel Fielhauer's Deposition Transcript |

Respectfully submitted,

By:  */s/ Raymond M. Kutch*       
**George Arnold**
State Bar No. 00783559
garnold@thompsoncoe.com
**Raymond M. Kutch**
State Bar No. 24072195
rkutch@thompsoncoe.com
**Essay Eden**
State Bar No. 24120248
eeden@thompsoncoe.com
THOMPSON, COE, COUSINS & IRONS, LLP
4400 Post Oak Parkway, Suite 1000
Houston, Texas 77027
Telephone:  (713) 403-8210
Facsimile:  (713) 403-8299

1

**Matthew J. Kolodoski**
State Bar No. 24081963
[mkolodoski@thompsoncoe.com](mailto:mkolodoski@thompsoncoe.com)
Thompson, Coe, Cousins & Irons, LLP
700 North Pearl Street, 25th Floor
Dallas, Texas 75201
Telephone:  (214) 871-8200
Facsimile:  (214) 871-8209

**Attorneys for Defendants**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been e-filed with the District Clerk of the Northern District of Texas, Dallas Division and electronically served upon all counsel of record pursuant to the Federal Rules of Civil Procedure on March 10, 2025.

*/s/ Raymond Kutch*
Raymond M. Kutch

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **BOBBY HARDRICK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **3:24-CV-00014-D** |
| | ) | |
| **WELLS FARGO BANK** | ) | |
| **NATIONAL ASSOCIATION;** | ) | |
| **RESOLVION, LLC;** | ) | |
| **KEEL RECOVERY, INC.;** | ) | |
| | ) | |
| **Defendants.** | ) | **JURY TRIAL DEMANDED** |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff Bobby Hardrick, in the above-styled cause, Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) Amends his Complaint as a matter of course. For his Amended Complaint against the Defendants:

## PARTIES

1. The Plaintiff, Bobby Hardrick, is a resident and citizen of the state of Texas, Dallas County, and is over the age of twenty-one (21) years. Plaintiff is a consumer as defined by 15 U.S.C. § 1692a(3).

2. The Defendant, Wells Fargo Bank National Association doing business as Wells Fargo Auto ("Wells Fargo"), is a foreign corporation and was, in all respects and at all times relevant herein, doing business in the state of Texas in this district, and is registered to do business in Texas. Defendant Wells Fargo is in the business of financing consumer automobile loans and regularly

1

EXHIBIT
A

collects collateral and debts when it alleges the consumer has defaulted. Defendant Wells Fargo is a "debt collector" as defined by Tex. Fin, Code § 392.001(6). The debt at issue is a "consumer debt" as defined by Tex. Fin. Code § 392.001(6).

3.    The Defendant, Resolvion, LLC ("Resolvion"), is a foreign entity and was, in all respects and at all times relevant herein, doing business in the state of Texas. The Defendant is engaged in the business of collecting consumer debts by using non-judicial self-help action in the repossession of automobiles from consumers residing in Dallas County, Texas and is a "debt collector" as defined by the FDCPA 15 U.S.C. § 1692a(6) and a debt collector as defined by Tex. Fin. Code § 392.001(6). Upon information and belief, Defendant Resolvion was attempting to collect a consumer debt as defined by the FDCPA and uses instrumentality of interstate commerce or the mails in a business wherein the principal purpose of which is the enforcement of security interests. The debt at issue is a "consumer debt" as defined by Tex. Fin. Code § 392.001(6).

4.    The Defendant, Keel Recovery, Inc. ("Keel Recovery") is a domestic entity and was, in all respects and at all times relevant herein, doing business in the state of Texas. The Defendant is engaged in the business of collecting consumer debts by using non-judicial self-help action in the repossession of automobiles from consumers residing in Dallas County, Texas and is a "debt collector" as defined by the FDCPA 15 U.S.C. § 1692a(6) and a debt collector as defined by Tex. Fin. Code § 392.001(6). Upon information and belief, Defendant Keel Recovery was attempting to collect a consumer debt as defined by the FDCPA and uses instrumentality of interstate commerce or the mails in a business wherein the principal purpose of which is the enforcement of security interests. The debt at issue is a "consumer debt" as defined by Tex. Fin. Code § 392.001(6).

## JURISDICTION AND VENUE

2

5.  This Court has jurisdiction under 15 U.S.C. § 1692k(d), and 28 U.S.C. § 1331, § 1332, and § 1367. Venue is proper in that the Defendants transacted business here, and the Plaintiff resides here.

## NATURE OF CLAIMS AND FACTUAL ALLEGATIONS

### Nature of Claims

6.  Article 9 of the Texas Uniform Commercial Code provides that after default, a secured party may take possession of collateral without judicial process, "if it proceeds without breach of the peace." Tex. Bus. & Comm. Code § 9.609. *Davis v. Toyota Motor Credit*, No. H-12-00287, 2014 U.S. Dist. LEXIS 57362 (S.D. Tex. Mar. 31, 2014).

7.  § 1692f(6) of the Fair Debt Collection Practie Act ("FDCPA") prohibits the "[t]aking or threatening to take any non-judicial action to effect dispossession or disablement of property if— (A) there is no present right to possession of the property claimed as collateral through an enforceable security interest; (B) there is no present intention to take possession of the property; or (C) the property is exempt by law from such dispossession or disablement." 15 U.S.C.A. § 1692f(6).

8.  Tex. Fin. Code § 392.301(a)(1) states that debt collectors may not use violence or other criminal means to cause harm to a person or property of a person. Tex. Fin. Code § 392.301(a)(1).

9.  "[I]n the civil context, Texas caselaw uses the terms 'assault,' 'battery,' and 'assault and battery' interchangeably, and we intend no distinctions among these terms." *Burns v. Intermodal Cartage Co.*, Civil Action No. 3:22-CV-00979-E, 2024 U.S. Dist. LEXIS 40847 (N.D. Tex. Mar. 8, 2024) (quoting *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 801 n.4 (Tex. 2010)).

10.  The Texas Penal Code provides for three categories of assault—(1) assault with actual bodily injury, (2) threatening another with imminent bodily injury, or (3) causing physical contact with

Appx. 0005

knowledge that contact is offensive. *Pickens v. Fletcher*, No. 4:12-cv-1196, 2013 U.S. Dist. LEXIS 81687 (S.D. Tex. June 11, 2013)(citing Tex. Penal Code Ann. § 22.01 (West 2011)).

11.  A creditor cannot delegate the duty of peaceable repossession to an independent contractor. *MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151 (Tex., July 1, 1992).

12.  A secured party that initiates the non-judicial self-help repossession can be held liable for the debt collection actions of their independent contractors under the Texas Debt Collection Practices Act. *See Cox v. Hilco Receivables, L.L.C.*, 726 F. Supp. 2d 659 (N.D. Tex. 2010).

13.  This liability can also extend to torts such as assault and battery. *See Thomas v. GM Fin. Co.*, No. 5:19-CV-1418-DAE, 2020 U.S. Dist. LEXIS 251643 (W.D. Tex. July 13, 2020).

### Defendants' Business Model

14.  Upon information and belief, Defendant Wells Fargo contracts with Defendant Resolvion to recover consumer vehicles in which Defendant Wells Fargo claims a possessory interest.

15.  Upon information and belief, this agreement states that Defendant Resolvion will provide services in the locating of the vehicle, the physical recovery of the vehicle, and the care of the vehicle post-recovery.

16.  Defendant Wells Fargo pays Defendant Resolvion per recovery. This pay structure creates an incentive to recover as many vehicles as possible.

17.  In turn, Defendant Resolvion contracts with local recovery entities to assist in the services it agreed to do on behalf of Defendant Wells Fargo

18.  Upon information and belief, Defendant Resolvion pays the local recovery entity per recovery. This pay structure creates an incentive to recover as many vehicles as possible.

19.  Upon information and belief, Defendant Wells Fargo and Defendant Resolvion maintain control over the recovery process by requiring compliance from the local recovery entity with both

4

Defendants' policies, procedures, insurance requirements, training, etc.

**Facts Specific to This Case**

20. Upon information and belief, at some time before January 2023, Defendant Wells Fargo obtained a security interest/lien in the 2018 Genesis G80 (VIN KMHGN4JE8JU227797) (the "Vehicle").

21. The Vehicle was purchased to be used primarily by Plaintiff for household/non-business purposes. At all times, Plaintiff maintained rightful physical control of the Vehicle.

22. In December 2022, Defendant Wells Fargo considered the Vehicle's account to be in default and sought to take possession of the Vehicle.

23. Defendant Wells Fargo contracted with Defendant Resolvion to take possession of the Vehicle.

24. In turn, Defendant Resolvion contracted with Defendant Keel Recovery to physically take possession of the Vehicle.

25. On January 3, 2023, Plaintiff came home from work in the Vehicle and parked to get his mail at the neighborhood mailbox.

26. Plaintiff noticed a man standing in the parking lot near Plaintiff's home. Since the neighborhood is behind a locked gate, Plaintiff became even more suspicious of the man.

27. Upon information, this man was an agent/employee of Defendant Keel Recovery, and therefore an agent of Defendant Wells Fargo and Defendant Resolvion, and had been in the neighborhood for some time attempting to locate the Vehicle.

28. Plaintiff drove to his driveway and had a short conversation with his daughter who was on the balcony of the Plaintiff's home.

29. At this point, Defendant Keel Recovery's tow truck was visibly approaching Plaintiff's home in order to take the Vehicle.

30. Plaintiff pulled the Vehicle into his garage and exited back outside in order to pull his daughter's

5

car into the driveway.

31. At this point, upon information and belief, the repossession agent on foot fired gunshot at Plaintiff.

32. Plaintiff fell to the ground and scrambled back to his home.

33. Plaintiff's daughter and neighbor looked out the window in reaction to the gunshot noises.

34. The repossession agent on foot ran to the gate and met the repossession agent in the truck at the gate since it could only be opened automatically by sensing an approaching vehicle.

35. Afterwards, Plaintiff immediately contacted 911 and the Dallas Police Department was dispatched.

36. The Dallas Police Department initiated an investigation and that investigation is still pending and ongoing.

37. Upon information and belief, Defendant Wells Fargo obtained possession of the Vehicle at a later date and disposed of it via auction.

## COUNT ONE
## FDCPA CLAIM AGAINST DEFENDANT RESOLVION AND DEFENDANT KEEL RECOVERY

38. The Plaintiff adopts the factual averments and allegations of all the above paragraphs hereinbefore as if fully set forth herein.

39. The Defendant Resolvion and Defendant Keel Recovery engaged in collection activities and practices in violation of the Fair Debt Collection Practices Act.

40. Defendants took non-judicial action to attempt dispossession of the Vehicle without a present right of possession due to a breach of the peace in violation of 15 U.S.C. § 1692f(6).

41. A breach of the peace occurred due to the gunshot.

42. As a proximate cause of Defendants' conduct, the Plaintiff incurred monetary damages and has

Appx. 0008

suffered mental damages and the accompanying physical damages.

## COUNT TWO
## VIOLATIONS OF THE TEXAS DEBT COLLECTION PRACTICES ACT AGAINST DEFENDANT WELLS FARGO, DEFENDANT RESOLVION, AND DEFENDANT KEEL RECOVERY

43.     The Plaintiff adopts the factual averments and allegations of all the above paragraphs hereinbefore as if fully set forth herein.

44.     Defendants are debt collectors within the meaning of Tex. Fin. Code § 392.001(6).

45.     Defendants, through their repossession agents directed to take possession of the Vehicle, violated Tex. Fin. Code § 392.301(a)(1) by using violence or other criminal means to cause harm to a person or property of a person.

46.     The gunshot is considered violence.

47.     As a proximate cause of Defendants' conduct, the Plaintiff incurred monetary damages and has suffered mental damages and the accompanying physical damages.

## COUNT THREE
## ASSAULT AND BATTERY AGAINST DEFENDANT WELLS FARGO, DEFENDANT RESOLVION, AND DEFENDANT KEEL RECOVERY

48.     The Plaintiff adopts the factual averments and allegations of all the above paragraphs hereinbefore as if fully set forth herein.

49.     Defendants, through their repossession agents directed to the take the Vehicle, intentionally and knowingly threatened Plaintiff with imminent bodily injury by firing the gun.

50.     The firing of the gun placed Plaintiff in fear of imminent bodily injury.

51.     As a proximate cause of Defendants' conduct, the Plaintiff incurred monetary damages and has suffered mental damages and the accompanying physical damages.

Appx. 0009

## AMOUNT OF DAMAGES DEMANDED

Plaintiff demands a judgment against the Defendants as follows:

52.    Compensatory and punitive damages against the Defendants;

53.    Remedies available under the FDCPA, including statutory damages, costs, and attorneys' fees and any other compensatory damages pursuant to 15 U.S.C.§1692k; and,

54.    Remedies available under cited Texas law, including statutory damage, costs and attorneys' fees and any other compensatory damages; and,

55.    Such other and further relief that this Court deems necessary, just and proper.

## PLAINTIFF DEMANDS TRIAL BY STRUCK JURY

/S/ JOHN C. HUBBARD
JOHN C. HUBBARD
Attorney for Plaintiff

**OF COUNSEL:**
**JOHN C. HUBBARD, LLC**
PO Box 953
Birmingham, AL 35203
(205) 378-8121
jch@jch-law.com

8

# Placeholder for Exhibit B – Berkshire Medical Apts' Video of Shooting

(This Exhibit is an MP4 video file.  Since it cannot be electronically filed, it will be uploaded to a CD or flash drive and mailed to the Court.)

# FIREARMS POLICY & ACKNOWLEDGEMENT

## FIREARMS EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

**SECTION I – COVERAGES, COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY, 2. Exclusions** and **COVERAGE B PERSONAL AND ADVERTSING INJURY LIABILITY, 2. Exclusions** are amended and the following added:

This insurance does not apply to claims, "suits," loss, damages, or costs or expenses, including but not limited to costs of defense, based on or directly or indirectly arising out of any use, existence, or threatened use or existence, of firearms of any kind by any insured, or any agent, representative, contractor or subcontractor, or any other person acting on behalf of any insured.

It is the intent of this endorsement to exclude from this insurance any claim, demand or "suit" as described above. Therefore, there shall be no duty or obligation on the part of the Company under this insurance to respond to, investigate or defend anyone, including but not limited to any insured, its agents, servants or "employees" or any third parties for any such claim, demand or "suit."

This exclusion applies whether or not such firearms has any function in your business, operations, premises, site or location.

**ALL OTHER TERMS AND CONDITIONS OF THE POLICY REMAIN UNCHANGED.**

Per the above restrictions outlined by our insurance provider, it is Keel Recovery's company policy to prohibit employees from carrying firearms in company vehicles.  Please sign below your acknowledgement and that you agree to adhere to company policy.

_____         6-15-2020_____
Signature                                                                       Date

_____
Print Name

┌─────────────────┐
│  **EXHIBIT**    │
│    **C**        │
└─────────────────┘



**Auto**

Wells Fargo Auto
6061 N State Hwy 61
Irving, TX 75068

wellsfargo.com

11/17/2022

CHELLETTE CORDER



Account ending in: 0165

Subject: Requirement to strictly comply with Agreement

Dear CHELLETTE CORDER:

You are late in making your payments and action is needed to avoid possible repossession of your Vehicle.
Please review the details below.

**Brief description of your vehicle (Vehicle) and auto financing agreement (Agreement)**

| Make | GENESIS |
|---|---|
| Model | G80 |
| Year | 2018 |
| VIN # | |
| Agreement dated | 07/31/2021 |
| Original amount of | $ |

**Amount now due to prevent potential repossession**

| Amount now due | Please pay the **Amount now due** by the **Payment deadline.** | |
|---|---|---|
| | **Amount now due** | $ |
| | **Payment deadline** | 11/28/2022 |
| | Please send your payment to:<br><br>Wells Fargo Auto<br>PO BOX 17900<br>DENVER, CO 80217-7900<br><br>**You can call us with questions at 1-800-289-8004.** | |
| **Requirement to comply with your Agreement** | Although we may have accepted late or partial payments in the past, going forward we may require you to comply with all the terms of your Agreement. | |
| **Why it's important to pay the amount now due** | If you do not pay the **Amount now due** by the **Payment deadline**, we may exercise our rights under the law, including repossessing the Vehicle and accelerating the balance of your Agreement. Accelerating the balance means the full amount you owe under the Agreement would become immediately due.<br><br>If the Vehicle is repossessed, you may be required to pay certain costs related to the repossession. Examples of costs related to repossession may include, but are not limited to, the cost to take possession of and sell the Vehicle. | |

| About next monthly payment | Once you bring your account current, it is important that you continue to make your payments on time. As a courtesy, we are letting you know the **Amount now due** above does not include your next monthly payment, which is due on 11/30/2022. While you are not required to make this next payment now to prevent repossession of the Vehicle, if you do not make it by the due date, you will fall behind on your payments. | |
|---|---|---|
| | **Next monthly payment** | $ |
| | **Monthly payment due date** | 11/30/2022 |



**EXHIBIT D**



CONFIDENTIAL - ATTORNEY EYES ONLY
Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

**Please send your payment to:**

Wells Fargo Auto
PO BOX 17900
DENVER, CO 80217-7900

**We're here to help**

If you have questions or would like to learn more about available payment methods, please call us as soon as possible at 1-800-289-8004, Monday - Friday, 7:00 a.m. to 9:00 p.m., or Saturday, 7:00 a.m. to 5:30 p.m. Central Time. For customers with hearing or speech disabilities, we also accept telecommunications relay service calls. Or, you can write us at:

Wells Fargo Auto
PO BOX 17900
DENVER, CO 80217-7900

Thank you.

Wells Fargo Auto

**The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.**



CONFIDENTIAL - ATTORNEY EYES ONLY

Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

Appx. 0014


Auto

July 16, 2022
CHELLETTE CORDER
[REDACTED]

Dear CHELLETTE CORDER:

Thank you for your recent deferment request. In order to process the deferment, we need to receive your signed and dated Deferment Authorization Form. Please note that if your deferment form is received after the date indicated in the Deferment Expiration Date box, we may be unable to process your request.

**What you need to do**
Please return your signed and dated form through one of the following options:

| Overnight Mail | First Class Mail | Return Fax |
|---|---|---|
| Wells Fargo Auto | Wells Fargo Auto | 844-505-6407 |
| Attn: CSS Deferments | Attn: CSS Deferments | |
| MAC: T9010-037 | MAC: T9010-037 | |
| 250 E. John Carpenter Fwy | PO Box 168048 | |
| Irving, TX 75062-2710 | Irving, TX 75016-8048 | |

**What you need to know**
Finance charges will continue to accrue on the unpaid balance at the contract rate. By deferring one or more installments, you will pay more finance charges than originally disclosed. After this deferment, you will need to continue making your full and timely payments on this loan. After the deferment period ends, more of the next payment will be applied to the interest that accrued during the deferment period, and less will go to the outstanding principal of your loan. As a result, assuming you make all remaining scheduled payments on time and in the agreed amounts after the deferment period ends, you will pay more interest over the term of your loan than you were originally scheduled to pay. If you choose to pay early, you could pay less interest. If you purchased any additional products along with your vehicle, such as Guaranteed Asset Protection (GAP) or credit insurance, please refer to the product agreement for information about how coverage might be impacted. The coverage period for additional products may not change even though you have a new account maturity date. Besides these items, all other terms of the account will remain the same. **Please note:** We may only grant one deferment every 12 months.

If you have any questions, please call us at 1-800-289-8004, Monday - Thursday, 7:00 a.m. to 10:00 p.m., Friday, 7:00 a.m. to 9:00 p.m., and Saturday, 7:00 a.m. to 5:30 p.m. Central Time. For customers with hearing or speech disabilities, we also accept telecommunications relay service calls.

Thank you. We appreciate your business.
Wells Fargo Auto

OF/BCL-01 (xx/xx/20) Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Deferment Authorization Form

I, __CHELLETTE CORDER__, "borrower", requested on __07/16/2022__ that Wells Fargo Auto defer the scheduled payment(s) on my contract or loan dated, __07/31/2021__, as indicated below. I understand that the installment payment will be deferred. Therefore, this deferment will extend the maturity date on my original contract or loan agreement. My new maturity date is __09/30/2027__. Wells Fargo Auto and I agree that, except as modified below, the contract or loan shall remain in full force and effect.

| Account Number | Original Payment Due Date | Deferment Expiration Date | Month(s) Deferred | Payment Month(s) Deferred |
|---|---|---|---|---|
| [REDACTED]0165 | 04/30/2022 | 07/26/2022 | 2 | 04/22-05/22 |

| Payment Amount Deferred | Next Payment Due Date | Next Scheduled Payment Amount | If you return this form by fax, you do not need to mail the form to us. Keep a copy for your records. |
|---|---|---|---|
| $[REDACTED] | 06/30/2022 | $[REDACTED] | |

YOUR SIGNATURE AND DATE ARE REQUIRED

x  *R. Hutson 7/18/22*
Wells Fargo Auto Authorized Signature   Date

x  *Chellette L. Snyder*   *8/4/2022*
Borrower Signature   CHELLETTE CORDER   Date

CONFIDENTIAL - ATTORNEY EYES ONLY

WELLS 000161

Wells Fargo Auto
P.O. Box 9050
Temecula, CA  92589-9050

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

2371438127

Send Payments to:
PO BOX 33068
RALEIGH, NC  27636

Send Correspondence to:
PO BOX 33068
RALEIGH, NC  27636

20220719-357

CHELLETTE CORDER



CONFIDENTIAL - ATTORNEY EYES ONLY

WELLS 000162

433_SCL

**Appx. 0016**



**Auto**

Wells Fargo Auto
PO BOX 17900
6061 N State Hwy 61
Irving, TX 75068

wellsfargo.com

07/19/2022

CHELLETTE CORDER



Account ending in: 0165

Subject: Requirement to strictly comply with Agreement

Dear CHELLETTE CORDER:

You are late in making your payments and action is needed to avoid possible repossession of your Vehicle. Please review the details below.

**Brief description of your vehicle (Vehicle) and auto financing agreement (Agreement)**

| | |
|---|---|
| **Make** | GENESIS |
| **Model** | G80 |
| **Year** | 2018 |
| **VIN #** | |
| **Agreement dated** | 07/31/2021 |
| **Original amount of** | $ |

**Amount now due to prevent potential repossession**

| Amount now due | Please pay the **Amount now due** by the **Payment deadline.** | |
|---|---|---|
| | **Amount now due** | $ |
| | **Payment deadline** | 07/29/2022 |
| | Please send your payment to:<br><br>Wells Fargo Auto<br>PO BOX 17900<br>DENVER, CO 80217-7900<br><br>**You can call us with questions at 1-800-289-8004.** | |
| **Requirement to comply with your Agreement** | Although we may have accepted late or partial payments in the past, going forward we may require you to comply with all the terms of your Agreement. | |
| **Why it's important to pay the amount now due** | If you do not pay the **Amount now due** by the **Payment deadline**, we may exercise our rights under the law, including repossessing the Vehicle and accelerating the balance of your Agreement. Accelerating the balance means the full amount you owe under the Agreement would become immediately due.<br><br>If the Vehicle is repossessed, you may be required to pay certain costs related to the repossession. Examples of costs related to repossession may include, but are not limited to, the cost to take possession of and sell the Vehicle. | |

| About next monthly payment | Once you bring your account current, it is important that you continue to make your payments on time. As a courtesy, we are letting you know the **Amount now due** above does not include your next monthly payment, which is due on 07/30/2022. While you are not required to make this next payment now to prevent repossession of the Vehicle, if you do not make it by the due date, you will fall behind on your payments. | |
|---|---|---|
| | **Next monthly payment** | $ |
| | **Monthly payment due date** | 07/30/2022 |



CONFIDENTIAL - ATTORNEY EYES ONLY
Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

**Appx. 0017**

Please send your payment to:

Wells Fargo Auto
PO BOX 17900
DENVER, CO 80217-7900

**We're here to help**

If you have questions or would like to learn more about available payment methods, please call us as soon as possible at 1-800-289-8004, Monday - Friday, 7:00 a.m. to 9:00 p.m., or Saturday, 7:00 a.m. to 5:30 p.m. Central Time. For customers with hearing or speech disabilities, we also accept telecommunications relay service calls. Or, you can write us at:

Wells Fargo Auto
PO BOX 17900
DENVER, CO 80217-7900

Thank you.

Wells Fargo Auto

**The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.**



CONFIDENTIAL - ATTORNEY EYES ONLY
Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

**Appx. 0018**

Wells Fargo Auto
P.O. Box 9050
Temecula, CA  92589-9050

PRESORT
First-Class Mail
U.S. Postage and
Fees Paid
WSO

2370632195

Send Payments to:
PO BOX 33068
RALEIGH, NC  27636

Send Correspondence to:
PO BOX 33068
RALEIGH, NC  27636

20220617-357

CHELLETTE CORDER



CONFIDENTIAL - ATTORNEY EYES ONLY

WELLS 000165

433_SCL

**Appx. 0019**



**Auto**

Wells Fargo Auto
6061 N State Hwy 161
Irving, TX 75068

wellsfargo.com

06/17/2022

CHELLETTE CORDER

████████████████

Account ending in: 0165

Subject: Requirement to strictly comply with Agreement

Dear CHELLETTE CORDER:

You are late in making your payments and action is needed to avoid possible repossession of your Vehicle. Please review the details below.

**Brief description of your vehicle (Vehicle) and auto financing agreement (Agreement)**

| Make | GENESIS |
|---|---|
| Model | G80 |
| Year | 2018 |
| VIN # | ████████████████ |
| Agreement dated | 07/31/2021 |
| Original amount of | $████████ |

**Amount now due to prevent potential repossession**

| Amount now due | Please pay the **Amount now due** by the **Payment deadline.** | |
|---|---|---|
| | **Amount now due** | $████████ |
| | **Payment deadline** | 06/27/2022 |
| | Please send your payment to: <br><br>Wells Fargo Auto <br>PO BOX 17900 <br>DENVER, CO 80217-7900 <br>**You can call us with questions at 1-800-289-8004.** | |
| **Requirement to comply with your Agreement** | Although we may have accepted late or partial payments in the past, going forward we may require you to comply with all the terms of your Agreement. | |
| **Why it's important to pay the amount now due** | If you do not pay the **Amount now due** by the **Payment deadline**, we may exercise our rights under the law, including repossessing the Vehicle and accelerating the balance of your Agreement. Accelerating the balance means the full amount you owe under the Agreement would become immediately due. <br><br>If the Vehicle is repossessed, you may be required to pay certain costs related to the repossession. Examples of costs related to repossession may include, but are not limited to, the cost to take possession of and sell the Vehicle. | |

| About next monthly payment | Once you bring your account current, it is important that you continue to make your payments on time. As a courtesy, we are letting you know the **Amount now due** above does not include your next monthly payment, which is due on 06/30/2022. While you are not required to make this next payment now to prevent repossession of the Vehicle, if you do not make it by the due date, you will fall behind on your payments. | |
|---|---|---|
| | **Next monthly payment** | $██████ |
| | **Monthly payment due date** | 06/30/2022 |



CONFIDENTIAL - ATTORNEY EYES ONLY
Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

Appx. 0020

**Please send your payment to:**

Wells Fargo Auto
PO BOX 17900
DENVER, CO 80217-7900

**We're here to help**

If you have questions or would like to learn more about available payment methods, please call us as soon as possible at 1-800-289-8004, Monday - Friday, 7:00 a.m. to 9:00 p.m., or Saturday, 7:00 a.m. to 5:30 p.m. Central Time. For customers with hearing or speech disabilities, we also accept telecommunications relay service calls. Or, you can write us at:

Wells Fargo Auto
PO BOX 17900
DENVER, CO 80217-7900

Thank you.

Wells Fargo Auto

**The laws of some states require us to inform you that this communication is an attempt to collect a debt and that any information obtained will be used for that purpose.**



CONFIDENTIAL - ATTORNEY EYES ONLY
Wells Fargo Auto is a division of Wells Fargo Bank, N.A. © 2020 Wells Fargo Bank, N.A. All rights reserved.

1           THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF TEXAS
2                  DALLAS DIVISION

3

BOBBY HARDRICK                )
4                             )
            Plaintiff,        ) CIVIL ACTION
5                             ) NO. 3:24-CV-00014-D
v.                            )
6                             )
WELLS FARGO BANK NATIONAL     )
7  ASSOCIATION; RESOLVION, LLC; )
KEEL RECOVERY, INC.           )
8                             )
            Defendants.       )
9

10

11  *********************************************************

12        ORAL DEPOSITION OF BOBBY HARDRICK, JR.

13       APPEARING REMOTELY FROM DALLAS, TEXAS

14                  JANUARY 23, 2025

15  *********************************************************

16

17    ORAL DEPOSITION OF BOBBY HARDRICK, JR., a witness

18  produced at the instance of the Defendants, was taken in

19  the above-styled and numbered cause on the 23rd day of

20  January 2025, from 9:35 a.m. to 3:02 p.m., before Dawn

21  Baldwin, CSR in and for the State of Texas, appearing

22  remotely from Parker County, Texas, reported by machine

23  shorthand pursuant to the Federal Rules of Civil

24  Procedure.

**EXHIBIT**

**E**

25

Bobby Hendrick
January 23, 2025

```
 1                    A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3
        John C. Hubbard
 4      JOHN C. HUBBARD, LLC
        P.O. Box 953
 5      Birmingham, Alabama  35203
        E-mail: jch@jchubbardlaw.com
 6

 7

 8   FOR THE DEFENDANTS:

 9      Essay Eden
        THOMPSON, COE, COUSINS & IRONS, LLP
10      4400 Post Oak Parkway, Suite 1000
        Houston, Texas  77027
11      E-mail: eeden@thompsoncoe.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Bobby Hardrick
January 23, 2025

3

1            T A B L E   O F   C O N T E N T S
                                              PAGE
2

3   APPEARANCES....................................   2

4

5   BOBBY HARDRICK, JR.

6       Examination by Mr. Eden.....................   5
        Examination by Mr. Hubbard.................. 162
7

8

9   Signature and Changes.......................... 166

10  Reporter's Certificate......................... 168

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              E X H I B I T S

 2   Exhibit      Description                      Page

 3   Exhibit A    Records from Dallas Police Department  66

 4   Exhibit B    911 Call Log                     69

 5   Exhibit C    Body Cam Footage of Officer Eric  95
                  Urquiza
 6
     Exhibit D    Body Cam Footage of Officer     112
 7                Jean-Mario Paillant

 8   Exhibit E    Body Cam Footage of Officer Carter  121
                  Aktabowski
 9
     Exhibit F    Video from Berkshire Medical     164
10                District Apartments

11   Exhibit G    Medical Records                  164

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 0025

Bobby Hardrick
January 23, 2025                                                    5

```
 1                 P R O C E E D I N G S
 2              THE REPORTER:  My name is Dawn Baldwin,
 3    Texas CSR 4906.  I am reporting the deposition remotely
 4    by stenographic means from Weatherford, Texas.  The
 5    witness is located in Dallas, Texas.
 6                 BOBBY HARDRICK, JR.,
 7    having been first duly sworn, testified as follows:
 8                    EXAMINATION
 9    BY MR. EDEN:
10        Q.  Good morning, sir.  My name is Essay Eden.  I'm
11    an attorney for Thompson, Coe.  I represent the
12    defendants, Keel Recovery, Inc., Resolvion, and Wells
13    Fargo Bank National Association.  Do you understand that
14    I am adverse to you today?
15        A.  Yes.
16        Q.  Have we ever met before, sir?
17        A.  No.
18        Q.  Now, we're here to talk about an alleged
19    incident on January 3, 2023 in which you allege you were
20    shot at.  Do you know the incident I'm talking about,
21    sir?
22        A.  Yes.
23        Q.  And does that sound right, if I told you that
24    you alleged in your lawsuit against my clients that the
25    incident occurred on January 3, 2023, would that sound
```

Appx. 0026

Bobby Hendrick
January 23, 2025

```
 1   correct?
 2       A.  Yes.
 3       Q.  Have you ever been deposed before?
 4       A.  No.
 5       Q.  Have you taken any medication today?
 6       A.  My normal medication for my Type II and my
 7   hypertension.
 8       Q.  Have you had any alcoholic beverage today?
 9       A.  No.
10       Q.  Good deal.  Is there any reason today that you
11   would not be able to give true and accurate testimony?
12       A.  No reason at all.
13       Q.  Good deal.  Now, I understand this is your
14   first deposition, so I'm going to go through the ground
15   rules with you.  But before we do that, what is your
16   understanding of what a deposition is?
17       A.  I believe it is to give you some facts and
18   answer questions the opposing attorney for the
19   defendants and get clarity on the alleged claim that
20   happened on January 3rd.
21       Q.  So far so good.  That's about right.  It's a
22   little more than that as well, right?  You just took an
23   oath to tell truth, so it's virtually the same testimony
24   you would give in open court if you were testifying at
25   trial or something like that.  Does that make sense?
```

Appx. 0027

Bobby Hardrick
January 23, 2025

1      A.  It does.

2      Q.  Now, if I ask you a question and you don't

3  understand, will you please let me know?

4      A.  Yes, sir.

5      Q.  You're doing a great job right now, but could

6  you please only give me verbal answers?  It's natural

7  for us to want to nod our heads or shake our heads or

8  say uh-huh or huh-uh, but it makes it difficult for the

9  court reporter to write it down.  Is that okay if you

10  give me verbal answers?

11      A.  That's okay.

12      Q.  And, again, you're doing a great job, but

13  please answer each question I ask you unless your

14  attorney specifically instructs you not to.  Is that

15  okay?

16      A.  Yes.

17      Q.  And if you need a break, will you let me know?

18      A.  Yes.

19      Q.  Now, if you don't tell me that you don't

20  understand my question, I'm going to assume you

21  understood it; is that fair?

22      A.  That's fair.

23      Q.  And, again, so far so good, can you let me

24  finish asking a question before you start answering and

25  then I'll return the same courtesy, I'll allow you to

Bobby Hardrick
January 23, 2025

8

```
 1   finish answering my question before I ask my next one.
 2   Is that okay?
 3        A.   That's okay.
 4        Q.   Could you please provide your full name for the
 5   record, sir?
 6        A.   Bobby Lee Hardrick, Jr.
 7        Q.   Your date of birth is May 26, 1972, right?
 8        A.   Correct.
 9        Q.   You previously lived in Illinois before moving
10   to Texas, correct?
11        A.   Correct.
12        Q.   Were you born in Texas or were you born in
13   Illinois?
14        A.   I was born in Missouri.
15        Q.   Were you raised in Missouri?
16        A.   No.  I was raised in Illinois.
17        Q.   Did you live in Missouri before you moved to
18   Illinois?
19        A.   No.
20        Q.   Have you lived in Illinois your whole life
21   before moving to Texas?
22        A.   Yes.  No, not my whole life before moving to
23   Texas.  That's not accurate.
24        Q.   Where did you live other than Illinois and
25   Texas?
```

```
1        A.  I lived in Oklahoma and I lived in -- I lived

2    in the Washington, D.C. area.

3        Q.  So I think I got that.  I think I got Oklahoma,

4    Washington, D.C. area, Illinois and Texas.  Did I miss

5    anyone?

6        A.  Not that recall.  Iowa.

7        Q.  What is your current address?

8        A.  5811 Savoy Place, Unit 413, Garland, Texas

9    75043.

10       Q.  So I got 5811 Suborn (sic) Place.  How do you

11   spell Suborn?

12       A.  It's S as in Sam, A as apple, V as in Victor, O

13   as in octopus, Y as in yellow, Place.

14       Q.  I got it.  Savoy, S-A-V-O-Y?

15       A.  Yes, sir.

16       Q.  Perfect.  Is that where you were living at the

17   time of the incident made the basis of this lawsuit?

18       A.  No, sir.

19       Q.  Where were you living at the time of the

20   incident, alleged, made the basis of this lawsuit?

21       A.  I was staying 4730 Fairmount Street, Dallas,

22   Texas.

23       Q.  Is that where you lived for the past five years

24   prior to the incident, alleged, made the basis of this

25   lawsuit?
```

Appx. 0030

Bobby Hendrick
January 23, 2025

1      A.  No.  I stayed in Arlington, Texas.

2      Q.  Do you remember the address for that residence?

3  It's okay if you don't.  It's okay.  Yeah, it's -- I'm

4  sure your attorney will tell you -- at least we say this

5  in Texas -- it's not an examination, so I don't want you

6  to be guessing or anything like that.  If you remember,

7  you can tell me.  If you don't -- you know, if you don't

8  remember, that's quite all right too.  Okay, sir?

9      A.  Okay.  I don't remember the exact address.

10      Q.  No problem.  No problem.  I usually tell my

11  clients that you're testifying with personal knowledge

12  of relevant facts, right?  So I just want you to tell me

13  what you do know and not need to speculate or -- you

14  don't have to connect any dots.  This is not -- we used

15  to do that a lot in law school and it was exhausting,

16  I'll tell you that right now.

17      A.  Okay.

18      Q.  So when did you move from Arlington, Texas to

19  that 4730 Fairmount Street residence in Dallas?

20      A.  I would say 2021.

21      Q.  And how do you spell the street name for that

22  residence in Dallas, 4730?

23      A.  F as in Frank, A as in apple, I as in igloo, R

24  as in Robert, M as in Mary, O as in octopus, U as in

25  umbrella, N as in Nancy, T as in Tom.

1      Q.   And that's that apartment complex where you

2   allege the incident occurred, correct?

3      A.   Correct.

4      Q.   What's the name of that complex?

5      A.   Medical District.

6      Q.   Is it Berkshire Medical District Apartments?

7      A.   Berkshire, yes, sir.

8      Q.   I'm not familiar with Dallas.  Is that because

9   it's in, like, the medical district area?

10      A.   Yes.

11      Q.   Got you.  When did you move to Arlington?

12      A.   2014.

13      Q.   What prompted you to move to Arlington from

14   Illinois?

15      A.   I moved from Iowa to Arlington.

16      Q.   What prompted you to move from Iowa to

17   Arlington?

18      A.   Truck driving.

19      Q.   Where did you live prior to Iowa?  Did you move

20   there from Illinois?

21      A.   Yes, from Chicago.

22      Q.   And when did you leave Chicago?

23      A.   Say that again.

24      Q.   When did you leave Chicago?

25      A.   I left -- I need to add Georgia.  In 2008, I

Bobby Hendrick
January 23, 2025

```
 1   went to Georgia.

 2        Q.  That's when I graduated high school, 2008.

 3        A.  Georgia?

 4        Q.  I didn't go to Georgia in high school.  I just

 5   graduated high school in 2008.

 6        A.  2008.

 7        Q.  Yeah, yeah, yeah.  I went to UT, University of

 8   Texas.

 9        A.  Okay.

10        Q.  Yeah.  Go Bulldogs, though.  I don't know if --

11   I don't think you rep the bulldogs.  I don't think you

12   rep Georgia.

13        A.  I don't rep the Bulldogs.

14        Q.  Many Bulldogs don't rep Bulldogs right now.

15   What prompted you to leave Chicago to go to Georgia,

16   work?

17        A.  Children.

18        Q.  Where did you go to high school?

19        A.  I went to John Marshall -- I finished high

20   school at John Marshall in Oklahoma City.

21        Q.  Did you graduate from there?

22        A.  Yes.

23        Q.  What year did you graduate John Marshall High

24   School?

25        A.  1990.
```

1      Q.  That's when I was born.  So you were born in

2  Chicago -- or I apologize, you were born in Missouri and

3  then lived in Illinois or did you live in Oklahoma?

4      A.  Illinois.

5      Q.  What prompted you to go from Illinois to

6  Oklahoma for high school?

7      A.  Just opportunity for a sport.

8      Q.  Did you get any additional education after high

9  school?

10      A.  Yes.  I went to St. Mary of the Plains College

11  in Kansas.

12      Q.  St. Mary's college?

13      A.  Yes.

14      Q.  What did you study?

15      A.  General.  I was there on a basketball

16  scholarship, so I was just in general at the time there.

17      Q.  What years did you attend St. Mary's in Kansas?

18      A.  '90 and went to -- I transferred to Langston

19  University in '91.

20      Q.  And how long were you at Langston University

21  for?

22      A.  I went there roughly two years.

23      Q.  Would it be safe to say '91 through '93 or '90

24  through '92?

25      A.  I would say '90 through '92.

Bobby Hardrick
January 23, 2025

1       Q.  Did you go to Langston for a basketball

2   scholarship as well?

3       A.  I did not.  They do not transfer on a

4   scholarship.

5       Q.  And did you complete a program at Langston

6   University?

7       A.  No, I didn't.  I stopped at '92.

8       Q.  Did you get any other education after that?

9       A.  Yes.  I went to Demarge College.

10              THE REPORTER:  I'm sorry, can you repeat

11   that?

12              THE WITNESS:  Demarge, D as in David, E as

13   in echo, M as in Mary, A as in apple, R as in Robert, G

14   as in George, E as in echo.

15       Q.  (BY MR. EDEN)  Did you complete a program

16   there?

17       A.  Yes.

18       Q.  And what did you study and complete?

19       A.  That was microcomputer technician.

20       Q.  Did you say microcomputer technician?

21       A.  Yes, sir.

22       Q.  Do you currently live by yourself at 5811 Savoy

23   Place, Unit 413, in Garland, Texas?

24       A.  No, sir.

25       Q.  Who do you live with?

Bobby Hardrick
January 23, 2025

```
 1        A.   My spouse.

 2        Q.   Did you say your spouse?

 3        A.   Yes, sir.

 4        Q.   Is it Chellette Corder?

 5        A.   No.

 6        Q.   What is the name of your spouse?

 7        A.   Constance Hardrick, which is C, O as in

 8   octopus, N as in Nancy, S as in Sam, T as in Tom, A as

 9   in apple, N as in Nancy, E as in echo.

10             THE REPORTER:  I'm sorry, it's -- I don't

11   know if I'm the only one having an issue.  It's cutting

12   out.

13             MR. HUBBARD:  No, I didn't get any of that.

14             MR. EDEN:  I think Mr. Hardrick's bandwidth

15   is low.

16             THE WITNESS:  Constance.  Is that a better

17   volume?

18             MR. EDEN:  I think, Ms. Court Reporter, the

19   bandwidth may be a little low for Mr. Hardrick and so

20   it's causing a lot of moments where it freezes.

21             (Technical difficulties.)

22             (Discussion off the record.)

23        Q.   (BY MR. EDEN)  Just to pick up where we left

24   off, we were discussing living with your spouse,

25   Constance Hardrick?
```

Bobby Hardzick
January 23, 2025

```
 1        A.  Yes.

 2        Q.  Constance is spelled C-O-N-S-T-A-N-C-E,

 3   correct?

 4        A.  Correct.

 5        Q.  When did you guys get married?

 6        A.  2023.

 7        Q.  Congratulations.

 8        A.  Thank you.  I'm trying to mute this tablet.

 9        Q.  Yeah.  I'm hearing my own voice.

10                 (Technical difficulties.)

11        Q.  (BY MR. EDEN)  Do you guys have any kids, you

12   and Constance?

13        A.  Yes.

14        Q.  How many kids do you guys have?

15        A.  We have one.

16        Q.  When did you have your child with Constance?

17        A.  26 years ago.

18        Q.  Son or daughter?

19        A.  Daughter.

20        Q.  Good deal.  What's the name of your daughter?

21        A.  Cierra.

22        Q.  Does she live in Texas with you too?

23        A.  No.  She lives in Oklahoma.

24        Q.  Did she go to Oklahoma to be a Sooner?

25        A.  She's from Oklahoma, actually.  I'm assuming
```

1    she's a Sooner.

2        Q.   That's okay.  I don't want to prejudice any

3    potential jurors we may get on the panel, you know what

4    I mean?  I'll keep my opinions about Oklahoma to myself.

5        A.   All right.

6        Q.   Although I will say my favorite quarterback to

7    watch is Baker Mayfield every day of the week, him and

8    Jameis Winston.  Anybody who tells me -- I had a

9    witness, he went to Florida State University.  At least

10   ten minutes of that deposition, we were just talking

11   about Florida State University.

12       A.   Okay.  Okay.

13       Q.   Did you live by yourself at the time of the

14   incident made the basis of this lawsuit?

15       A.   No, sir.

16       Q.   Who did you live with?

17       A.   I stayed with my daughter Asia.

18       Q.   And how do you spell Asia?

19       A.   A-S-I-A.

20       Q.   Did anyone else live with you -- with Asia at

21   the time of the alleged incident made the basis of this

22   lawsuit over at 4730 Fairmount Street?

23       A.   No.

24       Q.   What was the unit you guys were living in in

25   4730 Fairmount?

Appx. 0038

Bobby Hardzick
January 23, 2025

1      A.  4307.

2      Q.  That's also jarring because 4730 and then 4307

3  look a lot alike.

4      A.  Yes, sir.

5      Q.  Have you been married before other than your

6  current marriage with Constance?

7      A.  No.

8      Q.  Are you currently employed?

9      A.  I'm injured.

10      Q.  I am so sorry for coughing over your answer.

11  Did you say you were injured?

12      A.  Yes.

13      Q.  Now, what do you mean by that?  Are you

14  currently employed by folks, but you're not generating

15  any income because you're hurt and currently not working

16  or do you not have an employer?

17      A.  I don't have an employer currently.

18      Q.  Could you describe your injury?  Is it a

19  physical one?

20      A.  Physical, yes.

21      Q.  What happened?

22      A.  First, I pulled my shoulder and elbow on one

23  date, and then 30 days later, a young lady on Texas

24  highways ran into my semi, the back of the trailer.

25      Q.  Did she run into it with a vehicle or did she

Bobby Hardrick
January 23, 2025
19

```
1    physically run into it?
2         A.  She ran into it with a vehicle.  It was in rush
3    hour.  She was going faster than the conditions required
4    and ran into the back of the trailer on the highway.
5         Q.  When was the last time you were employed?
6         A.  September 26, 2024.
7         Q.  Is that also the date of the accident with this
8    young lady in rush hour traffic?
9         A.  The date of the accident was September 24,
10   2024.
11        Q.  And what was the condition of you leaving your
12   employer?  Were you involuntarily terminated or did you
13   voluntarily decide to stop working there?
14        A.  Involuntary.
15        Q.  And who was this employer?
16        A.  DTI Transportation.
17        Q.  Did you say D as in delta?
18        A.  D as in delta, T as in Tom, I as in igloo.
19        Q.  Is that the definition for I?  I actually don't
20   know.  I think you're right.  Is it igloo?
21        A.  Yeah, that's what I say.
22        Q.  I like it.  I'm taking it.  I like it.  Did
23   they give you a reason why they involuntarily let you
24   go?
25        A.  The reason stated unsatisfactory performance.
```

Appx. 0040

Bobby Hendrick
January 23, 2025

1       Q.   My girlfriend got fired from her job.  She's an

2   insurance defense lawyer as well and she got the

3   official reason of why she was let go by the law firm

4   and then, well, of course, with my girlfriend, there's

5   always a different reason, her reason.  Do you feel like

6   you have the same experience?  Do you have maybe an idea

7   or a thought about what a different reason may have been

8   why you were told that you didn't have a job over at DTI

9   anymore?

10      A.   Absolutely.

11      Q.   And what are your thoughts?  Why do you think

12  you were told to leave?

13      A.   What I believe?

14      Q.   Yeah, Bobby, what you believe, sir.

15      A.   Retaliation.

16      Q.   Retaliation for what?  What did you do for them

17  to retaliate against you for?

18      A.   Well, I didn't -- at the time I didn't -- I

19  didn't -- I had an injury on August and then 30 days

20  later had a no-fault accident.

21      Q.   You think they retaliated against you because

22  of your injuries from the August and September injuries?

23      A.   I would say so, yes.

24      Q.   And what were you doing for DTI?

25      A.   I was a truck driver.

Appx. 0041

Bobby Hendrick
January 23, 2025

```
 1      Q.  What was the nature of your relationship with
 2  DTI?  Sometimes folks could be hot-shotters.
 3  Sometimes -- I can tell you right now, my uncle retired
 4  from Shell at 60 years old, 65, and suddenly decides to
 5  start a trucking company.  Some of those folks are
 6  hot-shotters and some of those folks are on the official
 7  payroll.  What was your relationship like with DTI?
 8      A.  I did shuttles, pulling 53-foot trailers,
 9  driving a day cab.  So I pulled a tractor-trailer.  And
10  I also pulled doubles.
11      Q.  Now, folks like myself, Bobby, who never really
12  got into the trucking industry other than, I guess, for
13  the folks that I represent defensively like a lot of my
14  truck drivers, what does it mean to pull doubles?
15      A.  Two 32-inch (sic) trailers.  You saw on the
16  highway where you have like the UPS and the FedEx and
17  they're pulling two trailers instead of one 53-footer.
18      Q.  Got you.  That's what pulling double means.  I
19  understand now.
20      A.  Yeah.
21      Q.  Did you ever try and seek any recourse for this
22  retaliatory termination?  I mean, did you file for
23  unemployment?  Did you reach out to the EEOC or anything
24  like and say, look, guys, I think I got wrongfully
25  terminated from my job?
```

Bobby Hardrick
January 23, 2025

```
 1        A.  I filed for unemployment.

 2        Q.  That claim for unemployment, is that still

 3   pending or has it been already concluded?

 4        A.  When you say pending --

 5        Q.  Are they still trying to find out whether or

 6   not you deserve unemployment benefits?

 7        A.  I've been paid.  I'm actively on unemployment.

 8        Q.  Good deal.  So it's concluded.  They made a

 9   determination that you deserve unemployment benefits?

10        A.  Yes, sir.

11        Q.  And what was the basis behind their conclusion?

12   Did they ever send you anything or tell you anything

13   over the phone or write something to you in the mail?

14        A.  They did mail.

15        Q.  Did they tell you what the reason was behind

16   their conclusion in determining you deserve unemployment

17   benefits?

18        A.  They did.

19        Q.  And what was that reason?

20        A.  The reason said during their investigation,

21   they found that my employer terminated me for other

22   reasons than misconduct.

23        Q.  In other words, you didn't do anything wrong

24   enough for them to fire you, correct?

25        A.  I didn't do -- it wasn't classified as
```

Appx. 0043

1  misconduct, which would disqualify me for receiving

2  unemployment benefits.  So they found that it was a

3  reason other than any qualification for dis -- not

4  qualifying for unemployment.

5      Q.  I see what you're saying.  So then my question

6  was a little overbroad then, right?  At the very least,

7  what they've determined was you haven't done anything to

8  disqualify you from being provided unemployment

9  benefits, correct?

10      A.  Correct.  Correct.

11      Q.  Thank you for clearing that up.

12      A.  You're welcome.

13      Q.  Now, did your employer -- did DTI ever come out

14  and say, hey, look, we think you've performed

15  unsatisfactorily, here are some reasons why, or did they

16  just tell you they're letting you go for unsatisfactory

17  performance?

18      A.  Well, that was stated on the determination

19  letter.  They never had contact with me after that.  But

20  for me to be led otherwise was communication -- text

21  messages between my boss and I led me to believe I was

22  doing an above average job.

23      Q.  Now, let's go and talk about those injuries

24  that you suffered from that you're telling me DTI

25  retaliated against you by terminating you.  There was an

Bobby Hendrick
January 23, 2025

```
 1   August incident where you pulled your shoulder and

 2   elbow.  Do you remember telling me that?

 3        A.  Yes.

 4        Q.  All right.  What date was that?  I know it was

 5   in August 2024, but I may have missed the specific date.

 6        A.  August 24, 2024.

 7        Q.  Wow, 30 days on the dot.

 8        A.  On the dot.

 9        Q.  What happened in August 2024 that led to you

10   pulling your shoulder and elbow?

11        A.  I was delivering freight from FedEx to a FedEx

12   facility in Fort Worth.  And to pull doubles or pups, in

13   truck lingo, you have to have a dolly to connect both

14   trailers to pull.  And the dolly malfunctioned, so I

15   gave it extra efforts to try to disconnect the dolly.

16   They, like, don't want drivers leaving equipment

17   connected.  It slows down the process of getting the

18   freight off the trailer onto the dock and going to its

19   destination.  So I gave it an extra effort and it was

20   still malfunctioning.  I heard a pop and my arm and

21   shoulder started burning.  And that's how that happened

22   on August 24, 2024.

23        Q.  Do you know if DTI is a Texas-based company or

24   is it based elsewhere?

25        A.  Multiple.  Headquarters is Indiana --
```

Appx. 0045

Bobby Hardrick
January 23, 2025

1  Indianapolis, Indiana.  They have a facility in Florida,

2  a facility in Lancaster, Texas.

3      Q.  Got you.  And you were working with the

4  Lancaster, Texas arm of DTI, correct?

5      A.  Correct.

6      Q.  Did they provide workers' comp benefits?

7      A.  They do.

8      Q.  And did you make a claim for workers' comp

9  benefits while you were working for DTI after August 24,

10  2024?

11      A.  I went to the doctor.  They sent me to a

12  workman's comp doctor on August 25th.  I reported.  I

13  finished working through the night and woke up with a

14  swollen arm, just injured.  So I reported it to my

15  supervisor, and they sent me to a workman's comp

16  facility and I went back to work injured.

17      Q.  Do you remember the name of this doctor that

18  you went to?

19      A.  It was CareNow.

20      Q.  Where was this CareNow located?

21      A.  Garland, Texas.

22      Q.  And what did this doctor over at CareNow in

23  Garland, Texas tell you was the reason behind your

24  symptoms, right?  Did he tell you -- did he diagnose you

25  with something and say, hey, look, you've got a shoulder

Bobby Hendrick
January 23, 2025

```
 1   tear or something like that, labrum tear or something

 2   like that?

 3        A.  Not at that moment.

 4        Q.  How would you describe this appointment that

 5   you had with this doctor in Garland, Texas at CareNow on

 6   August 25th?  Would you say that was an initial

 7   consultation like your first appointment with them when

 8   you presented with your complaints?

 9        A.  Yeah, that was the initial -- that was the

10   initial visit.

11        Q.  At the end of this appointment, did he tell you

12   what to do?

13        A.  Yes.  He gave me restrictions.  It was a

14   female.  It was a lady doctor, and she put restrictions

15   and I believe -- I believe, I want to say, some

16   prescriptions for pain at that time and wanted to follow

17   up.

18        Q.  Do you remember the medication that you were

19   taking in order to address the shoulder and elbow

20   injuries you suffered from?

21        A.  The medication that was -- it was -- I want to

22   say some Ibuprofen.  I want to say that.  I'm not for

23   sure.  I don't recall.

24        Q.  When I was in high school -- I think it

25   happened a little sooner than that, but I hurt my back
```

Bobby Hardrick
January 23, 2025

27

```
 1   pretty bad diving in for a tackle and went to a hospital
 2   here in Houston, Texas called Kelsey-Seybold clinics and
 3   got some MRIs done and then the doctor said, I'm going
 4   to prescribe you some stuff.  And he prescribed me a
 5   muscle relaxer because I was dealing with a whole lot of
 6   pain in my low back, but then he also gave me pain
 7   medication, right, something to help manage the pain.
 8   Do you remember if you were prescribed anything like
 9   that, both maybe a muscle relaxer or some pain
10   medication in order to manage the pain?
11       A.  I believe -- I don't believe it was a muscle
12   relaxer that day.  I don't recall.  Let me see.
13       Q.  That's okay.  That's okay.  Like I said, if you
14   don't remember, you don't have to -- we can always, you
15   know, figure it out later in the life of litigation even
16   if it's important or relevant, right, but right now,
17   don't worry, it's not an examination.
18       A.  Okay.  Yeah, I don't recall the exact
19   medicines.
20       Q.  Did they instruct you to follow up with them on
21   a later date?  Did you have to schedule an appointment?
22   I'll tell you right now, going to my dentist is like
23   going to a body shop for my car.  You go in there for a
24   cleaning and suddenly they're setting you up with eight
25   appointments and you need Invisalign.  I'm sure it's
```

1  some type of Invisalign industrial complex thing.  But

2  did they ever tell you to come back and do a follow-up

3  appointment?

4      A.  Yes, they did.

5      Q.  Okay.  And what did they tell you to follow up

6  for?

7      A.  Just to see if -- I guess to see if it's

8  improving to lift the restriction or just to follow up

9  for -- to check on the diagnosis.

10     Q.  Did they tell you that you needed to follow up

11  for any additional examination, maybe some radiological

12  ones like an MRI, CAT scan, EKG or anything like that?

13     A.  Not -- not this -- not at this time, no.  They

14  took x-rays at the -- at the initial visit.

15     Q.  Got you.  And they went over these x-rays with

16  you after they performed the examinations?

17     A.  Yes.

18     Q.  And what did they tell you they found in those

19  x-rays?

20     A.  Well, she could tell my range of motion was

21  limited.  There was some swelling, I believe, no

22  fractures, no broken bones.  That's about the extent

23  that -- the x-ray doesn't magnify the tissue or what an

24  MRI or a CAT scan can see.  So that was what I got at

25  the facility, an x-ray, no broken bones, no fractures.

```
 1        Q.   Other than the physical examination at your

 2   consultation at CareNow on August 25, 2024, and other

 3   than the x-rays that were performed at CareNow on

 4   August 25, 2024, did these providers -- these healthcare

 5   providers perform any other types of examinations on

 6   you?

 7        A.   No, I don't -- I mean, just the basic

 8   examination for the complaint of, you know, shoulder,

 9   elbow, arm, the extent of what she could do on that --

10   with that visit.

11        Q.   How many appointments total did you have in

12   order to address the injury that you suffered from on

13   August 24, 2024?

14        A.   I had the initial visit.  Then I had went to my

15   PCP and back to work.

16        Q.   Who is your PCP?

17        A.   Gary Vollenweider.

18        Q.   Does he practice out of Garland, Texas?

19        A.   No, Dallas, Texas.

20        Q.   Now, this is a completely okay thing if you

21   don't know spelling, but is Vollenweider spelled V as in

22   Victor O-L-L-E-N-W-E-I-D-E-R?

23        A.   Yes.

24        Q.   Does he practice out of Carrollton Regional

25   Medical Center?
```

Bobby Hendrick
January 23, 2025

30

1      A.   No.

2      Q.   Texas Native Health?

3      A.   Yes.

4      Q.   Thank you.

5      A.   You're welcome.

6      Q.   Now, you got the date pretty locked in when you

7   went to CareNow and got treated over at Garland on

8   August 25th.  Do you remember when you went to go see

9   Dr. Vollenweider?

10     A.   August 26th.

11     Q.   I'm guessing the folks over at CareNow gave you

12  the discharge instructions to follow up with your

13  primary care physician?

14     A.   Yes.

15     Q.   And what did Dr. Vollenweider do for you at

16  this appointment on August 26, 2024?

17     A.   Actually, I was able to get back going to work.

18  Excuse me.

19     Q.   Dr. Vollenweider gave you the green light to go

20  back to work?

21     A.   It was his -- I want to say his nurse

22  practitioner.

23     Q.   Did they do any examinations on you separate

24  and apart from the ones that were performed on CareNow

25  on August 25, 2024?

Bobby Hendrick
January 23, 2025

```
 1      A.  Well, my follow-up on that was -- I had COVID
 2  in July, and my appointment was originally for a
 3  follow-up after having COVID.  So I was able to go in
 4  and get a return to work as well as getting followed up
 5  on my COVID.
 6      Q.  What was the primary purpose of going to Texas
 7  Native Health on August 26, 2024?  Was it for feeling
 8  under the weather that was caused by having COVID or was
 9  it for your shoulder and elbow injury from August 24,
10  2024?
11      A.  I had a scheduled follow-up from having COVID
12  and merged the visit.
13      Q.  And did Dr. Vollenweider determine that you
14  were good to go back to work for both your shoulder and
15  elbow injury as well as recovering from COVID?
16      A.  It was his assistant, and I did get a return to
17  work.
18      Q.  Did your nurse practitioner for your primary
19  care physician over at Texas Native Health on August 26,
20  2024 talk to you about your shoulder and elbow injuries,
21  maybe talk to you about what the causes were or what the
22  diagnosis is?  Did they corroborate what the doctor at
23  CareNow said?
24      A.  Actually, they didn't -- it wasn't -- they
25  didn't -- wasn't aware of workman's comp there.
```

Appx. 0052

January 23, 2025

```
1      Q.  Got you.  So you went to Texas Native Health

2  because you already had a standing appointment and then

3  you brought up the shoulder and elbow injury to them

4  after you discussed recovering from COVID with them?

5      A.  My employer was asking for a return to work

6  note with no restrictions.

7      Q.  I understand.  What were your discharge

8  instructions after you finished your appointment over at

9  Texas Native Health on August 26, 2024?  What did they

10 tell you you needed to do?

11     A.  Return to work with no restrictions.  No --

12 no -- no light duty work was available.

13     Q.  Did they prescribe you any medication or

14 schedule a follow-appointment for you?

15     A.  From there, I had an appointment with my

16 provider again.  Actually, from -- within the 30 days,

17 no, I was -- I was working injured, but I had to work,

18 trying to keep my job.  They didn't have light duty

19 work.  So as a working man and -- and to provide, I had

20 to do what I had to do and go to work.

21     Q.  I respect that.  I respect that.  My dad works

22 at a grocery store and he's worked there since, like,

23 2001.  He cut his hand something bad.  Only child.  My

24 mom doesn't work.  With a box cutter, he cut his hand

25 pretty bad.  Workers' comp told him you're good to go
```

1  back to work man, you can go back to work.  And he goes

2  to his own doctor.  The doctor is like, no, man, you

3  need surgery, like, you could do some permanent damage.

4  You cut it so bad there's a little bit of nerve damage

5  there.  My dad said the exact same thing, single income

6  household, went right back to work.

7       A.  Or be put outside.

8       Q.  Exactly, right, or put your family outside.  He

9  risked the use of his dominant hand in order to keep me

10  going.

11       A.  Good man.

12       Q.  I appreciate that.  I try to live up to that

13  example.  It's easy for me to say sitting in my office

14  with heat and stuff, right?

15       A.  I can see that.  Different type of professions.

16       Q.  Man, I'll tell you this, I've got a lot of

17  trucking clients.  I represent a lot of drivers, so I've

18  got to jump into those trucks with them and drive with

19  them, do some inspections.  I've got oil and gas

20  clients.  I go out there on those well sites and I'm

21  like, this is something else.  This is -- it's like

22  something, like, out of a fantasy.  I can't believe

23  human ingenuity engineered this.  It's these huge --

24  they're like seventh, eighth, ninth wonders of the

25  world.  How many appointments total did you have for

```
 1    your injury on August 24, 2024?  I've got a consultation

 2    at CareNow.  I've got an appointment at Texas Native

 3    Health.  Were there any other appointments or any other

 4    treatment you received for your shoulder and elbow?

 5         A.  Before -- before termination?

 6         Q.  At all, just in total for just that August 24,

 7    2024 injury.

 8         A.  So there's no time frame?

 9         Q.  Yeah, no time frame, just for the injuries you

10    suffered from -- related to your shoulder and elbow.

11         A.  Yeah, there's multiple doctors' appointments,

12    therapy, physical therapy, that is.  Like I said, I'm

13    still injured, so I do get medical treatment for these

14    injuries.  So yes, for August 24, 2024, I am still being

15    treated for that.

16         Q.  Got you.  Did anyone ever tell you that you're

17    going to need a surgery or placed on disability or that

18    you're impaired or anything like that as it relates to

19    the injuries you suffered from on August 24, 2024?

20         A.  The day before yesterday I was in the

21    orthopedic's office, and being that he was able to --

22    I've been in physical therapy since October 15, 2024.

23    I'm currently in physical therapy.  The injuries are

24    progressing.  So he had a check mark list that he was

25    able to -- I got the shots, physical therapy all the way
```

January 23, 2025

```
 1   up until he couldn't check off anymore right before
 2   surgery.  So he did request surgery on my shoulder.
 3   There's a couple of tears in there on the rotator cuff
 4   and the tendon.
 5        Q.  Got you.
 6        A.  Along with my elbow, there's a couple of tears
 7   in there as well.
 8        Q.  Now, I want to talk to you about the injury you
 9   suffered from on September 24, 2024.  Do you understand
10   which incident I'm wishing to talk about?  Mr. Hardrick,
11   are you still there?
12                MR. EDEN:  I think we may have -- I think
13   we may have lost Mr. Hardrick.  If we could take a short
14   break for five minutes.
15        A.  Yeah, can you hear me?
16        Q.  (BY MR. EDEN)  I can hear you now.  Okay.
17   Good.  Good deal.
18        A.  Can you hear me?
19        Q.  Yes, sir, we're good.
20        A.  Okay.  All right.
21        Q.  Now, I want to talk to you about the injuries
22   you suffered from on September 24, 2024.  Is that okay?
23                (Technical difficulties.)
24                MR. EDEN:  I think we may need to go off
25   the record for a few minutes.
```

Bobby Hardrick
January 23, 2025
36

```
 1                    MR. HUBBARD:  Yeah.

 2                    MR. EDEN:  Sorry, Guys.

 3               (Break taken from 10:32 to 10:41.)

 4     Q.  (BY MR. EDEN)  Mr. Hardrick, before we took our

 5   break, we were starting to talk about the injuries

 6   you're alleging you suffered from on September 24, 2024.

 7   Do you know the incident that I'm wishing to discuss?

 8     A.  It just went blank.

 9     Q.  I'm sorry?

10     A.  My -- let me see, start video.

11                    MR. HUBBARD:  We can still hear you.

12     Q.  (BY MR. EDEN)  Yeah, I can still hear you.  We

13   can still talk about it.

14     A.  Okay.  Yes, I do.

15     Q.  Good deal.  Good deal.  You described that as a

16   car accident where a young lady during rush hour traffic

17   ran into your semi truck.  Does that sound like an

18   accurate description of how the accident occurred on

19   September 24, 2024?

20     A.  That is what the police report reads, yes.

21     Q.  Good deal.  You already anticipated my

22   question.  Did the police come out and investigate the

23   crash?

24     A.  Yes.  Actually, the sheriffs because it was in

25   the Dallas County -- in the portion of Dallas on the
```

Bobby Hardzick
January 23, 2025

```
 1  highway -- interstate.
 2      Q.  Got you.  And what vehicle were you operating?
 3  I mean, was it your semi truck or was it another one?
 4      A.  Company truck.
 5      Q.  Were you working at the time of the accident?
 6      A.  Yes.
 7      Q.  What time of day was the accident?
 8      A.  Beginning of rush hour, I want to say between
 9  maybe 3:30, 4:00 p.m.
10      Q.  And you anticipated my next question because
11  there's usually two clusters of rush hour traffic,
12  right?  There's the morning rush hour traffic and then
13  the afternoon one, or if you live in Houston --
14      A.  All day.
15      Q.  -- just the entire day.  Yeah, exactly.
16  Exactly.  But, hey, just between us boys, it's what
17  keeps guys like me and your attorney still in business.
18  Do you know what I mean?
19      A.  All right.
20      Q.  All right.  So how was traffic that day?  I
21  mean, I understand it was rush hour traffic, but was it
22  stop and go?  Were cars able to go with the flow of the
23  speed limit or how was the traffic?
24      A.  Traffic that day, I was going roughly 32, so --
25  we were coming over a hill on the downgrade on I-20, so
```

1    I would say you had to pay attention.  You had to, you

2    know, be cautious and give yourself some room and drive

3    accordingly.  So it was rush hour, of course.

4         Q.  You guys were traveling on I-20?

5         A.  Yes.

6         Q.  Good deal.  And did the accident happen while

7    you were approaching an intersection?  Were you on the

8    highway or were you on what we call in Houston a feeder

9    road?

10        A.  I was on I-20 in the slow lane, the merging --

11   the lane merging off the feeder road.  But there was

12   no -- no merge right there.  It was just straight

13   highway.

14        Q.  Okay.  Do you know the name of the individual

15   who hit you?

16        A.  I have the -- it's on the police report.  A

17   young lady, 19 -- a 19-year-old young lady.

18        Q.  Do you know what vehicle she was driving?

19        A.  It was a Volkswagen.

20        Q.  Do you know what type of vehicle it was?  Was

21   it an SUV, a sedan, a hatchback?

22        A.  I would say a sedan, four-door sedan.

23        Q.  What lane was she traveling in when she

24   collided with your vehicle?

25        A.  The slow lane.  The outside lane.

Bobby Hendrick
January 23, 2025

```
 1        Q.   What lane were you occupying when the collision
 2   occurred?
 3        A.   The same lane.
 4        Q.   Did she rear-end you?
 5        A.   Yes.
 6        Q.   Were you pulling doubles at the time?
 7        A.   53-foot empty, thank God.
 8        Q.   Empty?  Yeah.
 9        A.   Yes.
10        Q.   When did you first notice her vehicle?  Was it
11   upon impact or did you notice it before?
12        A.   She was behind me.  As I said, we was coming
13   over a hill, so I was on the downgrade.  I first noticed
14   the vehicle when she ran into the trailer.
15        Q.   Got you.  So the first time you noticed her was
16   upon impact when she rear-ended you?  It's not like you
17   noticed her moments before or minutes before or anything
18   like that?
19        A.   Well, yeah, I noticed -- when you're coming
20   over -- a truck driver, you know all around your -- you
21   know, the head is on a swivel.  So you use your Smith
22   System.  So you know everything around you.  As I said,
23   I -- at that precise direction going west on I-20 coming
24   over a hill, so I'm pretty sure she didn't see the semi
25   and was just doing highway speed at the time, came over
```

1    the hill.  It was like the young lady stated in the

2    police report, she was going too fast for the

3    conditions --

4         Q.  (BY MR. EDEN)  That makes perfect sense.

5         A.  -- and couldn't stop.

6         Q.  That makes perfect sense.  And right now I'm

7    mostly on a fact-finding mission just to understand the

8    nature of the mechanism of the injury.  This is not a

9    car wreck case, so I'm not trying to, you know, dress up

10   any sort of liability on your part in terms of the car

11   accident.  Do you understand that?

12        A.  Right.  Right.  Right.

13        Q.  Good deal.  Good deal.  And I represent plenty

14   of truck drivers where -- even my own experience,

15   sometimes cars are changing lanes real fast, so even if

16   I'm looking in my rearview mirror before I apply my

17   brakes, there may not be a car there.  And just the

18   other day, I just watched a car just zoom right behind

19   an 18-wheeler really quickly.  It's a miracle that she

20   didn't hit this semi.  So I just wanted to understand

21   how much you knew about maybe the velocity of her

22   vehicle, the speed of it, and whether or not she looked

23   like she was braking suddenly.  I really just want to

24   unpack what you have personal knowledge of, right, what

25   you saw, what you heard, maybe tires screeching, all

Bobby Hardrick
January 23, 2025

1   that type of stuff.  From my understanding, what you're

2   telling me is that you first noticed her vehicle upon

3   impact.  I mean, you can't tell me how fast she may have

4   been going or anything like that because when you went

5   over that hill, the next thing you know, you got hit by

6   this Volkswagen, correct?

7       A.  Correct.  We have an in-cab camera, so you know

8   the velocity was pretty fast if you can hear 72 feet

9   back from a automobile, a four-wheeler, opposed to an

10  18-wheeler going downhill.  So I was empty.  That's why

11  I say thank God I was not empty because she wouldn't

12  have been able to move that 18-wheeler forward just as

13  much as she did.  But you can hear the impact all the

14  way up in the driver's seat of the truck, which is --

15  I'm operating the truck.  I mean, it's just amazing

16  how -- it sounded like she was in the cab.  That's how

17  hard she hit the -- the trailer.  But the DOT bumper did

18  its job and didn't let her go underneath the trailer,

19  which was another --

20      Q.  Miracle?

21      A.  Yeah, there you go.

22      Q.  That's the reason why I asked if you were

23  pulling doubles, because the way you're describing it,

24  I'm surprised she didn't get crushed by rear-ending you.

25      A.  Well, the DOT bumper did what it was supposed

Bobby Hendrick
January 23, 2025

1    to do.  And if I would have been loaded, then she

2    wouldn't have been able to move -- it would have been a

3    resistance on the DOT bumper because she wouldn't have

4    been able to push the -- the semi forward and especially

5    going down a hill.  So at that -- going down that

6    decline, she's coming over a hill fast, so it's more

7    velocity than just being on a straight road opposed to

8    the forces of going down the hill.

9         Q.  Did you call 911 or did someone else call 911?

10        A.  I called 911.  I called my safety guy.  And the

11   young lady and her passenger, they actually got out of

12   the car and came to the semi.  And I was concerned

13   because -- I drive trucks, so I know the -- the protocol

14   of when you have an accident.  So I asked them why are

15   they out of the car, they should be sitting in the car

16   waiting for emergency services to come and -- because

17   they could be hurt and hurt themselves more trying to,

18   you know, do unnecessary movements.  So that's what I

19   replied to them, and they went and got back in their

20   vehicle.  So to answer your question, I did dial 911 and

21   emergency -- the EMS came out along with the Dallas

22   Sheriff's Department.

23        Q.  Who all showed up at the scene?  Was it just

24   the police or ambulance showed up, fire department?  Who

25   all showed up to the scene?

Bobby Hendrick
January 23, 2025

1          A.   Dallas -- all of it -- all of the above,

2     sheriffs -- Dallas sheriffs, Dallas EMS, Dallas fire

3     department.

4          Q.   Were you injured as a result of the accident?

5          A.   Yes.

6          Q.   Were you --

7          A.   I had suspenders on instead of a safety vest

8     along with the seat belt.  So it -- the seat belt did

9     its job.  The suspenders did more damage than -- than

10    just being visible for sight, per se, on -- you know, in

11    the work way as far as on a yard or -- you know, you're

12    supposed to have safety vests.  We wore suspenders

13    instead of the whole vest itself.  So being pushed

14    forward, the seat belt and the suspenders restrained me

15    as it was supposed to do, so I did receive injuries.

16         Q.   Were you ambulanced to a hospital?

17         A.   I was.

18         Q.   What hospital were you ambulanced to?

19         A.   I went to United Methodist Dallas.

20         Q.   What were your complaints?  What did you tell

21    them you were suffering from?

22         A.   I was -- I was hurt.  Of course, you know that

23    I was already injured from my shoulder, elbow and being

24    restrained forward because, you know, the seat belt

25    comes over the left shoulder, locks in at your right

Bobby Hardrick
January 23, 2025

```
 1  thigh in the driver's seat.  So with that being said,
 2  being restrained from the forward motion, pulling me
 3  back, it grabbed my back and my neck and my elbow.  So
 4  that's it.
 5      Q.  I'm sorry, I don't think I asked a very good
 6  question.  When I asked that question, I meant like what
 7  body parts did you get injured.  So I understand you
 8  already hurt your shoulder and your elbow.  Did you also
 9  injure any additional body parts, maybe your neck, your
10  back, your head, anything like that?
11      A.  Neck and back.
12      Q.  Is that what you told them at United Methodist
13  in Dallas?
14      A.  I believe.  It should have been.  That's what
15  it was.  That's what I felt.
16      Q.  I promise you, sir, I'm not going to be trying
17  to get you in any gotcha moments.  So I'm not -- I know
18  they do that a lot.
19      A.  I'll tell you what, I'm only speaking facts.
20      Q.  I think -- I'm going to guess what you just
21  said because you broke up.  I think you said you're only
22  speaking facts?
23      A.  Only speaking facts and that -- that if I don't
24  recall, I don't recall.  But I'm going to -- I'll answer
25  if I have the answer.
```

1     Q.  Perfect.  Perfect.  Did you hurt anything else

2  other than your neck and back?  Did you say you hurt

3  your head as well or anything else?

4     A.  You know, it was an accident, so you're

5  frightened, you're in shock and you can only feel what

6  hurts.  So my initial complaints was that that I spoke

7  of, the neck, the back, my arm was already hurting,

8  shoulder.  So it was just -- and that was 30 days old.

9  And mind you, I was already working injured from the

10  August 24th accident.  So I didn't really get any

11  treatment on the shoulder and the elbow.  So yeah.

12     Q.  Did they perform any type of --

13     A.  That compounded it all together.

14     Q.  Got you.

15     A.  Excuse me?

16     Q.  Did they perform any radiological examinations

17  on you like they did on August 25th?

18     A.  Yeah, they did an x-ray.

19     Q.  Did they do anything else other than an x-ray?

20     A.  No.  They gave me some -- actually, the -- they

21  were shorthanded, so a lot of patients in the emergency

22  room with very limited personnel.  So they didn't give

23  me my prescription right away.

24     Q.  Okay.  Did they ever sit down with you after --

25     A.  It just went out.  Okay.  Say that again.

Bobby Hardzick
January 23, 2025

1      Q.  After they finished performing their

2   examinations with you, did they ever sit you down and

3   talk to you about what -- they told you they think is

4   going on and maybe the results or anything like that?

5      A.  As I said, they were shorthanded, so it was

6   like a -- you know, you go to a restaurant, fast-food

7   and it's a drive-thru.  You went through the drive-thru

8   because you kind of wanted to get out of the -- you

9   didn't want to go sit down in the restaurant and eat.

10  It was kind of like a drive-thru.  They were shorthanded

11  again.  So I got a drive-thru diagnosis and told to

12  follow up with my PCP.

13     Q.  Got you.  And were those all the instructions

14  you were provided?  Did they tell you to go follow up

15  with your PCP?  Did they not tell you to do anything

16  else, maybe prescribe you some medication?

17     A.  It was -- I had to call back.  You know, when

18  you go to an emergency room, it's a temporary diagnosis.

19  So they're going to -- if you're in pain, they're going

20  to prescribe you something for pain.  If you're

21  inflamed, they're going to give you something for

22  inflammation and some instructions, ice it, heat it, and

23  what not to do or the combination of taking interacting

24  drugs.  It's just a short visit to diagnose -- or check

25  to make sure you're not in an emergency situation and

Bobby Hendrick
January 23, 2025

47

```
 1    need help right away.

 2        Q.  Got you.

 3        A.  So it was just a regular, routine emergency.

 4        Q.  Did you follow up with your primary care

 5    physician, Dr. Gary Vollenweider?

 6        A.  September 6th, I went in.

 7        Q.  I'm sorry, did you say September 6th or October

 8    6th?

 9        A.  6th.  No, October 6th, I'm sorry.

10        Q.  No, you're good.

11        A.  Correct, October 6th.  I went in and we had a

12    two-week follow-up.  I go to the doctor regularly, so

13    it's not strange for me to be -- go to a doctor.  I make

14    sure that my -- I'm very well controlled in my diabetes

15    and my hypertension, so I come to the doctor routinely.

16        Q.  Did you follow up with your primary care

17    physician at Texas Native Health on October 6th because

18    you were told to by United Methodist after the accident

19    on September 24, 2024?

20        A.  I would say so.  I believe so.

21        Q.  And you reported those injuries that you

22    reported to at United Methodist as a result of the

23    September 24, 2024 accident at Texas Native Health,

24    correct?

25        A.  Correct.
```

1     Q.   And you told them you hurt your neck and your

2  back?

3     A.   Yeah.  I told them I was in an auto accident.

4  I showed them the video so he could see about where the

5  restraining -- you know, being thrown forward and then

6  restrained backwards.  So he can pretty much

7  visualize -- see the visualization of the accident.  And

8  from there, he asked me about my injuries from, you

9  know, August.  So he referred me to physical therapy.

10  But at this moment, I was denied through workman's comp

11  on the -- on the injury.

12     Q.   Yeah, both injuries were while you were

13  working?

14     A.   Right.  Right.  But this is a big -- that's

15  you-all's job.  I know.  But I was only able to get -- I

16  was only able to get medical treatment under workman's

17  comp up until October 5th.  And then they said that I

18  should have been healed in six to eight weeks, so

19  they're only going to allow me to go to the doctor

20  October 5th -- up until October 5th.  So I literally had

21  to, you know, go to my PCP, go to the physical therapist

22  and get referred to the specialist on my own.

23     Q.   And that was what I was going to ask next.  Did

24  you complete that physical therapy program even though

25  your workers' comp was denied?

1        A.   I'm still in physical therapy.

2        Q.   Got you.  And who is that specialist that you

3   were referred to?

4        A.   I was referred to Ali Ashraf.

5        Q.   Ali Ashraf?

6        A.   Yes.

7        Q.   Dr. Ashraf?  Okay.

8        A.   Dr. Ashraf from Baylor Scott & White.

9        Q.   Yeah.

10       A.   And that was from my PCP.

11       Q.   Yeah.  Are you still treating with Ali Ashraf

12   over at Baylor Scott & White Health?

13       A.   Now I'm actually getting to the point where now

14   the workman's comp is starting to come into play, so --

15   because they had to -- they had to reopen the case from

16   August and they had to backtrack, workman's comp did.

17   So they had to reopen the case, and they're taking

18   responsibility for the shoulder and the elbow and saying

19   that they don't take responsibility for the accident.

20   So --

21       Q.   Got you.  But they're taking care of you now?

22   They're able to go retroactively and provide you

23   workers' comp benefits to continue to treat with

24   Dr. Ashraf?

25       A.   Well, that -- that's the plan.  Well, I'm

Bobby Hendrick
January 23, 2025

50

```
 1   actually going to a workman's comp doctor.  Dr. Ashraf
 2   and Baylor Scott & White, as I said, that was from my
 3   personal care -- PCP.  So I had to -- with them denying
 4   me, I had to go get treatment on my own.
 5        Q.  Got you.  I understand.  And did either Dr. Ali
 6   Ashraf or the workers' comp doctor ever tell you you're
 7   going to need any sort of interventional treatment like
 8   a surgery or procedure to address these injuries from
 9   September 24, 2024?
10        A.  Well, I was -- I was sent to -- my workers'
11   comp doctor referred me to an orthopedic that's
12   workman's comp and basically put in a request to get --
13   go in and repair my shoulder.
14        Q.  Got you.  Any other referral for anything else,
15   maybe your neck or your back?
16        A.  Yeah.  I have a referral coming up in February.
17        Q.  And what procedure is that for?
18        A.  That's just to go over my -- my -- my back,
19   neck.
20        Q.  I'm sorry if I didn't ask good enough of a
21   question.  My question was, have you been referred for
22   any type of procedure or surgery for your neck or your
23   back?
24        A.  No, I haven't.
25        Q.  Got you.  Perfect.
```

January 23, 2025

```
1        A.   I've been referred to a pain management.   Like

2   I said, this is all not on workman's comp.   But I have a

3   future appointment in February to a neurosurgeon that's

4   workman's comp.   So everything is being backtracked

5   because, like I said, it's just -- that's where we are

6   now in the situation.   I was injured.   I have to get

7   healed.

8        Q.   Yeah, I completely understand.   I appreciate

9   your explanation.   I'm much less concerned about who

10  will be providing the benefits or paying for the

11  treatment.   I'm much more concerned about what treatment

12  these professionals are telling you you will be needing.

13  Do you understand the distinction that I'm trying to

14  make, sir?

15       A.   Right.   Right.   Right.   I understand --

16       Q.   Good deal.

17       A.   -- the financial and then the medical.

18       Q.   Correct.   I'm focused on the medical, right?

19  So this referral that you've gotten for a pain

20  management doctor and for a neurosurgeon, what symptoms

21  are they referring you to address?   Is that for your

22  neck and your back?

23       A.   Yeah, the neuro is, of course -- the ortho is

24  for extremities, and the neuro is for, you know,

25  internal, the spine, thoracic, lumbar, cervical, neck,
```

Bobby Hardrick
January 23, 2025
52

```
 1   things of that nature, the central nervous system, you

 2   know, trauma.

 3        Q.  Did you open an injury claim against this young

 4   lady?

 5        A.  Their -- their -- their insurance took

 6   responsibility already.

 7        Q.  Did you have to hire a lawyer or file a lawsuit

 8   for that to happen?

 9        A.  Yeah, I did.

10        Q.  Okay.  Do you remember the name of that law

11   firm or the name of your lawyer?

12        A.  Schuerger & Shunnarah.  I got a call from --

13   are you familiar with C-A-V-R?

14        Q.  C-A-V-A-R?

15        A.  C-A-V-R.

16        Q.  C-A-V-R?  No, I am not.

17        A.  It stands for Constitutional Advocate for

18   Victim's Rights, and I received a phone call and I was

19   confused, asking them how did they get my number and how

20   did they know about this because it just recently -- it

21   just happened.  And this was just like -- called me,

22   asked me could they -- actually, I wasn't even -- if I

23   could have went back to work September 26th, I would

24   have went back to work.

25        Q.  Mr. Hardrick, I don't mean to interrupt you.  I
```

January 23, 2025

1    apologize for interrupting you, but I want to make it

2    clear that I do not want you to answer any of my

3    questions with any conversations you may have had with

4    your current attorney or any other attorney that you

5    currently have representing you.

6        A.   Okay.

7        Q.   Do you understand that instruction, sir?

8        A.   Right.  Right.  Yes.

9        Q.   Good deal.  And it's the same thing -- I used

10   to be a plaintiff's lawyer.  I used to represent folks

11   who get into car wrecks and trucking accidents and then

12   somehow I found myself on the other side of the V

13   representing the folks driving those trucks, and I tell

14   everybody that exact same thing.  Any question that I

15   ask -- I should have told you this at the beginning of

16   the deposition, so that's a failure on my part.  That is

17   not in any way whatsoever a failure on yours.  But if I

18   ask you any questions, it may be answered by telling me

19   the substance of the conversations with your attorneys,

20   but I want you to know that is not allowed.  Okay, sir?

21       A.   Sure.

22       Q.   Good deal.  Good deal.  Good deal.  Now, all I

23   want to know, without knowing the substance of the

24   conversations between you and your attorneys, the name

25   of that attorney if you have that available for you.

Bobby Hardrick
January 23, 2025
54

1          A.  Schuerger & Shunnarah.

2          Q.  How do you spell -- did you say Schuerger &

3     Shunnarah?

4          A.  Schuerger.  I want to say it's S-H-R-U-E-G-E-R

5     (sic), Schuerger.

6          Q.  Got you.  Got it.

7          A.  Shunnarah is S-H-U-N-N-A-R-A-H, I believe.

8          Q.  Yeah.  I found it.  Schuerger Shunnarah.  Does

9     it look like these guys right here?

10          A.  Screen sharing.  Are they out of Alabama?

11          Q.  No, they're out of Houston, Texas.

12          A.  They have -- they're in 50 states, so I'm sure

13     that would be --

14          Q.  It looks like it.  Yeah, they've got Alabama

15     here, Alaska.  Good deal.

16          A.  Yes.

17          Q.  I was wondering.  I was like, I've never heard

18     of these folks before.  But it looks like a majority of

19     them are out of -- I think they've only got one Texas

20     attorney, Edward Pollard.  Is that the attorney you were

21     working with?

22          A.  Yes.

23          Q.  Gosh, I miss being a plaintiff's lawyer.  Don't

24     tell my boss I said that.  So do you remember if you had

25     to file a lawsuit as a result of that September 24, 2024

Bobby Hendrick
January 23, 2025

1    accident?

2        A.  I didn't.  I don't believe we filed a lawsuit.

3        Q.  Got you.  You were just able to make a claim

4    and then they took care of it for you?

5        A.  I haven't received anything.

6        Q.  And I think you told me their insurance took

7    care of it?

8        A.  Well, they've accepted responsibility --

9    liability.

10       Q.  I see.  I see.  Have you been compensated yet

11   for anything as a result of that claim?  Did you say,

12   hey, man, my truck is messed up or I'm hurt, you need to

13   pay my bills?

14       A.  No.

15       Q.  Got you.  Have you had to do anything like this

16   for that September 24, 2024 accident?  Have you ever had

17   to sit down and speak with some other attorney?

18       A.  Sit down and speak with some other -- are you

19   talking about in-person, audibly?

20       Q.  What we're doing right now, like take a

21   deposition.

22       A.  Oh, no, sir.

23       Q.  Where were you working prior to working for

24   DTI?

25       A.  I was working for Platinum Drivers.

1              THE REPORTER:  I'm sorry, can you repeat

2    that, please?

3              THE WITNESS:  Platinum Drivers, like

4    platinum, gold.

5        Q.  (BY MR. EDEN)  How long were you working at DTI

6    for?

7        A.  It was coming up on my one year.

8        Q.  Were you working for DTI on January 3, 2023?

9              MR. HUBBARD:  Can't hear you, Bobby.

10       A.  '23?  No.  No, I wasn't.

11       Q.  (BY MR. EDEN)  Were you working for Platinum

12   Drivers?

13       A.  January 3, 2023?

14       Q.  Yes, sir.

15       A.  Is that the date of the accident?

16       Q.  Yes, sir.

17       A.  No.

18       Q.  Who were you working for on January 3, 2023?

19       A.  No, I was not working for -- JCTL Trucking.

20       Q.  How long were you working for Platinum Drivers?

21   Mr. Hardrick, did you hear my question?

22       A.  Yeah.  I believe one year.

23       Q.  What was your specific job title or role at

24   Platinum Drivers?

25       A.  I was working for -- a dispatch job for Garland

Bobby Hardrick
January 23, 2025

```
 1   Steel.
 2       Q.  And what prompted you to leave Platinum Drivers
 3   and to join DTI?
 4       A.  My father was ill, and we --
 5               (Technical difficulties.)
 6               THE REPORTER:  I'm sorry, Mr. Hardrick, can
 7   you hear me?  I didn't understand anything after "my
 8   father was ill."
 9               THE WITNESS:  Yes, I hear you.
10       A.  We were just trying to --
11               (Technical difficulties.)
12       Q.  (BY MR. EDEN)  Mr. Hardrick, could you repeat
13   your question -- or answer?
14       A.  Yeah.  Transitioning from his home into an
15   assisted living center in Oklahoma City, Oklahoma.
16       Q.  Got it.  So Platinum Drivers was an Oklahoma
17   business?
18       A.  No, Texas.
19       Q.  Were you working in Oklahoma for Platinum
20   Drivers while you were staying in Oklahoma?
21       A.  No, I was living in Texas.  My father was in
22   Oklahoma.  We were transitioning him to an assisted
23   living center so he wasn't living alone.  So I was
24   having to travel back and forth from Texas to Oklahoma
25   during this -- taking care of my father.
```

Bobby Hendrick
January 23, 2025

```
 1        Q.   Why did that require you to leave Platinum
 2   Drivers?
 3        A.   Because they needed -- I was the only driver
 4   there and they needed a driver to perform their everyday
 5   duties, and I was not able to be there every day as far
 6   as taking care of my father out of town.  They needed --
 7   they needed a driver for everyday duties at that time.
 8        Q.   Understood.  Did you resign or did they
 9   involuntarily let you go?
10        A.   No, they just asked --
11             (Technical difficulties.)
12        A.   Well, they ended the assignment is what they
13   did.
14             MR. EDEN:  I didn't get that either, ma'am.
15        Q.  (BY MR. EDEN)  Could you repeat your answer?
16        A.   Can you hear me?  I said that they ended the
17   assignment.  They ended the assignment.
18        Q.   Got you.  They ended the assignment.  What do
19   you mean by that?  Was it a contract job?
20        A.   It was basically an agency -- driving agency.
21        Q.   But you were not fired, correct?
22        A.   They just said they ended the assignment.
23        Q.   Are you in any position to testify today --
24        A.   They needed a driver that was there.
25        Q.   Good deal.  I think I understand.  Are you in
```

Bobby Hardzick
January 23, 2025

```
 1   any position to testify today one way or the other if
 2   you were fired or not?
 3        A.   They just worded it they ended the position and
 4   they were looking for other -- I guess other accounts.
 5   So they were looking for other accounts.  I don't
 6   believe they would have terminated me.  They just ended
 7   that position.  That's how the driving agencies work.
 8        Q.   Got you.  Got you.  That position, that job,
 9   that role was no longer available for Platinum Drivers
10   is what you're telling me?  It's not like they said,
11   hey, man, I'm firing you?
12        A.   They had -- they had filled that seat with
13   another driver to do their daily functions.
14        Q.   I understand.  And for JCTL Trucking, how long
15   were you working for them?
16        A.   Two years.
17        Q.   What was your specific job title or role at
18   JCTL Trucking?
19        A.   That was over the road.
20        Q.   Is that the specific job title, over the road?
21   Is that what they call it?
22        A.   OTR, over the road.
23        Q.   How did you find the job?
24        A.   I ran -- that was my company.
25        Q.   Oh, you ran the company.  That JCTL is your
```

January 23, 2025

1    business?

2        A.  It was a one -- one truck owner.

3        Q.  How was it formed?  Were you a hot-shotter when

4    you were working at JCTL or is that incorporated?

5        A.  No, it was an LLC.

6        Q.  An LLC.  Got you.  So I've got four years'

7    worth of employment.  What about one more year?  Where

8    were you right before JCTL Trucking?

9        A.  USA Trucking.

10       Q.  And how long were you working at USA Trucking

11   for?

12       A.  Roughly two years, I believe.

13       Q.  And then same question, what was your job title

14   or role at USA Trucking?

15       A.  That was contracting.  It was basically 1099

16   work.  So we could use their load board, use their DOT

17   number, their MC number.  That was just contract work.

18   But, basically, I was an independent contractor with --

19   under their authority.  Does that make sense?

20       Q.  That makes perfect sense.  So you were pretty

21   much paid by the load?  In other words, like eat what

22   you kill kind of?

23       A.  Yeah.  We would have access to their load

24   board, which was their loads, pulling their equipment.

25   Basically, we could route ourselves off of their load

Appx. 0081

Bobby Hendrick
January 23, 2025

1  board and it's paid per -- paid per -- I guess it would

2  be -- it would show per mile.  But that's how the load

3  board read.

4      Q.  Got you.  And same question, I'm guessing you

5  were not involuntarily terminated from USA Trucking,

6  correct?

7      A.  Correct.  No.

8      Q.  I'm guessing you stopped working at USA

9  Trucking so you can go do what we all strive for,

10  self-employment, right?  You went to go start JCTL

11  Trucking?

12      A.  Yeah, JCTL.

13      Q.  Perfect.  Now, did you have to get any special

14  training or sort of technical degree to do any of the

15  jobs that you've ever been employed for?

16      A.  Special training?  I would say we had to take

17  orientation classes.  We had to take defensive driving,

18  which was getting a Smith System certificate.  I went to

19  school initially to get my CDL, so I was -- when I first

20  started driving, I had to go to school to get my CDL.

21      Q.  Yeah.  And I think that's what I was going

22  towards, right, trying to understand what it took for

23  you to be able to do the work that you've been doing.

24  Part of that, like we already know, is to maintain and

25  hold a commercial driver's license.  So what you're

```
 1  telling me is you went to school for that, correct?

 2       A.  Yeah, I went to a community college --

 3       Q.  Got you.

 4       A.  -- in Iowa.  That's what I was in Iowa doing.

 5       Q.  Perfect.  How many hours a week do you normally

 6  work?

 7       A.  On the trucking industry?

 8       Q.  Yeah.

 9       A.  That varies per day.

10       Q.  It's got to be consistent -- it's got to be

11  consistent with the Federal Motor Carrier Safety Act,

12  right, at the very least?  That's what I tell my

13  truckers.

14       A.  Yeah.

15       Q.  That's what I tell my truckers.

16       A.  Yeah.  You're going to do no more than 70 hours

17  without a 48-hour -- a 34-hour reset.  So it's just day

18  to day, week to week varied.  I mean, depending on the

19  loads and -- yeah, I would say that, no more than 70 in

20  a week.

21       Q.  On the week of the incident you're alleging

22  made the basis of this lawsuit, do you remember exactly

23  how many hours you had been working that week?

24       A.  I was working -- I was team driving at the

25  time, so we'd get -- team driving, you don't really
```

Bobby Hardrick
January 23, 2025
63

```
1  have -- you have one clock -- two clocks.  So I would

2  say that -- we came from Chicago.  So that's not a lot

3  of drive time, more than -- I would say that would

4  probably be less than 40.

5       Q.  Do you work just weekdays or do you work on the

6  weekends as well?

7       A.  At what time?  What period of time are you --

8       Q.  When you were working as a solo driver for JCTL

9  Trucking.

10      A.  That varied.  It depended what the load was

11  like.  We could work weekends and weekdays.  There was

12  not a set schedule for off days.  I didn't have a set

13  schedule, no.

14      Q.  I'll represent to you that January 3, 2023, the

15  date that you're alleging this incident occurred in your

16  lawsuit, was a Tuesday.  Does it sound accurate to say

17  that you had been working and driving over the weekend

18  for that specific job -- for that specific haul?

19      A.  Let me see.  You know, that's coming up around

20  the time of the holiday, the New Year's, so -- let me

21  see.  That would be maybe back in on New Year's and took

22  that time off and got back in the truck.  I want to say

23  the 1st -- the night of the 1st got to Chicago, turned

24  around, came back to Dallas on the 3rd, yes.

25      Q.  Mr. Hardrick, have you ever been arrested
```

1    before?

2        A.   Yes.

3        Q.   How many times total?

4        A.   I don't recall.  I don't recall.

5        Q.   When was the most recent?

6        A.   March 2023.

7        Q.   And what was the reason for the arrest?

8        A.   My daughter came in town and was visiting.

9        Q.   I think you might be having some more audio

10   issues.

11              MR. EDEN:  Do you guys want to take a short

12   break real quick and get it set straight?  I think I'm

13   ready to start jumping into the discovery and facts of

14   the alleged incident.

15              MR. HUBBARD:  Yeah.

16              (Break taken from 11:33 to 11:41.)

17              MR. HUBBARD:  Hey, Eden, I know we had

18   talked at the beginning.  Are we reserving all

19   objections other than object to the form?

20              MR. EDEN:  Yeah.

21              MR. HUBBARD:  Okay.

22       Q.   (BY MR. EDEN)  All right.  Mr. Hardrick, I

23   think we were talking about your most recent arrest

24   before the audio broke up.  And while the audio was

25   breaking up, I heard that the most recent arrest was

 1    March 2023.  Is that correct?

 2         A.  Yes.

 3         Q.  Okay.  And what was the reason for the arrest?

 4         A.  My daughter -- my daughter and I -- she came to

 5    visit and we had an altercation.

 6         Q.  Was it with Asia?

 7         A.  No.

 8         Q.  What's the name?

 9         A.  Aalisha.

10         Q.  How do you spell that?

11         A.  A-A-L-I-S-H-A.

12         Q.  I've got to say the audio is so much better.

13         A.  That's good.

14         Q.  Yeah.  And could you give a brief description

15    of that altercation?

16         A.  Just a father/daughter altercation, verbally,

17    and disagreement.  The police came out, and they said

18    that coming out to a family dispute -- asked what

19    happened, and I just said, you know, this is my

20    daughter, I'm not going to -- I'm the father, so

21    whatever you have to do.  So they said somebody had to

22    go to jail, and I went to jail.  I wasn't going to let

23    my daughter go to jail.

24         Q.  I'm going to try and share my screen with you

25    and hopefully my audio as well.  Just give me a second

Bobby Hardrick
January 23, 2025

```
 1   while my computer loads it up.  Are you in pain,

 2   Mr. Hardrick?

 3       A.  Yeah.  I'll make it through it.  I'll get

 4   through it.

 5             MR. HUBBARD:  If you need to walk around or

 6   anything, just let us know.

 7             THE WITNESS:  Okay.

 8       Q.  (BY MR. EDEN)  Yeah.  Yeah, just let me know

 9   any time you need a break.  We don't even need to take a

10   short one.  We can take a longer one for you to be able

11   to get some water, do some stretches, take some

12   medication, anything you need, Mr. Hardrick.  Okay, sir?

13       A.  Okay.  Thank you.  I go through this every

14   night, so I'll get through it.

15       Q.  I got into a pretty bad car wreck in 2017.

16   These teeth are veneers.  The airbag blew out and messed

17   up my teeth, broke all of them, cut myself, bit myself

18   through and through, so I completely understand.

19       A.  Okay.

20       Q.  I completely understand.  1:55.

21             MR. EDEN:  At this time I'd like to mark as

22   Exhibit A to Plaintiff Bobby Hardrick's deposition

23   responses to our subpoena duces tecum produced by

24   Defendants from Dallas Police Department.

25             (Exhibit A marked.)
```

1              MR. EDEN:  Any objections, Counsel?

2              MR. HUBBARD:  I'm not sure what it is yet.

3              MR. EDEN:  It's our subpoenas to the Dallas

4    Police Department and their responses to it -- our DWQs

5    to the police department.

6              MR. HUBBARD:  Yeah.  I don't think I ever

7    got a copy.  The last time I talked to Ray, they hadn't

8    seen anything, but --

9              MR. EDEN:  Oh, really?

10             MR. HUBBARD:  I don't think so.  It may be

11   the same thing they sent me.

12             MR. EDEN:  It does capture the January 3rd

13   incidents, but our subpoena wasn't limited to just the

14   scope of the incident.  It was for any and all records.

15             MR. HUBBARD:  Yeah.

16             MR. EDEN:  And we've gotten records for the

17   March incident that Mr. Hardrick is describing.  And if

18   you do have an objection, I can e-mail it to you and I

19   can move on to another area or -- what I normally do is

20   I just go ahead and place my objection just to preserve

21   it but let the questions keep going and then that way

22   any line -- any answers from any lines of questions that

23   are predicated based off of that exhibit, if later on

24   is, like, sound, then are struck, if that makes sense.

25             MR. HUBBARD:  Right.  Yeah.  That's good.

```
 1              MR. EDEN:  Good deal.

 2       Q.  (BY MR. EDEN)  Mr. Hardrick, do you see this on

 3  your screen?  Are you able to -- I know you're on your

 4  phone, but are you able to see it on your tablet?

 5       A.  I see it.

 6       Q.  Good deal.  I'll represent to you that these

 7  are what we call in the legal industry subpoenas, pretty

 8  much almost the same as what you would see on a TV show

 9  like Suits or Law and Order.  We go ahead and request

10  documents be produced by a certain entity, maybe a

11  medical provider or a peace officer or a department or

12  something like that, and then they provide us those

13  records supported by affidavit pretty much by penalty of

14  perjury as well as saying, hey, these are true and

15  accurate copies of our records by penalty of perjury and

16  it's kind of notarized by a custodian of record.  Do you

17  understand that so far?

18       A.  Yes.

19       Q.  Good deal.  And what I want to do is I want to

20  go to page 156 on the responses.  Do you see this on

21  your screen, sir?

22       A.  Yeah, I see that.

23       Q.  Is that Aalisha?

24       A.  Yeah, that's my daughter.

25       Q.  Good deal.  And is that you on the bottom of
```

```
 1   the page 135?

 2       A.  Yes.

 3              MR. EDEN:  At this time I'd like to mark as

 4   Exhibit B to Plaintiff Bobby Hardrick's deposition the

 5   911 call log that corresponds with the subpoenaed police

 6   records for this domestic violence arrest.  Any

 7   objections, Counsel?

 8              MR. HUBBARD:  No.

 9              (Exhibit B marked.)

10       Q.  (BY MR. EDEN)  Now, Mr. Hardrick, I don't

11   expect you to see anything on your screen.  Hopefully

12   you're not -- are you seeing -- you're not seeing my

13   outline, are you, my questions for you?

14              MR. HUBBARD:  Yes.

15              MR. EDEN:  Okay.  I'm going to go ahead and

16   minimize that.  Thank you, Mr. Hubbard.

17       Q.  (BY MR. EDEN)  What do you see on your screen

18   right now, Mr. Hardrick?

19       A.  I see a building on top of a sculpted --

20   sculpted -- I guess a mountain.

21       Q.  Well, then I'm bad at my job because I'm trying

22   to do this.  All right.  Now what do you see on your

23   screen, sir?  Hopefully not my notes.

24       A.  I see a cone.

25       Q.  Got you.  Good deal.  This is a VLC media
```

January 23, 2025

```
 1    player that you're seeing on your screen.  The good

 2    thing is there's no video, so I don't need you to see

 3    anything.  But what I will do is I will cancel this call

 4    from Coaction Insurance Company and play the audio from

 5    this file.  It's a 911 call log and then ask you some

 6    questions about it.  Is that okay, sir?

 7         A.  Yes.

 8         Q.  All right.

 9              (Audio played.)

10         Q.  (BY MR. EDEN)  Are you able to hear this on

11    your screen?

12              (Audio played.)

13         Q.  (BY MR. EDEN)  Mr. Hardrick, were you able to

14    hear that 911 call from Chellette Corder?

15         A.  Yes.

16         Q.  Who is Chellette Corder?  She describes herself

17    as your girlfriend.  Is that your understanding of your

18    relationship with Chellette?

19         A.  At the time.

20         Q.  I'm sorry, is your answer that at the time on

21    January 3rd -- or on March 5, 2023, she was your

22    girlfriend?

23         A.  You could say -- you could say that, yes.

24         Q.  Hey, man, I completely understand.  If you ask

25    the girl I'm talking to right now, you'll get
```

Bobby Hardrick
January 23, 2025

1    conflicting stories.  I'm going to go back to Exhibit A,

2    okay, Mr. Hardrick?  Now, this is Exhibit A, the

3    responses from the City of Dallas Police Department, but

4    I want to bring your attention specifically to Bates

5    page 0129.  This is your arrest sheet.  Do you see that

6    on your screen?

7         A.  Yes.

8         Q.  Your arrest sheet, according to this document,

9    was issued on March 5, 2023.  Does that sound like the

10   date on which the arrest occurred to you?

11        A.  I would -- I guess.  I know it was March 2023.

12        Q.  Got you.  And if we scroll a little bit lower,

13   we get a description of the officer's interview and

14   everything that happened and we've got some photographs

15   and stuff like that.  So what I want to do with you,

16   sir, is I want to go to page Bates labeled 130 and read

17   some of these statements made and then ask you some

18   questions following it, okay, sir?  Is that okay with

19   you?

20        A.  Sure.

21        Q.  All right.  Now, it says here on March 5, 2023,

22   at approximately 8:00 a.m., complainant Aalisha Rochelle

23   Cherese Hardrick went to arrested person Bobby Lee

24   Hardrick, Jr., room to get her leggings.  Did I read

25   that correctly?

January 23, 2025

1        A.   That's what I read.

2        Q.   And to the best of your recollection, on

3    March 5, 2023, especially as it relates to the morning

4    of March 5th, does that sound accurate?  Was she trying

5    to retrieve her leggings?

6        A.   She didn't have anything in my room.  Her

7    suitcase was not in my room.

8        Q.   After that it says, Arrested person Bobby Lee

9    Hardrick, Jr., told complainant Aalisha Rochelle Cherese

10   Hardrick that they had to go to Oklahoma by 3:00 p.m.

11   Did I read that correctly?

12       A.   Yes.

13       Q.   And is that accurate?  Did you tell your

14   daughter Aalisha that you had to be at Oklahoma by

15   3:00 p.m.?

16       A.   Yes.

17       Q.   And why did you need to be at Oklahoma by

18   3:00 p.m.?  Was it for work?

19       A.   No, family.

20       Q.   Family.  Was it for your father?

21       A.   I don't recall at the time.  I was back and

22   forth at that time.  I believe he was still at the

23   house.  I don't recall.

24       Q.   Complainant Aalisha Rochelle Cherese Hardrick

25   advised arrested person Bobby Lee Hardrick that she had

Bobby Hardrick
January 23, 2025

```
 1    to work and could go after 5:00 p.m.  Arrested person

 2    Bobby Lee Hardrick, Jr., then extended his forearm into

 3    complainant Aalisha Rochelle Cherese Hardrick's chest to

 4    prevent complainant Aalisha Rochelle Cherese Hardrick

 5    from going in his bedroom and stated we're not finna to

 6    do that.  Did I read that correctly, Mr. Hardrick?

 7         A.  That's what it reads.

 8         Q.  And is that accurate or do you dispute the

 9    accuracy of that police officer's record?

10         A.  I -- I dispute.

11         Q.  Got you.  So it's your testimony that you did

12    not extend your forearm into Aalisha's chest to prevent

13    her from going into your bedroom?

14         A.  Yes.

15         Q.  Got you.  It then reads, Complainant Aalisha

16    Rochelle Cherese Hardrick told AP Bobby Lee Hardrick,

17    Jr., not to put his hands on her and continued into

18    arrested person Bobby Lee Hardrick, Jr.'s room.

19    Arrested person Bobby Lee Hardrick, Jr., then proceeded

20    to take witness Asia Danielle Hardrick's vehicle keys

21    from the kitchen counter.  Did I read that correctly?

22         A.  Yes.

23         Q.  And --

24         A.  But not -- the latter part of that statement is

25    correct.
```

Bobby Hardrick
January 23, 2025

1      Q.  Got you.  And when you say correct, it's not

2   like I've got poor reading comprehension skills.  What

3   you're telling me is the latter part of that is

4   factually correct, right?

5      A.  With the keys, yes.

6      Q.  Yeah.  Got you.  And the reason why I've got to

7   ask these questions is because there's certain

8   evidentiary or legal hurdles that attorneys like myself

9   and Mr. Hubbard have to go over.  So sometimes it feels

10  like, hey, man, say less, we are on the same page.  You

11  know what I'm saying?  But whenever it comes to whether

12  something is correct or not in this instance, what

13  you're telling me is the distinction is it's -- the

14  second half is factually correct, but it's not like I

15  goofed on reading it, right?

16     A.  No, you read it exactly how it reads.

17     Q.  You would be surprised.  I've been caught on

18  the record misreading on accident, I promise you.  It's

19  nonfeasance, not malfeasance.

20     A.  Right.

21     Q.  Then it goes on to read, Arrested person Bobby

22  Lee Hardrick was walking towards his bedroom while

23  complainant Aalisha Rochelle Cherese Hardrick was

24  exiting the bedroom with the car keys.  As complainant

25  Aalisha Rochelle Cherese Hardrick went to grab the keys

Bobby Hardrick
January 23, 2025

1  from arrested person Bobby Lee Hardrick, arrested person

2  Bobby Lee Hardrick, Jr., grabbed complainant Aalisha

3  Rochelle Cherese Hardrick by her right arm.  Did I read

4  that correctly, sir?

5      A.  That's what it reads.

6      Q.  And is that accurate?

7      A.  I -- I'm not saying it's accurate.  I

8  disapprove of this whole complaint.

9      Q.  Okay.  And we'll go through it and then once

10  we're finishing reading it and trying to figure out what

11  parts are accurate or not, I would really like to kind

12  of unpack what you would dispute about it.  Is that

13  okay, sir?

14      A.  The whole complaint.  As I said, if you read

15  this whole complaint, it's what she said.  What they

16  asked me -- that's my daughter, so I don't have anything

17  to say.  So if you have to arrest me, arrest me.  I'm

18  not about to send my daughter to jail.  That's besides

19  this right here.

20      Q.  I see.  I see.

21      A.  So everything that you're seeing here, I

22  disagree with.

23      Q.  Got you.  Got you.  And because of that, I

24  don't have to go through the whole thing anymore.  I

25  think I'm getting an understanding.  You're telling me

Bobby Hardrick
January 23, 2025

```
 1   the whole thing, because it's only her side of the
 2   story, is inaccurate because they didn't get your side.
 3   Is that what my -- is that what you're telling me?
 4        A.  Yes.  Yes.  I would not give a statement on my
 5   daughter.  So yes.
 6        Q.  Perfect.  I want to read a couple of last
 7   parts, though.  Okay?  Right here where it reads,
 8   Arrested person Bobby Lee Hardrick used the complainant
 9   Aalisha Rochelle Cherese Hardrick's right arm to wrap
10   around her own throat and pulled back, impeding
11   complainant Aalisha Rochelle Cherese Hardrick's breath
12   for approximately three to five seconds with a grip of
13   eight out of ten.  Did I read that correctly?
14        A.  That's what it reads.
15        Q.  And you're disputing that ever occurred, right?
16        A.  Yes.
17        Q.  Okay.  And then it goes on to read, Arrested
18   person Bobby Lee Hardrick, Jr., also had complainant
19   Aalisha Rochelle Cherese Hardrick left arm pinned
20   against her body, restricting her body.  Are you
21   disputing that in the statement as well?
22        A.  Re-read that.
23        Q.  Yes, sir.  Arrested person Bobby Lee Hardrick,
24   Jr., also had complainant Aalisha Rochelle Cherese
25   Hardrick left arm pinned against her body, restricting
```

Bobby Hardrick
January 23, 2025

 1   her body.

 2       A.  So coming -- she was -- she was thrusting

 3   forward.  She was the aggressor, so I did have to defend

 4   myself a couple of times in this incident.  Not -- not

 5   hitting, not choking.  I'm saying basically defending --

 6   like, how would you say it?  Just not letting her attack

 7   me.  So I was trying to keep it -- just her off of me,

 8   as well as my daughter Asia.  So I can say you read it

 9   right.  I'm telling you the same thing I told the

10   police.  I didn't have anything to say.  It's my

11   daughter.  What father is going to send their daughter

12   to jail?

13       Q.  Yeah, I completely understand.  Then it goes on

14   to read, Complainant Aalisha Rochelle Cherese Hardrick

15   dropped down to the floor while arrested person Bobby

16   Lee Hardrick, Jr., continued to maintain his hold around

17   the neck of complainant Aalisha Rochelle Hardrick --

18   Cherese Hardrick.  I can tell you right now I did not

19   read that correctly because I missed the Cherese part.

20   But my question is, you're disputing that as well,

21   right?  I've got to go the infractions one by one.  I

22   think I got one last left.  But as it relates to this

23   specific fact that she's alleging, not the fact that

24   actually occurred that has been concluded or anything,

25   but what she's alleging in this statement from the

Bobby Hardrick
January 23, 2025

1    officer, your position is that that is not true, right?

2        A.   Absolutely.

3        Q.   Then it goes on to say, Complainant Aalisha

4    Rochelle Cherese Hardrick was able to punch arrested

5    person Bobby Lee Hardrick, Jr., and witness Asia

6    Danielle Hardrick intervened.  Is that true?  Did she

7    punch you?

8        A.   Constantly, but that -- that -- that -- that --

9    that -- I don't -- I didn't give this then and I say it

10   now, I don't have -- I don't have anything to say

11   against my daughter.  I mean, that's -- that's what I

12   gave and this is all what she said or what they said.  I

13   don't know.  But I didn't have any say-so -- response.

14   I just -- they had to do whatever they had to do.

15   That's what this is to me.  Meaning the arresting

16   officers.

17       Q.   So the arresting officers on Bates label

18   page 131 state that they observed complainant Aalisha

19   Rochelle Cherese Hardrick to have a small knot on the

20   right side of her head, scratches on the left side of

21   her neck, cut and bruise on the left side of elbow and a

22   red mark on their right shoulder blade.  Did I read that

23   correctly?

24       A.   That's what it reads.

25       Q.   And did she -- I mean, we have the photographs,

U.S. LEGAL SUPPORT, INC
713-653-7100

Bobby Hardsick
January 23, 2025

1   so we know she did.  But did she actually have those

2   injuries that were objective and visible?  Did she have

3   a small knot and the scratches and the cut on her -- and

4   the bruise?

5       A.  What I have to say is I barricaded myself in my

6   room.  My daughter Asia stood in front of my door.

7   Aalisha was outside going berserk trying to get around

8   Asia to get in my room.  I was on Facetime in my room,

9   so I have witnesses to all this.  I was on Facetime

10  trying -- I made the call to Chellette to tell her to

11  call the police.  That's why she called the police.

12      Q.  You told Chellette to call the police?

13      A.  Exactly.  That's how she knew to call the

14  police, that this was going on.

15      Q.  So from my understanding, you weren't the

16  aggressor.  According to your testimony, it was Aalisha

17  who was escalating the situation.  But because you're

18  her father, you didn't want to make any statements that

19  would have led to potentially her arrest, correct?

20      A.  That's what I said to the public defender's

21  office, as well as a video of Aalisha admitting she was

22  the aggressor and going through a time in her life where

23  she needed to seek God because she was being too angry

24  and aggressive towards people she's encountering.  So

25  that -- I sent the facts, and it was a no file.

Bobby Hardrick
January 23, 2025
80

1      Q.  Does she have a history or pattern of being

2  aggressive like this?

3      A.  I'm not for sure about her arrest history, but

4  being angry, yes.  Aggressive?  She's had aggressive

5  moments with her mother and her siblings.

6      Q.  Any other moments where police had to be called

7  or anything like that for Aalisha?

8      A.  No.  Aalisha was visiting from Atlanta.  She

9  wasn't -- she had just -- I want to say maybe had only

10  been in town two days, and I was on the road.  I think I

11  might have got back in town maybe a day before that.  I

12  wasn't -- I was on the road when Aalisha made it to

13  Dallas from Atlanta.

14      Q.  Did this arrest conclude with a conviction?

15      A.  It was a no file.  They didn't press charges.

16      Q.  Got you.

17      A.  The DA's office.  But I did -- I didn't find it

18  was a no file until nine months later.  I was checking

19  in to the bond -- the bail bondsman's office for nine

20  months and it was a no file.  So I didn't ever do the --

21  they told me they would let me know.  So I checked in

22  with the bondsman weekly for nine months, and then I had

23  to call the DA -- the public defender's office to find

24  out it was a no file.  They said they didn't file it.

25  So I literally was just calling in and checking in for

Bobby Hardsick
January 23, 2025

```
 1   nine months not knowing it was a no file.

 2        Q.  Any other arrests?  What's --

 3        A.  Yes.

 4        Q.  -- the most -- okay.  What's another one?

 5        A.  I don't have it offhand.  I don't have it

 6   offhand.

 7        Q.  That's okay.

 8        A.  Yeah.

 9        Q.  Now, if we were to take Asia's deposition,

10   would she corroborate your testimony?  Would she say

11   something similar, that she saw and noticed that you

12   were trying to barricade yourself in your room?

13        A.  Yes.  Yeah, she would state that I was on one

14   side of the door and she was in the middle of the door

15   and Aalisha was behind her.  At times Aalisha was

16   jumping on my bed.  I would say she would say what she

17   saw.  That's what I know.

18        Q.  Was she with you --

19        A.  I can't really say.  Excuse me.

20        Q.  Was she with you-all during the entire

21   incident?  Like, would she be able to say, yeah, he

22   never grabbed Aalisha's throat or arm or anything like

23   that?  Was she there for the entire incident?

24        A.  She was -- she was in between us.

25        Q.  Okay.
```

January 23, 2025

1    A.  You heard Chellette mention that she was

2  trying -- that Asia was trying to intervene, but she was

3  on -- you know, she just had knee surgery, so she was on

4  crutches.  I mean, I'm not going to attack my daughter.

5  I'm not that.  But I'm not going to let my daughter just

6  beat me down either.  I'm going to resist her from

7  beating me down.  I'm not going to attack my daughter.

8  So I believe other people saw the -- who was the

9  aggressor in this situation as well.  But being in the

10  state of Texas, if they come out to a domestic violence,

11  someone has to go to jail.  That's a law in Texas.

12  You're familiar with that.  You're in Texas.  So I was

13  not going to allow my daughter to go to jail.  Am I

14  still connected?

15    Q.  Yeah, you're good.

16    A.  Oh, okay.

17    Q.  I was just taking notes.  Currently, the only

18  arrest you do remember is that March 3, 2023 arrest,

19  correct?

20    A.  I don't -- I don't recall.

21    Q.  That's okay.

22    A.  I don't want to say anything that is not -- you

23  know, it's under oath.  I don't --

24    Q.  No, that's absolutely right.  That's exactly

25  what we tell our clients, right?  I don't want you

```
 1   guessing.  Have you ever been convicted of a crime
 2   before?
 3        A.  Convicted of a crime?
 4        Q.  Yeah.  It's usually whenever that whole process
 5   is already done, right?  And so the arrest happens, they
 6   press charges, you get an indictment, and then either by
 7   way of a trial or by some sort of conclusion --
 8        A.  No, I've never --
 9        Q.  -- someone says guilty or something like that?
10        A.  I've never been in trial or nothing like that,
11   no.
12        Q.  Any convictions whatsoever that you've been
13   found guilty for?  It doesn't have to be by way of a
14   trial.
15        A.  I don't -- I don't recall.  I don't believe
16   I've been convicted.
17        Q.  Got you.  And I know it sounds like I'm asking
18   the same question, but I promise you there are little
19   legal nuance differences between each one.  Now, when
20   you were arrested, did that lead to your incarceration
21   or were you not incarcerated?
22        A.  I mean, a couple -- a couple of days.
23        Q.  Got you.  Any other time you may have been
24   incarcerated, sir?
25        A.  Well, hold on.  Now, I was incarcerated in
```

Bobby Hardsick
January 23, 2025

```
 1  Illinois.  I spent -- I did do 90 days in Illinois.
 2      Q.  And what was the reason for your incarceration
 3  in Illinois?
 4      A.  I want to say that was resisting arrest.
 5      Q.  And how were you resisting arrest?
 6      A.  Ran.
 7      Q.  Can you give a brief description about the
 8  incident that you're describing?
 9      A.  Just ran from the police.  They randomly pull
10  people over -- running up on people walking.  I didn't
11  have anything to say to them, and they don't take that
12  well.  So they kind of force you into talking to them.
13      Q.  Have you sued anybody before besides the
14  lawsuit that we're here to discuss today?
15      A.  Have I sued anybody?
16      Q.  Yes, sir.
17      A.  I don't believe I've sued anyone.  Like
18  going -- filing a complaint with the court and suing
19  them?
20      Q.  The same thing that you're doing here, right,
21  with a lawsuit, yeah.
22      A.  No.  Actually, yes, I have.  With this incident
23  that we speak of, the officers ended up fracturing my
24  wrist, scratching my cornea and a few other things.  So
25  yeah, I did, yes.
```

Bobby Hardsick
January 23, 2025

1      Q.  Was that in Illinois?

2      A.  That was in Illinois, yes.

3      Q.  And what -- I mean, I just -- I'm trying to

4  wrap my opinion head around this.  When did this happen

5  when they were accusing you of resisting arrest?

6      A.  What do you mean when?  When I ran, they chased

7  me and five -- four or five officers jumped on my back

8  and you know the rest.

9      Q.  My question was when, sir.  So when I say when,

10 I mean technically speaking on a calendar.  Is it on a

11 specific year or stuff like that?

12     A.  I would say 2005.

13     Q.  Have you made any injury claims before other

14 than the two workers' compensation claims from

15 August 24, 2024 and September 24, 2024?

16     A.  Workers' compensation claims?  What are you --

17 I haven't received any money for anything on any claims.

18     Q.  I'm sorry, sir, I don't think I asked a good

19 enough of a question.  That's a failure on my part.  My

20 question was, have you made any injury claims before,

21 other than those two August 24th and September 24th

22 claims?

23     A.  And the 2005 claim?

24     Q.  Any claims at all.

25     A.  I just spoke of the 2005 claim.

Bobby Hardsick
January 23, 2025

1    Q.  I understand.  That's the reason why I'm asking

2  the question is to make sure that I didn't miss any

3  other injury claims other than the ones that we've

4  discussed.  Does that make sense?

5    A.  Yeah, that makes sense.  I don't -- I don't

6  recall making any.

7    Q.  So the only injury claims you remember making

8  is the 2005 claim, the August 2024 claim and the

9  September 2024 claim; true or untrue?

10    A.  Untrue.  I had a claim in 20 -- 2014.  I got --

11  I was -- when I first moved to Arlington, I got injured

12  working at -- who was that -- Cardinal Logistics.  So I

13  had to -- I wasn't able to perform my job.  They had

14  light duty.  I had to go sit in the office for eight

15  hours a day until I got better and I went back to work.

16    Q.  And when was that?  What year?

17    A.  2014.

18    Q.  Good deal.  And what did you injure?

19    A.  I want to say my ankle or leg.  I was unloading

20  from a dock and they had left a pallet on the dock.  It

21  was in Houston, as a matter of fact.  And as I was

22  unloading -- I was delivering Beauty Rest mattresses at

23  the time, and we had to pull off the mattresses on our

24  deliveries.  They had left a pallet on the dock, and I

25  was backing up off the trailer and pulling the mattress

Bobby Hardsick
January 23, 2025

```
 1    off and slipped over the pallet.  That would be it.  I

 2    went to the CareNow over there in Houston.  They had to

 3    send a driver over there to get the truck and drive me

 4    back to Dallas.  I sat off -- actually, I wasn't -- I

 5    wasn't off that long.  But that would be it, I believe.

 6         Q.  Were you ever in the military?

 7         A.  No.

 8         Q.  And any other diseases other than your diabetes

 9    medical condition and your hypertension?

10         A.  Hypertension, PTSD, anxiety, depression.  Is

11    that what you're asking?

12         Q.  I'm asking if you had any disease process,

13    ailments and stuff like that before January 3rd.

14         A.  Type II.  I was -- I was diagnosed with

15    Type II -- I want to say 2013, two years after I started

16    driving trucks, I believe.

17         Q.  So Type II diabetes.  What about the

18    hypertension?

19         A.  Hypertension, that disease came after.  I was

20    on hypertension medication due to the diabetes to kind

21    of -- I guess they give out that medication to keep the

22    kidneys from overworking.

23         Q.  What year did you learn that you had

24    hypertension?

25         A.  I don't recall that year.
```

Bobby Hardsick
January 23, 2025

88

1    Q.  Was it before or after January 3, 2023?

2    A.  It was before.

3    Q.  Anything else?  Any other disease process other

4  than diabetes and hypertension before January 3, 2023?

5    A.  Not that I recall.

6    Q.  Okay.

7    A.  If I'm understanding you, like have something

8  like cancer or lymphoma or leukemia or something like

9  that?  Is that what you're asking?

10    Q.  Yeah, exactly, like a medical condition.

11    A.  Okay.  A medical condition, yeah.  No, just

12  hypertension and Type II.

13    Q.  Got you.  Did you participate in athletics

14  outside of school before the incident occurred -- the

15  alleged incident occurred?

16    A.  You're talking -- that's a wide range of years.

17  Which one are you talking?

18    Q.  I just want to -- I just want to know --

19    A.  1990 or --

20    Q.  I just want to know if you were playing pickup

21  basketball before January 3, 2023?

22    A.  I haven't picked up a ball in so long.

23    Q.  So it's safe to say no athletics outside of

24  school before January 3, 2023?

25    A.  I might have.  I don't -- I wouldn't say -- I

Bobby Hardsick
January 23, 2025
89

```
 1   would have to say that --
 2        Q.  It's not like you're out here like my
 3   girlfriend going to play pickleball --
 4        A.  No.  No.
 5        Q.  -- a standing appointment --
 6        A.  No, no, no.
 7        Q.  -- or anything like that?
 8        A.  Yeah.  Yeah.  Nothing like that, no.
 9        Q.  Got you.  Any history of any knife or sharp
10   object wounds before January 3, 2023?
11        A.  I don't recall.
12        Q.  Have you been in any fights before January 3,
13   2023 that were physical?
14        A.  No.
15        Q.  When did you last see a doctor before
16   January 3, 2023?
17        A.  I don't recall.  I would say -- I would say
18   follow-up appointment.
19        Q.  I'm guessing when you told me earlier that you
20   went regularly to your primary care physician --
21        A.  Yeah.  Yeah.
22        Q.  -- what you would do is just regular check-ups?
23        A.  Yeah, check-up, blood work, just to make sure
24   everything is functioning and nothing has, you know,
25   changed and just regular -- regular check-ups.
```

Bobby Hardsick
January 23, 2025

```
 1        Q.  Do you have any medical devices implanted?

 2        A.  No.

 3        Q.  Okay.  Have you ever spent a night in the

 4   hospital before January 3, 2023?

 5        A.  No, I've never had an overnight stay in the

 6   hospital.

 7        Q.  Have you ever broken a bone before January 3,

 8   2023?

 9        A.  I don't remember breaking -- well, I think I

10   might have broke my arm in third grade --

11        Q.  Yeah.

12        A.  -- trying to do a trick in a swing or

13   something.  I'm not for sure.  As a teenager and adult,

14   no.

15        Q.  All right.  So let's go ahead and talk about

16   the alleged incident from January 3, 2023.  Is that all

17   right?

18        A.  Yes.  I'm going to need to plug up my device

19   here for a second.

20        Q.  No problem.

21        A.  All right.  Okay.

22        Q.  Are you ready to continue, sir?

23        A.  I am.

24        Q.  Good deal.  Do you remember what time the

25   alleged incident occurred on January 3, 2023?
```

Bobby Hardsick
January 23, 2025

1        A.   I want to say I got to the apartments around

2   6:30 maybe.

3        Q.   And that's because you had arrived to Texas

4   that evening from a trip to Illinois?

5        A.   I had just got into town from Illinois right

6   before I went -- I parked the truck, jumped in the car

7   and came to the apartments.

8        Q.   What car were you driving --

9        A.   A Genesis G80.

10        Q.   -- when you came to Texas from Illinois?

11        A.   I was driving -- are you talking about once I

12   parked the semi?

13        Q.   So you drove the semi from Illinois to Texas?

14        A.   Yeah.  I had a delivery.  I had to go from

15   Texas -- right after the holiday, we had a load going to

16   Chicago.  We went and delivered that.  And it was right

17   after the holiday, so finding a load coming back was

18   difficult.  So we just bobtailed back from Chicago to

19   Texas.  I had literally just got back in town.

20        Q.   And where did you park the semi when you

21   arrived to Texas?

22        A.   The semi is parked over there where -- we had a

23   little shopping center where they had a little area for

24   us to park our -- they had box trucks over there, semis,

25   bobtails.  It was probably around the -- within a

Appx. 0112

Bobby Hardsick
January 23, 2025

```
 1   six-mile radius of the apartments.
 2       Q.  Got you.  And when you parked your car at this
 3   shopping center six miles away from the Berkshire
 4   Medical District Apartments, what vehicle did you drive
 5   when you drove from that shopping center to go to the
 6   Berkshire Medical District Apartments?
 7       A.  That would be the Genesis G80.
 8       Q.  Did you have any passengers with you in that
 9   Genesis G80 when you traveled back to the Berkshire
10   Medical District Apartments?
11       A.  No.  I was solo.
12       Q.  What time did you arrive at the Berkshire
13   Medical District Apartments?
14       A.  That's what I was saying, around -- I want to
15   around 6:30 maybe, around that time, 6:30, 7:00, around
16   that time.
17       Q.  And when you arrived to the parking area of the
18   Berkshire Medical District Apartments, did you then
19   notice the alleged shooter?
20       A.  Can I -- can I walk you through what -- how I
21   got in the gate and onto the property?
22       Q.  I think I'd like an answer to my question
23   first.
24       A.  So as soon -- you're talking about as soon as I
25   got into -- onto the property.  When I parked, I noticed
```

1  the shooter standing in front of me on the sidewalk in

2  front of the front gate of the apartment.

3       Q.  Got you.  And then when you parked the Genesis

4  G80, where was it parked -- situated in the parking lot

5  of Berkshire Medical District Apartments?

6       A.  Outside the mail housing pavilion, middle --

7  middle row section -- or middle row, you can go straight

8  out the gate or in the gate midway between the front

9  gate and the buildings behind the -- that driveway.

10      Q.  Is that what -- is that what that area

11  designated is called?  Is it called the mail house

12  pavilion?

13      A.  I don't know.  I just call it the mail house

14  pavilion.  It's the mail house.  It would be mailboxes,

15  but it has a pavilion over -- a covering over it, so it

16  just -- the mailboxes.  Do you want me to show it to

17  you?

18      Q.  That's okay.  For the purposes of this

19  deposition, is it fair if we use the term mail house

20  pavilion that we're describing the area in which tenants

21  go and get their mail from?  For the purposes of our

22  deposition I mean, not as in like formally or anything.

23  Are you still there, Mr. Hardrick?

24      A.  Yeah.  Are you asking me that or --

25      Q.  Yeah, I'm asking you that, sir.  Is it fair --

Bobby Hardsick
January 23, 2025

```
 1   is that okay in this deposition whenever we use the term
 2   mail house pavilion, that we have a mutual understanding
 3   that we're describing the area in which the mailboxes
 4   are for the tenants to go and retrieve their mail?
 5        A.  Yeah, that's fine.
 6        Q.  Good deal.  Now, how far is it from this mail
 7   house pavilion to the gate -- the front gate of the
 8   parking complex?
 9        A.  I would say maybe midway.
10        Q.  Let me ask you a different question.  Are you
11   able to see the front gate from the mail house pavilion
12   or is it obstructed or too far?
13        A.  No, it's -- I would say less than 50 yards --
14   50 feet -- 50 yards, maybe.  Yeah, about 50 yards, I
15   would say.  It's right in front of you if you go
16   straight out.  You would -- you drive straight out from
17   the mail house pavilion roadway.
18        Q.  So then you first noticed the alleged shooter
19   at the entrance of the gate and then you parked the
20   vehicle, that Genesis G80, next to the mail house
21   pavilion.  Did the alleged shooter move from that gate
22   area to the mail house pavilion area?
23        A.  No, stood there.
24        Q.  He just stood there?
25        A.  Stood there looking.  I left the car running.
```

1    And when I got out, I went and got the mail and came

2    back to the running car.  He was still standing there.

3        Q.  Now, after he shot at you, did you call the

4    police or did someone else call the police?

5        A.  My daughter called the police, Asia.

6        Q.  Did you have an opportunity to speak with the

7    police over the phone before they arrived at the scene?

8        A.  I don't believe I did.  Asia was on the phone.

9    When I went -- got away, ran upstairs, beating on the

10   door and told Asia to call the police, someone just

11   tried to kill me.  She got her phone and called the 911

12   and opened the door, and I ran in the house.  She said I

13   know.  She said she know.  She knows because she had ran

14   out on the balcony.

15       Q.  Now, sir, you had an opportunity to speak with

16   the police when they arrived at the scene, correct?

17       A.  Correct.

18              MR. EDEN:  At this time I'd like to mark as

19   Exhibit C to plaintiff Bobby Hardrick's deposition body

20   cam footage of Officer Eric Urquiza produced by

21   plaintiff's counsel on September 23, 2024.

22              (Exhibit C marked.)

23       Q.  (BY MR. EDEN)  Here's hoping I don't share my

24   notes again.  Do you see this on your screen, sir?

25       A.  I can't even see that.  No, the tablet is over

Bobby Hardrick
January 23, 2025

```
 1   there.  I'm just talking audibly if that's okay.

 2       Q.  Let's --

 3       A.  Do I need to look at the screen?

 4       Q.  You will be needing to look at the screen, but

 5   let's wait for a moment.

 6       A.  Okay.

 7       Q.  I need to discuss within counsel --

 8               MR. EDEN:  Sir -- Mr. Hubbard, any

 9   objections with this being marked as Exhibit C?  It's

10   something that you folks produced in discovery in

11   September.

12               MR. HUBBARD:  No objection to it being used

13   today.

14               MR. EDEN:  Thank you, Counsel.

15       Q.  (BY MR. EDEN)  Mr. Hardrick, is it okay if you

16   use the tablet?  I'm going to play --

17       A.  Yeah.  I'm --

18       Q.  -- some portions of the video?  Sir, remember

19   at the beginning of this deposition, we kind of went

20   over the ground rules?  One of the rules is allowing me

21   to finish my question before you start answering and

22   then me extending that same courtesy.  Is that okay if

23   we maintain that?

24       A.  Yes.

25       Q.  Okay.  And I'm not fussing.  I do the same
```

Bobby Hardrick
January 23, 2025

97

```
 1  thing.  I've actually done the same thing during our

 2  deposition here with you here today.  Trust me when I

 3  say I'm not fussing, I promise.

 4              (Video played.)

 5      Q.  (BY MR. EDEN)  Now, I'm going to back to that

 6  eight-minute mark that we started the video on and

 7  replay it.  But were you able to see movement on your

 8  screen, Mr. Hardrick, and hear audio?

 9      A.  Yes.  Yes.

10      Q.  Good deal.  Good deal.  So right back to that

11  eight-minute mark.

12              (Video played.)

13      Q.  (BY MR. EDEN)  Is that you, Mr. Hardrick?

14      A.  Yeah, that's me.

15      Q.  Okay.  Good deal.

16              (Video played.)

17      Q.  (BY MR. EDEN)  Mr. Hardrick, were you able to

18  hear the full audio?

19      A.  Yes.

20      Q.  Are you okay, sir?  Do you need to take a

21  break?  I understand this is sensitive and stuff like

22  that, so I'm completely comfortable if you do need to

23  take a break and drink some water, catch your breath or

24  something like that.  We can take a short break.

25      A.  No, let's keep -- let's go ahead and move
```

1    forward, please.

2        Q.  Okay.  Do you remember giving statements to the

3    police officer?

4        A.  Yes.

5        Q.  And were you being truthful to the best of your

6    ability when you were providing those statements to the

7    peace officers investigating the incident?

8        A.  My statement is the same as you see on the

9    videotapes.

10             MR. EDEN:  Objection as nonresponsive.

11        Q.  (BY MR. EDEN)  Sir, I understand that and I'm

12   completely comfortable with knowing that it's consistent

13   on January 3rd as it is today.  My question was a little

14   bit different than that.  I'm not trying to ask you a

15   question about inconsistencies.  I'm just asking you if

16   you were being truthful to the officer to the best of

17   your ability?

18        A.  I replayed audibly what I went through.

19        Q.  Got you.

20        A.  My confession to the officer.

21        Q.  Perfect.  And from our understanding, you had

22   moved the vehicles.  You took your vehicle out, opened

23   the garage and began moving stuff out of that garage to

24   make space to put the Genesis G80 in the garage?

25        A.  So let me make a correction.  I moved my

Bobby Hardrick
January 23, 2025
99

1    daughter's vehicle out of the garage.  I was out of

2    town.  When I'm in town, I park in the garage.  She

3    parks in the parking lot.  So she didn't know I was

4    coming back in town, so she had her car in the garage.

5    I had to move her car out of the garage to put the

6    Genesis in the garage.  And I pulled her car out over

7    there where I -- where I said that's her car, left it

8    there running.  And then what you're saying, as far as

9    getting my belongings out of the Genesis to back into

10   the garage is exactly how that happened.

11        Q.  Got you.  And what is the make and model of

12   your daughter's vehicle?

13        A.  That was a Jeep Cherokee -- no, a Compass, a

14   Jeep Compass.

15        Q.  Got you.  And --

16        A.  Both cars running.

17        Q.  Whose car is the Genesis G80?

18        A.  That was in Chellette's name.

19        Q.  Got it.  So you were taking out the Jeep

20   Compass from the garage in order to put the Genesis G80

21   in the garage, but in between that, you were moving

22   stuff out of the garage to make space for the G80?

23        A.  No.  I emptied my trunk out --

24        Q.  Got you.

25        A.  -- what you see on the curb right there --

Bobby Hardrick
January 23, 2025
100

```
 1        Q.  Got you.

 2        A.  -- in front of my garage.  My traveling bag I

 3   came from being out of town.

 4        Q.  That makes sense.  I understand.  I'm going to

 5   continue the video if that's okay, sir.

 6              (Video played.)

 7        Q.  (BY MR. EDEN)  Mr. Hardrick, were you able to

 8   hear that audio?

 9        A.  Yes.

10        Q.  Good deal.  And you're being truthful here,

11   right?  Is that accurate?  He was standing roughly

12   around where kind of that tree is located right in front

13   of you and aimed a firearm at you, right?

14        A.  Exactly what the video reads.

15        Q.  And he fired four shots?

16        A.  Four shots, two, and as I was running off, two

17   more.  I was like, is he shooting at me?

18        Q.  I'm guessing this is just out of the ordinary

19   for you, right?  I mean, I can completely understand the

20   shock.  It's not like you have folks shooting at you on

21   a regular basis so then you kind of have a good grip of

22   what's going on and you're like, that cannot be a gun

23   right now, can it, and then you kind of process it a

24   little bit, right?

25        A.  You see the spark.  That's what made me turn
```

```
 1   around.  I'm like -- on the second one, I did a U-turn
 2   because I'm like -- had to sit there and was like, is
 3   this dude -- why would I walk up on somebody that is
 4   going to shoot at me?
 5        Q.  Got you.  Okay.  So I completely agree with
 6   you.  I completely agree with you.  So he shoots two
 7   shots.  You process this guy is shooting at me, and then
 8   you turn around to run away and he shoots another two at
 9   you?
10        A.  Yeah.  Yeah, two more times.  You said just
11   answer -- give the answer.  Yes.
12        Q.  That's what lawyers do.  They ask leading
13   questions.  You don't ask a question you don't already
14   know the answer to, right?  Okay.  So he shoots two
15   shots.  Where are you running to?  I mean, are you
16   running left, right, down that hall, up the stairs?
17   Where are you running to?
18        A.  First of all, you're running away from the --
19   you don't want to die.  So I don't want to run where
20   I -- where he watched me get the keys from my daughter
21   above the balcony.  I don't want to run in the direction
22   the tow truck came from, and that's a wide open parking
23   lot.  So as I was going to do in the beginning, when I
24   moved my daughter's car, I was going to go in the
25   aisleway and go upstairs and go home.  So if I can make
```

Bobby Hardsick
January 23, 2025                                                                102

1   it home and I pray I make it home and don't get shot and

2   killed right here, I was running home.

3        Q.  Where --

4        A.  Excuse me?

5        Q.  I was going to ask, where did you live?  Are

6   you on the second floor or on the first floor?

7        A.  I'm on the third floor, and that's what baffled

8   me.  I was running up them stairs praying this guy does

9   not shoot me in my back.  I was going up the stairs

10  thinking I'm about to die, thinking in the back of my

11  head.  But he turned around and ran.

12       Q.  So he shoots roughly --

13       A.  So I thank God.

14       Q.  Yeah, I agree with you.  So he shoots roughly

15  four shots -- approximately four shots, two shots while

16  you're facing him and kind processing the situation, and

17  then what you're telling me is your natural instinct is

18  I've got to get home, I've got to get out of here, I

19  don't want to be in the open field where I can get shot.

20  You immediately turn around and run in the opposite

21  direction to go up to the third floor to your apartment

22  and then he's still -- he's still shooting at you two

23  more shots while you're running away?

24       A.  Did you see the video?

25       Q.  Yeah, but I -- I did.  I did see the video.

Bobby Hardrick
January 23, 2025                                                                            103

1      A.  The video is not going to lie.  I processed

2   getting shot at twice.  If you look at it, I almost did

3   a U-turn.  You know how you do a U-turn in the car

4   because you're going the wrong way but meant to go the

5   other way?

6      Q.  Yes, sir.

7      A.  So I almost did a U-turn.  And then I started

8   running and then you see him shoot two more times, and

9   he turns around and runs after the tow truck.

10     Q.  He shoots you two more times when you turn your

11  back to him?  He shoots you two more times when you turn

12  your back to him?

13     A.  You see it.

14     Q.  I just need an answer to my question, sir.

15     A.  He shoots four times total.  He shot twice.  As

16  I turned around, he shot two more times and then he took

17  off running.

18     Q.  Got you.  Now I'm going to play some more of

19  this video.

20     A.  Okay.

21            (Video played.)

22     Q.  (BY MR. EDEN)  Mr. Hardrick, do you see that

23  Jeep right underneath the police tape?

24     A.  Yes.

25     Q.  Is that that Jeep -- what did you call it -- a

Bobby Hardrick
January 23, 2025
104

1  Jeep Compass --

2       A.  Compass.

3       Q.  -- that belongs to your daughter?

4       A.  Yes.

5       Q.  Okay.

6              (Video played.)

7       A.  Hello?

8       Q.  (BY MR. EDEN)  Sorry about that.  It just lost

9  the signal -- I mean, lost the screen.  I'm about to

10  pull it right back up.  Same exhibit but at the 11:38

11  minute mark.

12             (Video played.)

13      Q.  (BY MR. EDEN)  Mr. Hardrick, that stuff that

14  you guys are discussing at 11:54 and forward, is that

15  the stuff that you were taking out of the trunk of your

16  Genesis G80 that you were telling me about earlier?

17      A.  Yes.

18      Q.  Good deal.  And that stuff includes, you know,

19  your typical travel bag and everything you needed for

20  your trip when you were on that haul in Illinois,

21  correct?

22      A.  Well, that stuff in that bag is roughly -- I

23  had just, before Illinois, came back in town from

24  California.

25      Q.  What were you doing in California?

Bobby Hardsick
January 23, 2025                                                              105

```
 1        A.  Making a delivery.
 2        Q.  Got you.  How long were you in California for?
 3   Just for that delivery period?
 4        A.  California?  We had to drive from California --
 5   I mean, to California, deliver, find a load, come back,
 6   delivered a load, got a load to go to Illinois.  So I
 7   was -- I wasn't even home.  We came home Christmas, came
 8   home New Year's Eve.  The rest of the time I was on the
 9   road from December and coming back into January 3rd,
10   over the road, like across country type driving.
11        Q.  I understand.  I understand.  And then how long
12   were you in Illinois for for this haul?  Same situation,
13   just for, you know, dropping it off and then coming back
14   to Houston?
15        A.  To Dallas.
16        Q.  To Dallas.  I am so very sorry.  I apologize.
17        A.  So -- so we didn't -- it was -- you know, the
18   load board during the time of the holidays kind of gets
19   low and picks up after the holidays.  So there were no
20   loads.  So we just went up there, dropped the load, got
21   on the load board, sat around, couldn't find a load and
22   then decided there's no loads.  We just bobtailed back
23   from Illinois to Dallas.  And yeah, it's a turnaround if
24   you want to call that.  You can't just do a turnaround
25   going out to California.  You have to drive.
```

Bobby Hardrick
January 23, 2025                                                      106

1      Q.  Yeah, I think so, right.  I think that's from

2   my experience with my truckers too.  You can't just do a

3   turnaround.  I completely understand.  I'm going to keep

4   playing the video if that's okay?

5                (Video played.)

6      A.  All right.

7      Q.  (BY MR. EDEN)  Now, that's consistent.  I mean,

8   you're pretty much saying in this video exactly what

9   you're telling me in this deposition, Mr. Hardrick.  So

10  after you ran upstairs and he was shooting those other

11  two rounds, what did you do next?  Did you enter your

12  apartment or were you kind of like stuck outside?

13     A.  No.  So -- okay.  Now, I heard something.  You

14  said he shot two more rounds as I was going up the

15  stairs.  No, as I was -- he shot four rounds from me

16  being in the middle of the street doing that U-turn to

17  running towards the hallway -- the aisleway.

18     Q.  Got you.

19     A.  So the four shots were shot before I entered

20  the hall.

21     Q.  Got you.

22     A.  And then I started scrambling up the stairs as

23  my pants fell halfway down to my knees.  So I was

24  scrambling to get up the stairs.  So I scrambled up

25  three flights of stairs and running down the hallway.

Bobby Hardsick
January 23, 2025
107

1    Halfway down the hallway is where we live, 4307, with my

2    pants still hanging down and trying to hold them up and

3    just was in shock and, again, frightened, scared and got

4    to the door, beat on the door.  My daughter came from

5    the balcony, and I told her somebody just tried to kill

6    me downstairs.  She said, I know, I just heard the

7    gunshot.  And then I said, call 911.  So I didn't have

8    to stand outside.  When I beat on the door, she came

9    from the balcony to the door.

10       Q.  Got you.  Got you.  And so you were ultimately

11   able to enter your apartment, speak with your daughter

12   and call 911, correct?

13       A.  In that order.

14       Q.  Got you.  Perfect.  And it's not like you were

15   trying to escalate the situation or be vigilante or

16   anything like that.  I'm guessing you were just sitting

17   in your apartment waiting for the police to arrive,

18   true?

19       A.  I was trying to get my breath and thanking God

20   I didn't get killed.

21       Q.  And you stayed out of the apartment --

22       A.  Not killed.

23       Q.  Yeah.

24       A.  Yeah.  Yes, they -- they -- they came to the

25   apartment.

Bobby Hardsick
January 23, 2025                                                    108

```
 1        Q.  How long did it take for them to get to the

 2   apartment?

 3        A.  I don't recall.  I don't recall.  I try not to

 4   think about this situation.

 5        Q.  I understand.  And I apologize for having to go

 6   through it with you today.  It's part of the litigation

 7   process, unfortunately.  It's the same thing -- same

 8   thing like in a criminal case, you know what I mean?

 9        A.  I get it.

10        Q.  So you and your daughter, did you -- were you

11   concerned that he might try and come up to your

12   apartment or anything like that?  Did you guys, like,

13   hunker down until the police arrived or what did you

14   guys do inside that apartment?

15        A.  So what she saw, she saw the tow truck driver

16   leaving.  After she heard the gunshot, she ran to the

17   balcony.  She saw the shooter running out after the tow

18   truck.  So it wasn't -- now, if you're asking about --

19   no, because after she said what she said and she's

20   already watched them exit the property from the balcony.

21   He had enough time to get to the gate, which only opens

22   by car sensors.  You couldn't just run up to this gate.

23   Body weight will not open the gate.  It had to be car.

24        Q.  Like a key fob?  I see what you're saying.

25   Even if you have a key fob or access card or passcode,
```

Bobby Hardsick
January 23, 2025                                                    109

1    it's the same thing like any other garage gate, right,

2    you kind of have to enter by vehicle, you can't just

3    walk up it to with your body?

4         A.   Right.  Exactly.

5         Q.   Got you.  I'm going to keep playing this video

6    if that's okay, sir.

7         A.   Okay.

8              (Video played.)

9         A.   Hello?

10        Q.   (BY MR. EDEN)  Yeah, I'm here.

11        A.   Okay.

12        Q.   Now I want to fast forward a little bit to the

13   16-second marker, but before I do, according to this

14   video, police officers didn't notice anything shot up,

15   didn't find any bullet casings or anything like that.

16   Were you aware of that, sir?

17        A.   Up until I saw the cracked glass on the car

18   that they were looking at on the -- on the evidence.

19   And then the officer told me that he's pretty sure that

20   there was a revolver being used.

21        Q.   Okay.

22        A.   That could explain why there's no casings on

23   the ground.

24        Q.   Good deal.  I'm going to go ahead and go back

25   to --

1       A.  That's what the officers told me.

2       Q.  I'm going to go back to the same exhibit, but

3  this time at the 16-minute marker if that's okay.

4       A.  Okay.

5            (Video played.)

6       Q.  (BY MR. EDEN)  Mr. Hardrick, did you order food

7  at the crime scene after you were shot at?

8       A.  Did I order food at the crime scene?

9       Q.  That's what the lady there is saying.  She's

10 saying he ordered food.  She's trying to cross the

11 police tape.  She said it's the guy with the yellow

12 shirt.  I can replay it with that context so we can view

13 it through that lens.

14      A.  Yeah, let me see that.

15      Q.  Yeah, no problem.

16           (Video played.)

17      A.  If I could say that --

18      Q.  (BY MR. EDEN)  It will stop at 17 -- it will

19 stop at 17 seconds.  So what I'm trying to do, sir, is

20 I'm trying to establish a reliable timeline through the

21 objective evidence that your attorney was kind enough to

22 go and acquire.  But from my understanding, you had

23 ordered food after the shooting during the crime scene?

24      A.  No, it would had to have been like I normally

25 do when I know that I want the food to meet me at the

Bobby Hardsick
January 23, 2025                                                        111

```
 1  downstairs area.  So I would call them before I park the
 2  truck or -- or at that time.  So I'm sure that I had to
 3  order the food before I got in the car.
 4       Q.  Got you.  That makes sense.  I do the exact
 5  same thing all the time.  I get stuck in some crazy rush
 6  hour traffic between my office and my home, and so what
 7  I do is I end up Uber Eats and Chick-fil-A.
 8       A.  You can see I'm out of shape right there, so I
 9  didn't want to come back down the stairs.
10       Q.  I completely understand.  I do the same thing
11  and only once or twice have I ever been jammed up where
12  it was something inconvenient for me to deal with with
13  an Uber Eats driver, you know what I mean.  But I just
14  wanted to establish a reliable timeline.  Now I want to
15  stay on the same exhibit, Exhibit C, but go through the
16  24-minute mark.
17                 (Video played.)
18       Q.  (BY MR. EDEN)  Actually --
19       A.  I kind of got offended because they was like,
20  well, are you sure you got shot at?  I'm like -- man,
21  that takes me back to that moment.
22       Q.  I would be upset about that if someone were
23  challenging the veracity of my complaint or something
24  like that.  I completely appreciate the emotional
25  frustration you must have been feeling in that moment.
```

Bobby Hardrick
January 23, 2025                                                             112

```
 1                    MR. EDEN:  Right now what I do want to do
 2    is I want to mark as Exhibit D to this deposition of
 3    Plaintiff Bobby Hardrick, the body camera footage of
 4    Officer Jean-Mario Paillant produced by plaintiff's
 5    counsel on September 23rd, 2024.
 6                    (Exhibit D marked.)
 7        Q.  (BY MR. EDEN)  It's going to take time for this
 8    VLC player to open up every time I click on the link.
 9    Before, I guess, I mark that as an exhibit and go
10    through the exhibit, I want to ask you really quickly,
11    who is Joshua Ashby?
12        A.  That's my team driver.
13        Q.  Okay.  That's the dude you were with when you
14    were doing the haul in California and Chicago?
15        A.  Yeah.
16        Q.  Got you.  It did open.  Perfect.
17                    MR. EDEN:  Okay.  I'm going to mark as
18    Exhibit D to this deposition the body camera footage of
19    Officer Jean-Mario Paillant produced by plaintiff's
20    counsel on September 23, 2024.  Any objections, Counsel?
21                    MR. HUBBARD:  No objection.
22                    MR. EDEN:  Good deal.
23        Q.  (BY MR. EDEN)  Sir, what I want to do is I want
24    to go to the 40-minute mark.  This is what it's like
25    being an associate at a law firm is you have to sit
```

Bobby Hardrick
January 23, 2025

```
 1  there and watch every minute of hours and hours of
 2  footage.
 3       A.  Right.
 4       Q.  Ray doesn't do that.  He does sometimes.  Are
 5  you able to hear this?
 6              (Video played.)
 7       Q.  (BY MR. EDEN)  Mr. Hardrick, do you know why
 8  the police officer might ask for you to not start any
 9  stuff with your coworker?
10       A.  I have no idea what they were -- they were
11  saying.  Start any stuff, what do you mean by that?
12       Q.  I'm not entirely sure.  So I want to come to
13  the 28 -- gosh, it's so hard to see that -- the
14  28-minute mark of the video.
15       A.  Okay.
16              (Video played.)
17       Q.  (BY MR. EDEN)  Mr. Hardrick, you're describing
18  Joshua Ashby in this clip, aren't you?
19       A.  Yes.  Yes.  Yes.
20       Q.  Okay.  And he's that individual who was on the
21  trip with you that you're describing to the police
22  officers that you got into it with?
23       A.  Yes.
24       Q.  Okay.  I'm going to keep playing the video
25  then.
```

Bobby Hardrick
January 23, 2025

114

```
 1              (Video played.)
 2      Q.  (BY MR. EDEN)  Mr. Hardrick, what are you
 3  thinking in this scene in this moment right here when
 4  you lean up against the wall?  I'll tell you this right
 5  now, whenever I see my dad do that, it looks like he's
 6  got a revelation or a thought.  What were you thinking
 7  in this moment, if you remember?
 8      A.  That the guy was already out there while we
 9  were on the road.  We hadn't even touched down in Dallas
10  yet.  And my co -- my -- his name is Joshua as well.
11  But the other witnesses stated that they saw this guy
12  out there while we were making our way back from, I
13  would say -- we were in Texas but hadn't got to park
14  yet.  But this guy was already on the property and was
15  waiting --
16      Q.  Got you.
17      A.  -- earlier in the day.
18      Q.  Got you.  All right.  I'm going to keep playing
19  the video then.  Thank you for your testimony.
20              (Video played.)
21      Q.  (BY MR. EDEN)  What do you mean there when you
22  say you don't know who Josh knows?
23      A.  I'm not familiar.  I don't recall that at the
24  time.  But when I say we got into it, he was a rookie
25  driver.  So it was about being scared of driving and
```

Bobby Hardrick
January 23, 2025
115

1  learning how to drive.  It wasn't -- what would I say --

2  it wasn't an argument.  It was basically teaching him

3  how to drive.  But you hear it different.  So that's

4  what that means.  You can't drive 50 miles an hour down

5  the highway and expect to get freight delivered and get

6  paid at the same time.  So that's what that was

7  regarding to.

8      Q.  Mr. Joshua Ashby has access to your gate code

9  for the apartment complex at Berkshire Medical District

10 Apartments?

11     A.  Yes.  Yes.  Yes.

12     Q.  Okay.  I'm going to keep playing the video.

13          (Video played.)

14     Q.  (BY MR. EDEN)  Mr. Hardrick, why are you giving

15 the police Joshua Ashby's information and name?

16     A.  They asked me facts.  I grew up with Joshua

17 Ashby's brother back in -- all the way in Illinois,

18 40-year-old -- 50-year-old -- 45-year-old friend.

19 That's his brother.  So I'm just -- the officer asked me

20 questions.  I answered it.

21     Q.  My question --

22     A.  I didn't hold nothing back.  I mean, it's on

23 the video.

24     Q.  Right.  I understand that.

25     A.  You can see it.  You can hear it.  So as I'm

 1  doing this deposition, I'm going to give facts.  I'm

 2  going to give all the information.  I'm not going to

 3  hide nothing back to make me look a certain way.  I'm

 4  not going to try to paint a picture to make me look a

 5  certain way.  I'm going to give the facts.  He asked me

 6  what happened, and that's what I said.  At the same

 7  time, I'm already knowing after the fact that this guy

 8  was already on the property while we were on the

 9  highway.

10      Q.  Okay.

11      A.  So I just answered it and gave the facts as it

12  is.  I'm not going to lie.

13      Q.  Okay.  I'm going to come back to the 27-minute

14  mark -- 27 and 55-second mark.  All right.  Sir, I'm

15  just going to rewind it a little bit and replay just a

16  small part of the video that we've already watched and

17  then I'm going to ask you some questions following.

18  Okay?

19      A.  Sure.

20              (Video played.)

21      Q.  (BY MR. EDEN)  Mr. Hardrick, do you remember

22  who you're speaking with over the phone right now at

23  27:55?

24      A.  I don't remember.  I don't recall that.  I was

25  in shock.  I mean, I don't --

Bobby Hardrick
January 23, 2025

117

1       Q.  That's okay.

2       A.  I don't even -- you're showing me a part of it

3   that I'm looking at now saying, okay, that happened.

4       Q.  I completely understand.

5           (Video played.)

6       Q.  (BY MR. EDEN)  I'm hearing an echo, are you,

7   from my microphone with the audio and video,

8   Mr. Hardrick?

9       A.  No, I'm not hearing an echo.

10      Q.  Okay.  Good deal.

11          (Video played.)

12      Q.  (BY MR. EDEN)  Mr. Hardrick, you told me he

13  asked about your coworker and all that type of stuff

14  while you're describing something over the phone with an

15  unidentified individual.  And so I guess my question is,

16  why are you talking about this on the phone in front of

17  the police immediately following the alleged shooting?

18      A.  From the -- because they asked -- what do you

19  mean?  Let me get an understanding of what you're

20  asking.

21      Q.  Yeah, take your time.  Or was that a question

22  for me?

23      A.  Yes.

24      Q.  Okay.  Good deal.  According to this video at

25  28:39 -- really starting at 27:55, you're talking about

1  Joshua Ashby at the time the shooting occurred and

2  you're speaking with an unidentified individual over the

3  phone.  Why are you talking about Joshua Ashby in front

4  of the police?

5       A.  In front of the police?

6       Q.  Yes.  Do you see how the cop is standing right

7  in front of you?

8       A.  Yeah.

9       Q.  I'm not asking you why you were talking to the

10 officer about Joshua Ashby.  My question is separate and

11 apart from that.  My question isn't why are you giving a

12 statement to the police in front of -- to the cop.  My

13 question is, why are you talking about Joshua Ashby to

14 an unidentified individual over the phone in the first

15 place to this individual?

16      A.  That -- that -- that -- that was even

17 downstairs explaining the time frame of getting out of

18 the truck, explaining -- like I said, that wasn't an

19 incident of getting into it because we don't like each

20 other or we -- the dispute was about working, driving,

21 driving, learning how to drive -- drive a truck.  So I'm

22 saying -- I'm going through my mind in anything, and I'm

23 saying -- I'm going to say what I can say, but that's

24 not it because I'm trying to figure out why would

25 somebody be sitting here that I know or that is after me

Bobby Hardsick
January 23, 2025
119

```
 1    and I'm not even in town --

 2         Q.  Got you.

 3         A.  -- at all.  So I'm just saying that the --

 4    Joshua was not there, so there was an incident as far

 5    as -- all I can say.  But he was with me.

 6         Q.  Got you.

 7         A.  I mean, just think about it.  You walk into a

 8    thing and -- like I did, I called the tow truck the next

 9    day -- the Wells Fargo, is my car on repo?  I didn't

10    know it was on repo.

11              MR. EDEN:  Objection as nonresponsive.

12         Q.  (BY MR. EDEN)  So what I'm going to do for you,

13    sir, is I'm just going to go back to the original part

14    we were at before we rewound this exhibit and start at

15    the 33-minute and 20-second mark.  Is that okay?

16         A.  Sure.

17              (Video played.)

18         Q.  (BY MR. EDEN)  All right, sir.  I'm going to

19    fast-forward to the 40-minute marker on this exhibit.

20    It was the previous part of the video that we were

21    watching before as you approach Officer Paillant.

22              (Video played.)

23         Q.  (BY MR. EDEN)  What other incident may have

24    occurred between you and Mr. Ashby separate and apart

25    from you guys, quote, getting into it when you were
```

Bobby Hardrick
January 23, 2025

120

1  driving back from Chicago?  Is there any other incidents

2  that might have happened between you and Mr. Ashby?  Any

3  other moments of conflict?

4        A.  No.  No.  No.  No.

5        Q.  Okay.

6        A.  We never got into it.  It was just that day

7  that I was wanting him to train in different weather,

8  like out in Seattle going down the mountain in the

9  blizzard and wind, rain, just different things teaching

10  him how to drive and that was it.  And like I said, I

11  was in a state of shock.  So I wasn't expecting to come

12  and see the tow truck and get shot at.  So in my mind,

13  I'm trying to think of the last -- anything.  When I had

14  the chance to think about it and talk to him and his

15  brother and the neighbors and listen to all of --

16  everything, it made sense then.  But at this moment that

17  you were playing, everything was going through my mind.

18  But there wasn't much to go off of because I was -- we

19  were out of town.  So I can't tell you what I was

20  thinking at that moment from just being shot at,

21  thinking I almost died.  I was trying to process this

22  whole moment and what -- how could this be.  That's what

23  you see me in, a state of shock talking.

24             MR. EDEN:  Objection as nonresponsive.  At

25  this time I would like to mark as Exhibit E to Plaintiff

1   Bobby Hardrick's deposition body camera footage of

2   Officer Carter Aktabowski.  Any objections, Counsel?

3                    MR. HUBBARD:  No objection.

4                    (Exhibit E marked.)

5        Q.  (BY MR. EDEN)  I want to start this video with

6   this exhibit at the 9-minute and 42nd mark.  Okay,

7   Mr. Hardrick?

8        A.  Yes.

9                    (Video played.)

10       Q.  (BY MR. EDEN)  Now, Mr. Hardrick, were you able

11  to see that lady in that little stairway area when she

12  came to the officers and told them that they were able

13  to -- that she was able to see what had happened?  Are

14  you able -- did you see that on your screen?

15       A.  Yeah.  I spoke with her as well.  So they

16  voluntarily came up there and spoke to the officers.

17       Q.  Good deal.  Good deal.  Now, the reason why I'm

18  asking is because that individual has been identified as

19  Miaya Holliman.  Do you know Miaya pretty well?

20       A.  I don't know my neighbors by name, but we -- I

21  sit outside and barbecue when I do come home, so they

22  know me from sitting outside barbecuing in front of my

23  garage.

24       Q.  Got you.

25       A.  I don't know them by name because I'm always on

Bobby Hardrick
January 23, 2025
122

```
 1   the road.

 2        Q.  Do you barbecue a lot, Mr. Hardrick?

 3        A.  Yeah.  They call me Bobbycue.

 4        Q.  I really like that, man.  If you want to wrap

 5   it up with the trucking business, I think you've got a

 6   good Texas -- what's the style, Texas barbecue or what?

 7        A.  No, I haven't learned that yet.  I'm a charcoal

 8   man from Illinois.

 9        Q.  Oh, I see.  Ain't nothing wrong with that.

10        A.  So some wood chips and a little wood, that's

11   about it.

12        Q.  Got you.

13        A.  I'm trying to learn the smoking aspect, but --

14   I'm in the right place to do it.

15        Q.  Dallas is a good place to learn how to smoke

16   some brisket.  I'll represent to you her name is Miaya

17   Holliman.  She makes a statement to one of the officers.

18   There are three officers that kind of showed up separate

19   and apart from the additional folks who showed up.  But

20   when it comes to this body cam footage, I'm sure you're

21   seeing us hear you tell the same story, right?  I mean,

22   it stayed consistent.  It's not like you're switching up

23   the facts or anything like.  But the reason why there

24   are multiple of these videos is because you make a

25   statement to a different officer.  So the first time,
```

```
 1   I'll represent to you, when we went through your

 2   statement, it was with the Officer Eric Urquiza.  He's a

 3   Hispanic officer whose body cam footage is marked as

 4   Exhibit C.  This one currently is an Officer Carter

 5   Aktabowski that you spoke with.  His body cam footage is

 6   marked as Exhibit E.  Do you understand that these are

 7   different statements that you're making?  They're still

 8   essentially the same consistent statements, it's just

 9   two different people you're speaking with about the same

10   facts or events, correct?  Do you understand that?

11        A.   Uh-huh.

12        Q.   Good deal.

13             (Video played.)

14        Q.   (BY MR. EDEN)  Mr. Hardrick, this is you

15   communicating with Officer -- oh, my goodness, what is

16   his name -- Officer Aktabowski.  This is when the

17   officers first arrived at the scene.  We see that

18   there's a time and date stamp up here for January 3,

19   2023.  Now, why did you bring up Joshua Ashby, your

20   coworker, again -- or for the first time, rather, to

21   Officer -- to Officer Aktabowski?

22        A.   I'm going to say it again.  To come in -- I've

23   been coming in for a long time -- a lot of time, and to

24   walk into that -- I wasn't expecting to come in and get

25   shot at.  The last person that I was with -- we was
```

1    together.  The reason why I'm saying this, I'm

2    flabbergasted.  I'm not knowing the tow truck is there.

3    They come on January 3rd, locate the car on January 3rd.

4    That's not in my mind at the time.  I just got shot at.

5    I'm trying to put together and think what might could

6    have happened or -- I don't know anybody -- I wasn't

7    with nobody.  That's what I'm trying to say.  I'm trying

8    to process through my mind.  And then when I see the tow

9    truck moving around, I'm not knowing my car is under

10   repo at the time.  So I was just processing through my

11   mind anything.  You've got to realize, I had just got

12   shot at.  I was in a state of shock.  So you're talking

13   to me now when I'm not in shock, but you're asking me

14   questions about when I was in shock.

15        Q.  Got you.  I understand.  I'm going to keep

16   playing the video.

17               (Video played.)

18        Q.  (BY MR. EDEN)  I think -- I think this is when

19   the other officer was telling that delivery lady to not

20   cross the police tape perimeter, and I think you walked

21   over there to get your food.  I think that -- does that

22   make sense?  It's like different cameras -- it's almost

23   like editing a mystery film, right?  It's like we've got

24   so much raw footage from different vantage points and

25   different perspectives that we kind of have to put all

Bobby Hardsick
January 23, 2025                                                125

1   the puzzle pieces together.  I appreciate your patience

2   with me in getting this done.

3           But when establishing that reliable timeline

4   like I told you earlier, do you feel comfortable or have

5   an understanding of when you're communicating with

6   Officer Aktabowski?  It's roughly around the time -- I'm

7   trying to establish a reliable timeline, and I really

8   like the delivery lady as a marker, as a time stamp,

9   right?  Do you have an understanding that this statement

10  that you're making to Officer Aktabowski is when that

11  delivery lady attempts to deliver your Chinese food?

12      A.  I'm watching it, but what are you -- I don't

13  get what you're saying.

14      Q.  (BY MR. EDEN)  I'm just asking if you have an

15  understanding of when this statement is being made

16  during the officer's investigations.

17      A.  The statement for who?

18      Q.  The statement you're making to Officer

19  Aktabowski.

20      A.  I'm not recalling what you're saying -- getting

21  what you're asking me.

22      Q.  Okay.  I'll ask it in a better way.  I'll ask

23  it in a better way.  You're talking to Officer

24  Aktabowski while that lady is trying to deliver your

25  food, right?

Bobby Hardrick
January 23, 2025                                                          126

```
 1        A.  Right.

 2        Q.  Got you.  That was the question.  Sorry about

 3   that.

 4             (Video played.)

 5        Q.  (BY MR. EDEN)  I want to, for the record, state

 6   we are now on minute marker 13 minutes and 37 seconds of

 7   Exhibit E.  Now I'm going to continue playing the video

 8   for you.  Okay, sir?

 9        A.  Okay.

10             (Video played.)

11        Q.  (BY MR. EDEN)  Mr. Hardrick, why did your

12   daughter drop the keys down when you arrived at

13   Berkshire Medical District Apartments after your Chicago

14   trip?

15        A.  To pull the car out of the garage.

16        Q.  Got you.  So she dropped the keys for you to

17   pull the car out of the garage?

18        A.  Pull her car out of the garage.

19        Q.  Sorry.

20        A.  It was her car keys.

21        Q.  That makes perfect sense.  I want to go and

22   fast forward to the 16-minute mark of Exhibit E.  You've

23   got to tell me, Mr. Hardrick, if you can see my notes

24   because that's cheating if you do.

25        A.  No, I'm not.  I'm actually listening.
```

Bobby Hardrick
January 23, 2025                                                    127

1    Q.  Good deal.  Good deal?

2              MR. HUBBARD:  I've done that before.  I've

3    actually e-mailed my notes.

4              MR. EDEN:  Oh, man, that's painful.  I know

5    that's going to be me in the future.  I just feel it

6    every time I hit send.

7    Q.  (BY MR. EDEN)  I'm going to press play at the

8    16-minute marker for Exhibit E, the body cam footage

9    from Officer Carter Aktabowski.  Okay, Mr. Hardrick?

10   A.  Yes.

11             (Video played.)

12   Q.  (BY MR. EDEN)  So, Mr. Hardrick, it sounds

13   like, according to you in this body cam footage at 16

14   minutes for Exhibit E, that you did see a tow truck pull

15   up and then the tow truck left.  And when he was gone,

16   after that, the alleged shooter was still standing there

17   and then fired the shots after that, according to you?

18   A.  According to me, my thought is once I closed

19   the garage, the -- getting the car was over with.  You

20   should have shot me at the -- if you was looking to

21   shoot me, why didn't you -- if you're going to shoot a

22   gun in the community, why wouldn't you shoot me when I

23   was at the mailbox?  Why would you let me walk to go to

24   my daughter?  Why would you let me do all this movement

25   until I close the garage and the tow truck pull off and

Bobby Hardrick
January 23, 2025
128

```
 1   you pull off after the tow truck?
 2        Q.  Well, that's not what you said in the video, is
 3   it?  What you're saying in the video at the 16-minute
 4   mark -- and I can go back and replay it.  But what
 5   you're saying is the tow truck --
 6        A.  I was in shock.
 7        Q.  I'm sorry.
 8        A.  I was in shock.
 9        Q.  I'm sorry, sir.
10        A.  I can't tell you what I -- what I did at that
11   date.  I just thank God I'm here to even have a
12   deposition.  But it just makes sense that you have ample
13   opportunity -- if you wanted to kill me, you could have
14   even ran up to the stairs and killed me in my back.
15   Immediately after the tow truck left and the garage
16   closed, you make gunfire, then you ran out after the tow
17   truck.  Why didn't -- if you're going to kill
18   somebody -- shoot somebody, you're not going to pick a
19   time and be witnessed.  He could have did it when I
20   first got there.
21        Q.  Got you.
22             MR. EDEN:  Objection as nonresponsive.
23        Q.  (BY MR. EDEN)  And as a friendly reminder,
24   Mr. Hardrick, I want to remind you, remember for a clean
25   record and to really help the court reporter,
```

Bobby Hardsick
January 23, 2025                                                                    129

1    Ms. Baldwin, you've really got to let me finish the

2    question before you start answering and I'll extend the

3    same courtesy.  Is that okay, sir?

4         A.  That's okay.

5         Q.  All right.  Good deal.

6         A.  It's just going back through these moments and

7    you picking and choosing.  I lived it and I live every

8    day, so the motor mouth comes along with that.

9         Q.  Oh, you're good, brother.  I do the exact same

10   thing all day every day.  It's actually hard for me to

11   keep my mouth shut according to my girlfriend.  Okay.

12   Now, I want to stay with the same exhibit, the body cam

13   footage of Carter Aktabowski, but I want to start at the

14   19-minute and 15-second mark.  Do you see that part of

15   the video on your screen where you're standing over the

16   kitchen island and your daughter -- I mean, do you see

17   an image of a young lady in front of the camera?

18        A.  That's my daughter.

19        Q.  And that's your daughter Asia?

20        A.  Yes.

21        Q.  Good deal.  And so I think this is the part of

22   the video where she's providing a statement to the

23   police officer.  I just want to watch this part and then

24   ask you some questions following.  Is that okay?

25        A.  Okay.

Bobby Hardrick
January 23, 2025

130

```
 1              (Video played.)

 2      Q.  (BY MR. EDEN)  Mr. Hardrick, it's not too much

 3  of a conflict with the description of the alleged

 4  shooter, but what do you remember about him?  If you

 5  could, give a brief description about what he looked

 6  like, what he was wearing, age, weight, something like

 7  that.  I mean, could you give us a brief description

 8  about what this alleged shooter looked like?

 9      A.  Dark skin, skinny, had on a gray hoodie, black

10  pants, yeah.

11      Q.  Do you remember what type of pants he was

12  wearing, if they were sweatpants, jeans, slacks?

13      A.  Sweats.

14      Q.  Sweatpants?  Got it.  Now I'm going to fast

15  forward to the 21 and 38 mark.  I promise you, ain't a

16  lot happening in between these videos.  It's a lot of --

17  a lot of heavy breathing from the camera man, if you

18  know what I mean.

19      A.  Okay.

20      Q.  So we're at 21:38.  Asia is giving a statement

21  on the screen to the police officer from the beginning.

22  And I'm going to go ahead and start that video.  Okay,

23  sir?

24      A.  Yes.

25              (Video played.)
```

Bobby Hardrick
January 23, 2025
131

```
 1        Q.  (BY MR. EDEN)  So, Mr. Hardrick, I'll represent
 2   to you that the African-American officer that knocked on
 3   the door that Officer Aktabowski opened the door for is
 4   Officer Jean-Mario Paillant whose body cam footage we
 5   marked as Exhibit D.  Do you understand that, sir?
 6        A.  Yeah.  That's that --
 7        Q.  Got you.
 8        A.  That's the body cam who knocked on the door.
 9        Q.  Exactly.  And so that's kind of what we're
10   doing now.  It's like one of those indie films, right,
11   where we get multiple vantage points of the exact same
12   scene just through different folks' lens, if that makes
13   sense.
14        A.  Folks' lens, right, I get you.
15        Q.  I'm going to continue the video at 22:32.
16              (Video played.)
17        Q.  (BY MR. EDEN)  Now, as your daughter is
18   describing the alleged shooter, does that sound correct
19   with your recollection?  Did he kind of have, like,
20   shorter dreads or something like that?
21        A.  I thought they were longer --
22        Q.  That's okay.
23        A.  -- hanging out the -- hanging out the hoodie.
24        Q.  Got you.  It's not like he had like a small
25   fade like I do, right?
```

Bobby Hardrick
January 23, 2025
132

1          A.   Right.  I wear that also.

2          Q.   I'll tell you this right now, I've got an

3     appointment at 4:00 today with my barber in a different

4     town because I'm loyal to my barber.  I'm not going

5     to -- you know what I mean?  I'm not going to go to one

6     right here across the street just because it's

7     convenient.  I have a terrible hairline, so he works

8     magic for me.

9          A.   I get it.

10         Q.   Was he African-American, the alleged shooter?

11         A.   Yeah, dark skin.

12         Q.   Got you.  I'm going to continue the video at

13    22:46 if that's okay.

14                   (Video played.)

15         Q.   (BY MR. EDEN)  Mr. Hardrick, were you able to

16    hear your daughter provide a description of the alleged

17    shooter?

18         A.   I hear the answer she's giving him, yes.

19         Q.   Yeah.  And my question is, does that sound

20    accurate?  Is your daughter providing an accurate and

21    truthful description of the alleged shooter as you

22    remember him?

23         A.   I'm going to say I can't recall the weight, but

24    I can recall the height.  He was a little bit taller,

25    but skinny with the gray, the black.  I'm not going to

Bobby Hardsick
January 23, 2025                                                          133

```
 1   say I can give you a weight count.
 2        Q.  I like to use -- because it's difficult, right?
 3   We're not scales.  I like to use football positions to
 4   describe weight.  It just feels like a nice, little
 5   ballpark, you know what I mean?  Now --
 6        A.  I like to weigh in 80,000 pounds,
 7   50,000 pounds.  So I have --
 8        Q.  You're good.
 9        A.  -- 12,000 pounds on the front and no more than
10   34,000 pounds on my tandems and axles.  So that's the
11   weight I'm used to.
12        Q.  That sounds good.  But, like, if you were to
13   look at him, did he look like he would be lineman on a
14   football team?  Did he look like he would be a tight end
15   or a wide receiver?  I played wide receiver.  I'm 150.
16   What did you -- do you think he could --
17        A.  I'm going to say like Olive Oyl.  That's what I
18   pictured.
19        Q.  Olive Oyl from Popeye's?
20        A.  Yeah.
21        Q.  I mean, not Popeye's, but the show Popeye.  Got
22   you.  Got you.
23        A.  Yeah, Popeye.  Yeah, Olive Oyl.  He was super
24   skinny.
25        Q.  You might have missed -- you're lucky you got
```

Bobby Hardsick
January 23, 2025

134

```
 1   me in my generation because someone else a little bit

 2   younger than me, maybe a first year associate, might

 3   have missed that reference.  I'm going to keep going.

 4   Right now we are at the 24-minute mark on Exhibit E

 5   providing a description -- Asia, your daughter, is

 6   providing a description of the alleged shooter.

 7             (Video played.)

 8        Q.  (BY MR. EDEN)  So according to your daughter,

 9   sir, she's stating that she didn't see this alleged

10   shooter get in the tow truck or anything like that.  Did

11   you hear that?

12        A.  Yeah, I heard that.

13        Q.  Do you have any reason to challenge the

14   truthfulness or the veracity of the statement that your

15   daughter is providing to Officer Carter Aktabowski at

16   the 24-minute and 43-second mark in Exhibit E, the body

17   cam footage of Officer Carter Aktabowski?  Do you have

18   any reason to challenge the truthfulness or the veracity

19   or the accuracy of your daughter's statement to him?

20        A.  Yes, because the angle.  If you look at the

21   picture where Joshua Stinson took on his third balcony

22   floor of the tow truck driving around, he physically

23   went -- encountered the shooter.  So he has an angle

24   pointing outside of the gate.  If you're looking from

25   where Asia is looking from, that's going straight down
```

Bobby Hardsick
January 23, 2025
135

1    the gate, not in and out.  Joshua's perception of what

2    he saw and explained, he saw it pulling out of the gate.

3    So I do, yes.

4        Q.  Who is this?  Joshua who?

5        A.  Joshua is another -- you will see him at the

6    end of the video.  He gave -- he walked up and gave the

7    officer what he saw.  And he later came up to me, and he

8    video-recorded this and sent me a video of the tow truck

9    driver going around -- you know, running around the

10   parking lot and this guy standing at the gate.  So he --

11   like he said, he had a different angle of what Asia had.

12       Q.  Did he speak with the police?

13       A.  It's a neighbor.

14       Q.  I understand he's a neighbor.  But he spoke

15   with the police, is what you're telling me, in this

16   video?

17       A.  Yes.  I don't know what video.  There were a

18   few of them.  But I know that Joshua was the one who

19   brought it to my attention.  He asked the officer could

20   he talk to me behind the yellow tape.  He said that he

21   was watching this guy and he was taking a video of the

22   tow truck driver and the guy, and he was leery.  He said

23   he was wanting to call the police then, but he got busy

24   and he was running back and forth from the building --

25   or his -- in the house to the patio -- in the house and

```
 1   patio.  Then when he was in the -- cleaning up his

 2   house, he said he heard the gunshot.  That's when he

 3   said it all hit him.  He was like, I should have called

 4   the police.  He ran to the patio.  And his patio is the

 5   apartments that's sideways as far as -- he can come out

 6   his patio and look outside the gate, who comes in and

 7   out.

 8        Q.  Got you.

 9        A.  He can look and see along the gate.  So I

10   would -- I would -- from what she saw to say and from

11   what he saw and said, I could understand because of the

12   angles of the patios.

13        Q.  Got you.  And so when the shooter was first,

14   before any shots were fired, standing in front of you,

15   how far in front of you would you say he was?

16        A.  He was where the officer was like I told you.

17        Q.  I understand that.  I'm more so concerned with

18   the distance between you and him.  That's what I'm -- I

19   understand where he was at.  I was just trying to figure

20   out the distance between you and the shooter.

21        A.  From the sidewalk to the middle of the street.

22        Q.  So you got a pretty good look at him?

23        A.  Yeah.

24        Q.  Okay.

25        A.  I did a turnaround.  I looked.  I had to see
```

Bobby Handsick
January 23, 2025
137

1   because he was -- he was -- both hands on the gun at

2   first and was looking right at me.

3       Q.  Did he have a uniform on that would indicate

4   that he belonged to a tow truck company or a

5   repossession company?

6       A.  He had a hoodie and some black pants -- black

7   sweats.

8       Q.  Is that a no to my question?

9       A.  No.  No.

10      Q.  No as in he didn't have a uniform on indicating

11  he was an employee, correct?

12      A.  I'm not for sure if they wear uniforms.  I

13  never seen a tow truck driver other than back then tow

14  truck drivers wear a uniform.

15      Q.  Got you.  Got you.  So you're in no position to

16  testify today one way or the other whether or not he was

17  wearing a uniform then; true or untrue?

18      A.  He had a hoodie and he had pants on.

19      Q.  I think the only answer there is true or

20  untrue, sir.  I'll rephrase -- I'll re-ask the question.

21  Okay?  The question was, so you're in no position to

22  testify today one way or the other whether he was

23  wearing a uniform for work, for repossession, or tow

24  truck company; true or untrue?

25      A.  I don't know what the uniform would look like

1   if he did.

2        Q.  Got you.  So --

3        A.  I don't know if I'm looking at his uniform.

4   No, I wouldn't say no.  I would say I wouldn't know what

5   to look for as his uniform as what they would wear.

6   You're asking me -- a uniform could be a shirt and

7   pants.  A uniform could be a hoodie with the name on the

8   back.  I didn't see.  I don't know.

9        Q.  Right.  Right.

10       A.  You're asking me a question that I can't give

11  you the answer to because I don't know what type of

12  uniform they would provide.

13       Q.  And I think that's a failure on my part asking

14  the question because that is what the cull of the

15  question is.  The cull of the question was asking

16  whether you would be able to say one way or the other.

17  Does that make sense?  I'm not asking you to say no, he

18  wasn't wearing a uniform.  I'm trying to support your

19  testimony.

20       A.  I don't -- I would have to say I couldn't

21  answer that because I don't know what type of uniform

22  they would wear.

23       Q.  Got you.  That was what the question was.

24  Mr. Hardrick, you understand that is the question I'm

25  asking, right?

Bobby Hardrick
January 23, 2025                                                                                      139

1        A.  Yeah.

2        Q.  That is what I'm saying.

3        A.  Yeah.  Yeah.

4        Q.  Does that make sense?

5        A.  Yeah.  And I'm giving you the answer that I can

6     give you.  If I could be looking at someone -- it could

7     be a clown in a uniform, and I could just be like, you

8     dressing like that, and they're like, this is our

9     uniform.  Okay.  I don't know what uniform -- I can tell

10    you the officers out there was dressed for work and that

11    type of uniform.  I could give you that answer.

12       Q.  That's exactly what I'm asking, is that you

13    wouldn't be able to tell me one way or the other, right?

14       A.  I wouldn't -- I would have to say that it's not

15    a fair question because I don't know what type of

16    uniform Keel Recovery drivers use or if they even use a

17    uniform.

18       Q.  Got you.  What do you think it is that I'm

19    asking you, Mr. Hardrick?

20       A.  You're trying to make me say that I know what

21    Keel Recovery uniforms would be.  I don't.

22       Q.  I see.  So that is not what I'm asking, and I

23    apologize in failing in asking my question because I'm

24    not trying to ask you if you know what they look like or

25    to say that they do look one way or the other.  I'm not

Bobby Hardrick
January 23, 2025
140

1  asking that.  Do you understand now that that is not, in

2  fact, what I am asking you?

3      A.  You want to say a uniform.  It's a question

4  that I can't give you an answer to.  I can't tell you

5  yes, I can't tell you no because there's -- there's --

6  uniforms come in -- when they're -- the NFL that you

7  were talking about, they wear their uniforms.  They

8  could have the hoodie and the sweatpants on.  That could

9  be their uniform.  They could all have the same thing

10  and that's going to be the uniform.  But you're trying

11  to get me to dictate what type of uniform.  For me to

12  say I saw him in a uniform or not, I can't.

13              MR. EDEN:  Mr. Hubbard, I think --

14      A.  I'm just telling you what I saw.

15              MR. EDEN:  -- it's a good time to take a

16  short break because I think no matter how many different

17  times I try to ask this question, it just -- the cull of

18  the question isn't coming across.  I think it would be

19  good if we take a little bit of a break.

20              MR. HUBBARD:  Sounds good.

21              MR. EDEN:  Thanks.

22              (Break taken from 2:02 to 2:15.)

23      Q.  (BY MR. EDEN)  All right.  Mr. Hardrick, I

24  think I've gotten easier questions drafted that will

25  help everyone understand what the cull of the questions

1    are, okay, because --

2          A.  Sorry about that.  Sorry about that.

3          Q.  No, you're good.  There's a sign at this golf

4    course on the 9th hole near my girlfriend's house and it

5    says crocodiles do not swim here.  It says, crocodiles

6    and then it says do not swim here.  And you're looking

7    at that sign and you're thinking to yourself, what is it

8    trying to tell me?  Is it trying to tell me that

9    crocodiles don't swim here and I can go get my ball or

10   are they telling me, hey, crocodiles are here, you

11   better not swim in this water, guy.  You know what I

12   mean?  So I completely understand.

13         A.  All right.  All right.

14         Q.  Now, the question I was trying to ask you

15   before, I've got a better way of asking it now, okay,

16   is -- and I'm going to do it in a true and false way.

17   Okay?

18         A.  Okay.

19         Q.  What you're -- what you're telling me is you do

20   not know if the shooter was wearing a uniform; true or

21   untrue?

22         A.  True.

23         Q.  Okay.  And according to your testimony and the

24   statements you provided to the officers, you did not see

25   the shooter get in the tow truck; true or untrue?

Bobby Hardrick
January 23, 2025
142

1        A.  True.

2        Q.  Okay.  And according to you and Asia and the

3   video that we watched marked as an exhibit, Asia did not

4   see the shooter get in the tow truck as well; true or

5   untrue?

6        A.  True.

7        Q.  Okay.  And do you know if anyone saw the

8   shooter get in the tow truck?

9        A.  I was speaking with a -- the witness, and they

10  didn't -- no.  Let me say no.  Hello?

11       Q.  Yeah, I'm here, sir.  I'm here.  I'm just a

12  little slow.  I'm just a little slow.

13       A.  That's okay.  That's okay.

14       Q.  I've got 34 years of my dad reminding me of

15  that.  And were you ever made aware that the

16  investigating officers that came out to the scene did

17  not call for crime scene to come out because they found

18  that there was no reason to?  They stated that there was

19  no shell casings in the area, no holes in any of the

20  walls or fire projectiles and any property damage.  Are

21  you aware that they did not call for crime scene to come

22  out to the parking lot of Berkshire Medical District on

23  January 3, 2023?

24       A.  I'm aware that the supervisor told him he

25  didn't want to break protocol when they were looking at

Bobby Hardrick
January 23, 2025
143

1   the cracked windshield.  One of the officers didn't want

2   to call, but the head officer said he wanted to --

3   didn't want to break protocol, it is a crime scene to

4   call for them to come out there.  I witnessed that on

5   the video.

6       Q.  Got you.  Got you.  And so that cracked

7   windshield, do you know whose vehicle that was?

8       A.  I don't.

9       Q.  I'll represent to you that was for Miaya

10  Holliman, that suspect -- or not suspect -- that witness

11  who came out of her apartment when you were giving a

12  statement to the officer.  Do you understand that that

13  cracked windshield was for a vehicle that belongs to

14  Miaya Holliman?

15      A.  Right now you're saying so.

16      Q.  Yeah, that's all I'm asking is if you

17  understood that based off what I'm representing.

18      A.  Okay.

19      Q.  Good deal.  And Miaya Holliman said to the

20  police officers -- and it's supported by the body cam

21  footage produced by your attorney in discovery on

22  September 24, 2024 -- that those cracks on the

23  windshield were already preexisting.  Did you know that?

24      A.  I didn't know.  I just saw that on the video.

25      Q.  Got you.  Now, sir, I'll represent to you that

Bobby Hardsick
January 23, 2025                                                        144

```
 1   a lawsuit is usually broken down into two parts when it
 2   comes to these types of civil cases.  The first part is
 3   liability.  You know, that's just trying to describe
 4   what people did wrong.  And so for a lot of my trucking
 5   clients, my drivers specifically, they want to say
 6   liability is, well, you failed in exercising ordinary
 7   care in the operation of your commercial vehicle.  You
 8   drove too fast, you didn't check for a blind spot, you
 9   ran a red light or something like that.  That's what
10   liability is.
11           The second part of the case or for these
12   lawsuits are what are called damages.  Because it's a
13   civil lawsuit, you're entitled to what are called
14   compensatory damages.  That's to make you whole again
15   for the damages that you've suffered as you allege in
16   the lawsuit.
17           Do you understand the distinction that I'm
18   trying to make between liability and damages?
19       A.  Yes.
20       Q.  Now, I don't have you for very much longer, so
21   I'm going to try and go a little more expedited when I
22   discuss your damages.  But that's what I want to discuss
23   moving forward.  Is that okay?
24       A.  No.  I don't want you to get your hair cut.
25       Q.  So --
```

```
 1        A.  Yes, that's okay.

 2        Q.  -- I've actually got -- never mind.  I was

 3   going to say something, but it was going to get me

 4   caught up on the record and then my girl was going to

 5   get on me and be like, what do you -- what do you need

 6   this haircut for so badly by Saturday, so I'm not going

 7   to say it.

 8        A.  Okay.

 9        Q.  Let's just say she might not be my girlfriend

10   for very much longer.  That's all I wanted to say on

11   that.

12        A.  You messed up already.

13        Q.  I want to talk --

14        A.  She might not detach herself from you.

15        Q.  I cannot stress enough, we may have gotten past

16   that mark.  We may have gotten past that.

17        A.  Right.  I get it.

18        Q.  It's hard.  Man, it's hard.  I've never had to

19   break someone's heart before.  But -- but I want to -- I

20   want to talk to you about how this alleged incident has

21   impacted you following January 3, 2023.  That's kind of

22   the reason why I asked earlier in your deposition about

23   if you, you know, performed any athletics after school

24   before January 3rd because I want to know some of the

25   stuff that you were able to do before January 3rd that
```

Bobby Hardsick
January 23, 2025
146

 1  you're no longer able to do as alleged in your lawsuit

 2  or just, generally speaking, how this alleged incident

 3  has affected you.  So could you please provide a brief

 4  description about how this alleged incident has affected

 5  you?

 6      A.  Well, it's affected me and my family in many

 7  ways.  Are you just asking for self -- myself?

 8      Q.  Yeah, for you.

 9      A.  Okay.  Okay.  Okay.  Well, just general --

10  general life, you know, just going through, you have

11  triggers.  You break train of thoughts through the day.

12  Driving a truck, my career, I'm -- I basically through

13  the therapy was saying I've had three accidents since

14  this has happened in a commercial vehicle, and they --

15  they recommended to try to reduce the triggers to come

16  out of the truck, try to find a different career.

17  That's my therapist and my marriage counselor.  So we

18  were just trying to come up to a way -- because, you

19  know, that's my way of living.  It's kind of hard to --

20  I don't -- that's my career -- to jump into another

21  career and get the pay that you can make driving a

22  truck.  So that's been hard right there.  And just

23  trust.  Trusting is -- is -- is almost shot, you know.

24  It's just -- you know, it's hard to explain.  But life

25  isn't the same since it happened, you know, just

Bobby Hardsick
January 23, 2025

147

1   anxiety, depression, not knowing if you will ever get

2   back to the way of living or, you know, the -- it might

3   come back, it might not.  I can't put a dollar amount on

4   that because if it does come back, great.  But if it

5   doesn't come back and the amount of money that is

6   offered and accepted doesn't go thereafter, the latter

7   part, money runs out, you know, but you're still feeling

8   you're there.  So it's kind of hard to put a dollar

9   amount on my recovery that I'm trying to get at and as

10  close back to normal as I can get.  I don't know.  But

11  can I ask you, what would you put on it?

12      Q.   I used to freely answer that question when I

13  was a plaintiff's lawyer.  In fact, I would put that up

14  on a big demonstrative ELMO in a courtroom and ask folks

15  and tell them what to put there, but I can't give you

16  that answer, I'm sorry.

17      A.   Yeah, I'm like that as well.  It's just -- you

18  know, my daughter is affected.  She was there.  I mean,

19  even the people that was out there had to live through

20  it and with neighbors and everything.  I don't know what

21  to put on it.  I mean, I just thank God that -- that's

22  like me saying what's my life worth.  I just thank God

23  that I'm here.  I'm not -- I didn't get shot and -- or

24  killed, but it's hard to say.  I can try to give an

25  answer, but I don't think I have one.

Appx. 0168

```
 1        Q.  That's okay.  I've got a lot to work with here.
 2   So you're telling me this incident has caused you
 3   anxiety and depression.  You're seeing a therapist.  Do
 4   you happen to know that therapist's name currently?
 5        A.  Yeah.
 6        Q.  Who is that therapist?
 7        A.  Chris Logan.  Chris Logan.
 8        Q.  And are you being prescribed anything for your
 9   anxiety and depression as a result of your treatment
10   with Chris Logan?
11        A.  Yeah.  I was on actually -- it's my PCP
12   prescribing it.  I was on Fluoxetine.  And it got closer
13   to this time right here, so I was kind of going through
14   anxiety and more depression, so my doctor put me on --
15   took me of the Fluoxetine -- weaned me off of that and
16   then he put me on Sertralon -- Sertraline.  Let me give
17   you the right information.
18        Q.  That's okay.  We'll go ahead and wrangle those
19   records in a bit.  But are you currently still treating
20   with Chris Logan?
21        A.  Yes.  Yes.  Yes, I am.  I'm actually going to
22   see him after this.
23        Q.  Good deal.  Good deal.  And have you provided
24   these -- have you provided records from Chris Logan to
25   your attorney?
```

Bobby Hardsick
January 23, 2025                                                                    149

```
 1        A.   Yes.

 2        Q.   Okay.  And where does Chris Logan practice at?

 3        A.   He's out of Native -- Texas Native Health out

 4   of Dallas, Texas.

 5        Q.   Got you.

 6        A.   Sertraline, S-E-R-T-R-A-L-I-N-E.

 7        Q.   Wait a minute.  Is Texas Native Health also

 8   where your PCP practices out of, Gary Vollenweider?

 9        A.   Yes.  It's an Indian-based clinic.  I'm

10   Cherokee.

11        Q.   I see.

12        A.   Yeah.

13        Q.   So Chris Logan works in conjunction with your

14   primary care physician, I'm guessing, since they're,

15   like, part of the system -- healthcare system?

16        A.   Yes.  They have different branches.  Just like

17   your law firm, you might be in bankruptcy, you might

18   have litigation over here for corporate law or -- just

19   like that.  It's that entity.

20        Q.   Us litigation guys are the cool ones.  It's the

21   coverage attorneys who do insurance stuff, those are the

22   weird ones.

23        A.   All right.

24        Q.   Watch me catch an insurance attorney on the

25   jury, right?  All right.  Well, were you suffering from
```

Bobby Hardrick
January 23, 2025
150

```
1   anxiety and depression and being treated for it prior to

2   January 3, 2023?

3       A.   No, I wasn't.  I wasn't suffering from anxiety

4   and depression.

5       Q.   Okay.  Remember earlier in the deposition we

6   discussed who it is that I represent?  What I want to do

7   is I want to go through each one of them with you and

8   talk about their role.  Okay?

9       A.   Okay.

10      Q.   All right.  Now, Keel Recovery, Inc., you named

11  in the lawsuit as being the repossession agency company.

12  I represent -- our law firm represents Keel Recovery,

13  Inc.  What all do you think Keel Recovery did wrong?

14      A.   What do I think did wrong?

15      Q.   What all do you think Keel Recovery, Inc. did

16  wrong?

17      A.   First of all, for coming through the gates and

18  didn't have authority to do so, starting there.  I would

19  say shooting at me and not even calling to make a police

20  report.  If I'm a tow truck driver and I experience

21  something I didn't have a part of, I want to let my

22  employer know and I want to make a police report,

23  especially if I want to go back to that area to try to

24  get the car.  So I would have made a police report

25  regardless.
```

Bobby Hardrick
January 23, 2025
151

1    Q.   How do you know it was the Keel Recovery agent

2    who was shooting at you?

3    A.   Well, he was there with the tow truck and he

4    left with the tow truck, and we don't have random

5    bullets coming across our parking lot out there.  Either

6    you're walking a dog or you're power walking.  That's

7    why it was so strange for this to happen.  And as you

8    heard my neighbor, the officer asked him, does

9    Mr. Hardrick ever had any problems, no, he's not --

10   never in that video footage.  So, I mean, I know

11   personally -- even me speaking to Joshua Ashby -- my

12   father just passed away in August.  He was a pallbearer.

13   He carried my father to lay him to his final rest.  So,

14   I mean, it's -- you know, at first when I was going

15   through these things -- events in my mind, I was -- it

16   was -- it was flabbergasting.  But after taking the time

17   to talk and sort it all out and -- and -- I can plainly

18   see what happened.  That's how I know.

19   Q.   Got you.  And according to your testimony

20   earlier, you don't know if the shooter was wearing a

21   uniform, you did not see the shooter get in the tow

22   truck, and you don't know if anyone saw the shooter get

23   in the tow truck, correct?

24   A.   Correct, I say that.

25   Q.   So what factual basis are you relying on to say

Bobby Hardrick
January 23, 2025
152

1  that this shooter was working with or for Keel Recovery,

2  Inc. at the time?

3      A.  Well, like I said, they were there before --

4  they were there together, they left together, and my

5  witness had a view of them exiting.  They went in the

6  same direction.

7      Q.  Got you.  And what was name of that witness?

8  It was Joshua what?

9      A.  Joshua.  I don't remember his last name.  It's

10  on the video.

11      Q.  Was he white, black?

12      A.  He's black.

13      Q.  Skinny?  It looked like he would be a corner or

14  would he be a linebacker?

15      A.  He's the last -- he's the last -- he's the last

16  guy on the video.  He asked if he could speak to me and

17  give me his number and asked if -- the video -- the

18  cop's video camera is looking right at him while he

19  talks, and he handed the officer his driver's license.

20      Q.  The problem is there is a lot of video, and I

21  watched it all.

22      A.  Right.

23      Q.  I just want to know which one was which.  There

24  were several people who spoke with the officers that

25  were investigating the scene, so --

1      A.  Right.

2      Q.  Can you give me a brief description about his

3  weight maybe?  Was he thin?

4      A.  Joshua -- Joshua was short and thin.

5      Q.  Short, thin and black?

6      A.  Yes.

7      Q.  Thank you.  What about his hair?  Does he get a

8  taper also or a fade or does he have some dreads?

9      A.  I want to say he had -- I'm going to say he had

10  medium hair maybe.  But he's -- he's the guy that came

11  face to face with the -- with the shooter and took the

12  video of the tow truck driving around from the third

13  floor facing out the gate.

14      Q.  Got you.  Now, I want to ask you the same

15  question but for Resolvion.  Okay?

16      A.  Okay.

17      Q.  What all do you think Resolvion did wrong?

18      A.  Resolvion did not do their homework.

19      Q.  What do you mean by that?

20      A.  Well, when I was speaking to the office -- are

21  you familiar with the Office of the President of Wells

22  Fargo Bank, that -- that area of corporate?

23      Q.  I got correspondence between you and some folks

24  over at Wells Fargo.

25      A.  Well, that's the Office of the President is

Bobby Hardrick
January 23, 2025                                                                    154

```
 1   what they call that.
 2        Q.  Okay.
 3        A.  They're the bigwigs.  So I stayed in touch with
 4   the Office of the President, and he was just being
 5   frank.  He was just saying -- you know, talking out loud
 6   or he was just making it be known, he just came out and
 7   said Resolvion is going to be the one to pay for this.
 8        Q.  Wells Fargo told you that?  Anything else that
 9   you rely on to say that Resolvion -- what they did
10   wrong?  Anything else?
11        A.  I'm going to say that they should have -- know
12   who they hired -- contracted to.
13        Q.  So you think they negligently hired folks to
14   repossess vehicles and stuff?
15        A.  I'm going to say that this time they did.  I
16   can't -- if you did it once, you know -- and then on top
17   of that, if you're not -- if you're going to
18   subcontract, I want to know if you have permission.  I
19   want to know did the apartment people give you
20   permission to come on and disturb their residents.  I
21   want to know if you're doing legal things, not just go
22   grab a car.
23        Q.  You don't know if they were trespassing; true
24   or untrue?
25        A.  Yeah, I know.  I spoke to the manager.
```

Bobby Hardrick
January 23, 2025                                                      155

 1        Q.   Oh, so you do know that the tow trucks there

 2    repossessing vehicles as you've alleged were

 3    trespassing?  That's what you're telling me?

 4        A.   They're trespassing.  They didn't have

 5    permission from the management.  They didn't have a

 6    court order to come over there to take the car.

 7        Q.   Got you.  And if we were to subpoena the

 8    apartment complex, Berkshire Medical District

 9    Apartments, and speak with their management team and

10    stuff like that, they would corroborate that testimony?

11        A.   That's -- that's what she told me.

12        Q.   Got you.

13        A.   I'm not going to tell you a lie under oath.

14        Q.   I believe you, sir.

15        A.   I don't think she would.

16        Q.   We don't know her.  That's why the hearsay rule

17    exists.  It's like the telephone game, right?

18        A.   Right.

19        Q.   I cannot stress this enough, brother, there

20    have been so many times where me and my girl would get

21    into a huge fight and she'll go and tell folks, this is

22    what Essay said, and I hear from her sister and I'm

23    like, that is not at all what I said whatsoever.  It's

24    the crocodiles do not swim here thing, man.

25        A.   Right.  I get it.

Appx. 0176

Bobby Hardsick
January 23, 2025
156

1      Q.  Okay.  Anything else about Resolvion and what
2   they did wrong?
3      A.  I'm just going to say that they passed the
4   torch down.  So the big fish was the overseer of both of
5   them.
6      Q.  Same question --
7      A.  The big whale looking after the little whale.
8      Q.  Same question, but this time for Wells Fargo.
9   What all do you think Wells Fargo did wrong?
10      A.  They had a lot to touch basis with.  Like I
11   said, I was even in contact.  They gave me permission to
12   sell the car before we even got into the repo part of
13   it.  We knew -- we were having business conversations.
14   They gave us permission and basically told us how we
15   could go about selling the car even though it had a repo
16   on it.  They walked me through how to go through the
17   dealership, what they would give the dealership to
18   override the repo that the dealership would come up
19   with.  I can't -- I don't know the fancy words for it
20   that he was using.  But they walked me through how to
21   sell this car.  And then he even went as far as taking
22   the car after all this happened.  And it just -- like I
23   said, I was in constant contact with Wells Fargo with
24   this whole thing.
25      Q.  Anything else?

Bobby Hardsick
January 23, 2025                                                     157

1        A.  I got a letter from Wells Fargo stating that

2   they're -- they're really -- they take these allegations

3   seriously and they're sorry that I don't -- I'm not

4   satisfied with Keel Recovery's, basically, conduct.

5   There's a letter with that.  There's a whole memo from

6   Wells Fargo to me.  So I just think that everybody

7   failed -- dropped the ball.

8        Q.  Anything else that Wells Fargo did wrong other

9   than giving you permission to sell the car and then

10  attempting to repossess it?

11       A.  They didn't -- they didn't oversee the -- who

12  they hired -- who they contract out to.  In return, the

13  contractor is supposed to oversee the subcontractor.  So

14  the ball was dropped all the way across.  The car was

15  recovered and sold.  So they got that part done.  I was

16  shot at, and I'm still -- that's life.  That's -- these

17  are hard questions.  They don't have to close their eyes

18  at night and go through these things and see images or

19  go through the -- you know how these things play out.

20  So that's all I have to say, just everybody do the right

21  thing.

22       Q.  And is there anything that you used to be able

23  to do before --

24       A.  Yeah.

25       Q.  -- that you're no longer able to do as a result

1   of the alleged incident?

2        A.   Enjoy -- enjoy baseball games, football games

3   that have fireworks.  Enjoy New Year's Eve, New Year's

4   Day.  Enjoy going to places where I could stand a crowd.

5   That's not easy no more.  Seeing people in hoodies and

6   the tow trucks out here chasing, you know, these cars,

7   to see the tow truck is just a flashback.  And it's

8   only -- it's the tow truck with the -- it looks like

9   it's a cross on the back of it where they let down and

10  get up under the --

11       Q.   Yeah, I know the cross that you're talking

12  about.

13       A.   Yeah.  Yeah, it's those tow trucks.  It's not

14  the flatbeds or anything.  It's just a lot of triggers

15  that changed my enjoyment of life.

16       Q.   Now, if I were to request from your attorney

17  the identity of that witness that you're relying on who

18  you're telling me had that vantage point that your

19  daughter Asia did not have, would you be able to provide

20  his identity and contact information for this lawsuit?

21       A.   Yes.

22       Q.   Good deal.

23            MR. HUBBARD:  Counsel, I think it was in

24  our initial disclosures, his phone number.

25            MR. EDEN:  Oh, is it?  Let me see.  I think

1  you might be right.

2        A.  He was the one who came and he asked to speak

3  to me.  He said he just knew something wasn't right.  He

4  wasn't going to sit there and worry about -- if he was

5  thinking that the guy was by himself, why is he

6  taking -- why is he videotaping the tow truck as well

7  going around the parking lot?  He did both.  He came in

8  contact with the shooter.  Then he had these videos of

9  the tow truck.  He had a whole video, and then he said

10 he -- what happened is he switched phones and he was

11 only able to recover some of the video.  But he said he

12 had a whole video for a minute of the scene, is what

13 directly came out of his mouth.  So yes, sir.

14       Q.  (BY MR. EDEN)  Who is Dr. Saida Osman?

15       A.  Who?

16       Q.  Dr. Saida Osman.  Here, I'll go ahead and mark

17 it as an exhibit.

18              MR. EDEN:  At this time I would like to

19 mark as Exhibit --

20       Q.  (BY MR. EDEN)  I'm sorry, sir?

21       A.  Can you -- that's my original -- that's the one

22 who diagnosed me with PTSD.

23       Q.  Got you.  Over at 1283 Record Crossing Road?

24       A.  Yes.  He was seeing me on a regular -- that's

25 why I said I come here on a regular -- so all these

Bobby Hardsick
January 23, 2025
160

```
 1   notes add up to show that I wasn't -- where the change
 2   took place at and the time frame that it took place on
 3   their notes.
 4        Q.  And does Dr. Osman practice out of Texas Native
 5   Health?
 6        A.  Yes.
 7        Q.  Okay.
 8        A.  I've been with Chris for over two years now.
 9        Q.  Chris Logan?
10        A.  About two years.  Yes.
11        Q.  Got you.
12        A.  And then Martha, she sees us because it's
13   affected my marriage as well.  So me and my wife go to
14   marriage counseling here as well and try to, you know,
15   make it through.  Like you, it's a battle, but --
16        Q.  Yeah.  Yes, sir.  Is there anything -- are you
17   currently employed?  You're not currently employed, are
18   you?
19        A.  No.  That's totally different.
20        Q.  Yeah.
21        A.  Actually, yeah, I'm -- that's a different ball
22   game.  I'm looking to get healed so I can get back
23   working.
24        Q.  I feel you.  I understand.  Is there anything
25   that you wish to discuss that we haven't had an
```

Bobby Hardrick
January 23, 2025

161

1  opportunity to discuss today?

2      A.  Other than to be thankful to have a whole body

3  and external body and be alive.  That's -- that's my

4  thankful.  You can't put a dollar amount on that.  I

5  can't.  I don't -- maybe, you know, if I wasn't here and

6  somebody else had to answer that, that would be -- they

7  might could probably do that.  But for me, it's hard.

8      Q.  Got you.

9      A.  It's like me putting a price on my life.

10     Q.  Well, I am almost -- almost out of time.  I've

11 still got a little bit left.  So is it okay if we take a

12 five-minute break for me to review my notes, and then

13 if -- after we come back from the break, I think we're

14 going to just be done.

15             MR. HUBBARD:  Sounds good.  I have very

16 little.

17             MR. EDEN:  Thank you.

18             (Break taken from 2:45 to 2:55.)

19     Q.  (BY MR. EDEN)  Mr. Hardrick, I think I've

20 covered everything I needed to cover.  Have I been kind

21 and respectful to you, sir?

22     A.  Absolutely.  Great -- great -- great guy.  I

23 would buy you a drink if I was sitting next to you if we

24 was at a bar.

25     Q.  I would -- I would say the exact same.  You've

Bobby Hardrick
January 23, 2025                                                    162

1   been kind and respectful to me as well and really,

2   really like you as well.  Thank you so very much.

3              MR. EDEN:  I'll pass the witness.

4              THE WITNESS:  Likewise.

5                        EXAMINATION

6   BY MR. HUBBARD:

7        Q.  Mr. Hardrick, I've got a couple of questions

8   for you.

9        A.  Okay.

10       Q.  During the summer, we answered some

11  interrogatories from the Defendants.

12       A.  Yes.

13       Q.  Were those an honest and accurate account of

14  the facts and your damages?

15       A.  Yes.

16       Q.  All right.  I want to make the video part of

17  the record.  I know it's hard to watch, Mr. Hardrick.

18  I'm not sure how to do that, so it may take me a second.

19       A.  Okay.

20       Q.  All right.  Are you seeing what I'm seeing?  Is

21  the video up?

22       A.  I see the selection, but it's not up.

23       Q.  You don't see the video from Berkshire?

24       A.  I see -- I don't see -- it's not open.

25              MR. EDEN:  It's a -- currently what's open,

Bobby Hardsick
January 23, 2025                                                              163

```
 1   Mr. Hubbard, is the folder for docs from Berkshire and

 2   there's, like, files in that folder.

 3               MR. HUBBARD:  Okay.  Do you know how to

 4   make the media player show?

 5       A.  Is that the one that has D-11 on it?

 6       Q.  (BY MR. HUBBARD)  Yes.

 7               MR. HUBBARD:  Did that help?

 8               MR. EDEN:  No, it's still the folder.  I

 9   can play the video for you, sir.

10               MR. HUBBARD:  We may be here a while.

11               MR. EDEN:  Let me find it for you.  I'll

12   play it for you, sir.

13               MR. HUBBARD:  Okay.  Let me skip ahead,

14   Bobby, and see if I can get this file to show up.

15               MR. EDEN:  All right.  I'm going to start

16   sharing my screen for you.  I'm going to start from the

17   beginning.

18       Q.  (BY MR. HUBBARD)  All right.  Bobby, can you

19   see the video?

20       A.  Yes.

21               (Video played.)

22       Q.  (BY MR. HUBBARD)  Have you seen this video

23   before?

24       A.  Yes.

25       Q.  What is it a video of?
```

Bobby Hardsick
January 23, 2025                                                    164

```
 1        A.  That's a video of the Keel Recovery truck, the

 2   shooter and myself.

 3        Q.  Does it fairly and accurately depict the

 4   incident that's made the basis of this lawsuit?

 5        A.  Yes.

 6        Q.  Is that -- you said that was you in the video?

 7        A.  Yes, running.

 8        Q.  All right.

 9            MR. HUBBARD:  I'd like to mark this as

10   whatever the next exhibit is.

11            (Exhibit F marked.)

12            MR. HUBBARD:  Thank you for pulling that

13   up.

14        Q.  (BY MR. HUBBARD)  All right.  Last one.  Maybe

15   I can get this to pull up.  All right.  Do you see the

16   medical records, Bobby?

17        A.  Yes.

18            MR. HUBBARD:  All right.  I want to mark

19   this as Exhibit G, I believe.

20            (Exhibit G marked.)

21        Q.  (BY MR. HUBBARD)  Did you see a Dr. Osman on --

22        A.  April 19th?

23        Q.  Is it April 19th?  Yeah, I see it up there.

24   Did you go then?

25        A.  Yes, I did.
```

Bobby Hardrick
January 23, 2025
165

```
 1        Q.  All right.  Going down to this part where it

 2   talks about PTSD, did you talk about the incident with

 3   Dr. Osman?

 4        A.  Yes.  Yes.

 5        Q.  And it looks like she put, He was shot in

 6   January.  Now he has trouble sleeping and every time he

 7   hears a loud noise, he gets anxious.  He is more

 8   hypervigilant and constantly looking around his

 9   surroundings.  Is that what she wrote?

10        A.  Yes.

11        Q.  It's your understanding you were diagnosed with

12   PTSD due to the incident made the basis of this lawsuit?

13             MR. EDEN:  Objection; leading.

14        A.  Yes.

15        Q.  (BY MR. HUBBARD)  And you've been seeing your

16   therapist Chris for this lawsuit?

17        A.  Yes.  Yes.

18             MR. HUBBARD:  All right.  That's all I

19   have.

20             MR. EDEN:  We'll reserve.

21             THE REPORTER:  Mr. Hubbard, did you need a

22   copy of the transcript?

23             MR. HUBBARD:  Electronic transcript.

24                  (END OF PROCEEDINGS)

25
```

U.S. LEGAL SUPPORT, INC
713-653-7100

Bobby Hardrick
January 23, 2025

166

1                    CHANGES AND SIGNATURE

2    DEPOSITION OF:  BOBBY HARDRICK, JR.

3    DATE OF DEPOSITION:  JANUARY 23, 2025

4    PAGE    LINE            CHANGE            REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

167

1          I, BOBBY HARDRICK, JR., have read the foregoing

2     deposition and hereby affix my signature that same is

3     true and correct, except as noted above.

4

5                    _____

                     BOBBY HARDRICK, JR.

6

7

8

9

10

11    THE STATE OF _____)

12    COUNTY OF _____)

13

14          Before me, _____, on this
      day personally appeared BOBBY HARDRICK, JR., known to me

15    (or proved to me under oath or through
      _____) (description of identity

16    card or other document)) to be the person whose name is
      subscribed to the foregoing instrument and acknowledged

17    to me that they executed the same for the purposes and
      consideration therein expressed.

18          Given under my hand and seal of office this
      _____ day of _____, _____.

19

20

21                   _____

                     NOTARY PUBLIC IN AND FOR

22                   THE STATE OF _____
                     COMMISSION EXPIRES: _____

23

24

25

Bobby Hardrick
January 23, 2025

```
 1                    THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                          DALLAS DIVISION

 3
    BOBBY HARDRICK                 )
 4                                 )
              Plaintiff,           ) CIVIL ACTION
 5                                 ) NO. 3:24-CV-00014-D
    v.                             )
 6                                 )
    WELLS FARGO BANK NATIONAL      )
 7  ASSOCIATION; RESOLVION, LLC;   )
    KEEL RECOVERY, INC.            )
 8                                 )
              Defendants.          )
 9


10


11  **********************************************************

12                    REPORTER'S CERTIFICATION

13  **********************************************************

14

15        I, Dawn Baldwin, a Certified Shorthand Reporter

16  duly commissioned and qualified in and for the State of

17  Texas, do hereby certify that there came before me,

18  remotely, on the 23rd day of January 2025, the following

19  named person, to-wit: BOBBY HARDRICK, JR., who was duly

20  sworn to testify the truth, the whole truth, and nothing

21  but the truth of knowledge touching and concerning the

22  matters in controversy in this cause; and that he was

23  thereupon examined upon oath and his examination reduced

24  to typewriting under my supervision; that the deposition

25  is a true record of the testimony given by the witness.
```

Bobby Hardwick
January 23, 2025                                                                                 169

1          The amount of time used by each party at the

2    deposition is as follows:

3          Essay Eden...............04 Hours, 41 Minutes
           John Hubbard.............00 Hours, 05 Minutes
4

5          I further certify that I am neither attorney or

6    counsel for, nor related to or employed by any of the

7    parties or attorneys in the action in which this

8    proceeding was taken, and further that I am not a

9    relative or employee of any attorney or counsel employed

10   by the parties hereto, or financially interested in the

11   action.

12          CERTIFIED TO BY ME on this the _____ day

13   of_____, 2025.

14

15          _____

16          DAWN BALDWIN, Texas CSR
            Expiration Date:  10/31/25
17          U.S. LEGAL SUPPORT, Firm #122
            16825 Northchase Drive, Suite 900
18          Houston, Texas  77060

19

20

21

22

23

24

25

Appx. 0190

Bobby Hardrick
January 23, 2025

| Exhibits |
| --- |

EX A Bobby Ha
rdrick, Jr.
 012325
 4:3 66:22,25
71:1,2
EX B Bobby Ha
rdrick, Jr.
 012325 Cover
 Page
 4:4 69:4,9
EX C Bobby Ha
rdrick, Jr.
 012325 Cover
 Page
 4:5 95:19,22
96:9 111:15
123:4
EX D Bobby Ha
rdrick, Jr.
 012325 Cover
 Page
 4:6 112:2,6,
18 131:5
EX E Bobby Ha
rdrick, Jr.
 012325 Cover
 Page
 4:8 120:25
121:4 123:6
126:7,22
127:8,14
134:4,16
EX F Bobby Ha
rdrick, Jr.
 012325 Cover
 Page
 4:9 164:11
EX G Bobby Ha
rdrick, Jr.
 012325
 4:11 164:19,
20

| 0 |
| --- |

0129
 71:5

| 1 |
| --- |

1099
 60:15
10:32
 36:3
10:41
 36:3
11:33
 64:16
11:38
 104:10
11:41
 64:16
11:54
 104:14
12,000
 133:9
1283
 159:23
13
 126:6
130
 71:16
131
 78:18
135
 69:1
15
 34:22
15-second
 129:14
150
 133:15
156
 68:20
16
 127:13
16-minute
 110:3 126:22
127:8 128:3
16-second
 109:13
17
 110:18,19
18-wheeler
 40:19 41:10,
12
19
 38:17
19-minute
 129:14
19-year-old
 38:17
1972
 8:7
1990
 12:25 88:19
19th
 164:22,23
1:55
 66:20
1st
 63:23

| 2 |
| --- |

20
 86:10
20-second
 119:15
2001
 32:23
2005
 85:12,23,25
86:8
2008
 11:25 12:2,
5,6
2013
 87:15
2014
 11:12 86:10,
17
2017
 66:15
2021
 10:20
2023
 5:19,25 16:6
56:8,13,18
63:14 64:6
65:1 70:21
71:9,11,21
72:3 82:18
88:1,4,21,24
89:10,13,16
90:4,8,16,25
123:19
142:23
145:21 150:2
2024
 19:6,10
24:5,6,9,22
25:10 29:2,
4,13 30:16,
25 31:7,10,
20 32:9
34:1,7,14,
19,22 35:9,
22 36:6,19
47:19,23
50:9 54:25
55:16 85:15
86:8,9 95:21
112:5,20
143:22
21
 130:15
21:38
 130:20
22:32
 131:15
22:46
 132:13
23
 56:10 95:21
112:20
23rd
 112:5
24
 19:9 24:6,22
25:9 29:13
31:9 34:1,6,

Bobby Hardwick
January 23, 2025

14,19 35:9,
22 36:6,19
47:19,23
50:9 54:25
55:16 85:15
143:22
**24-minute**
111:16
134:4,16
**24th**
45:10 85:21
**25**
29:2,4 30:25
**25th**
25:12 26:6
30:8 45:17
**26**
8:7 16:17
19:6 30:16
31:7,19 32:9
**26th**
30:10 52:23
**27**
116:14
**27-minute**
116:13
**27:55**
116:23
117:25
**28**
113:13
**28-minute**
113:14
**28:39**
117:25
**2:02**
140:22
**2:15**
140:22
**2:45**
161:18
**2:55**
161:18

---

**3**

**3**
5:19,25
56:8,13,18
63:14 82:18
88:1,4,21,24
89:10,12,16
90:4,7,16,25
123:18
142:23
145:21 150:2
**30**
18:23 20:19
24:7 32:16
45:8
**32**
37:24
**32-inch**
21:15
**33-minute**
119:15
**34**
142:14
**34,000**
133:10
**34-hour**
62:17
**37**
126:6
**38**
130:15
**3:00**
72:10,15,18
**3:30**
37:9
**3rd**
6:20 63:24
67:12 70:21
87:13 98:13
105:9 124:3
145:24,25

---

**4**

**40**
63:4
**40-minute**
112:24
119:19
**40-year-old**
115:18
**413**
9:8 14:23
**42nd**
121:6
**43-second**
134:16
**4307**
18:1,2 107:1
**45-year-old**
115:18
**4730**
9:21 10:19,
22 17:22,25
18:2
**48-hour**
62:17
**4906**
5:3
**4:00**
37:9 132:3

---

**5**

**5**
70:21 71:9,
21 72:3
**50**
54:12 94:13,
14 115:4
**50,000**
133:7
**50-year-old**
115:18
**53-foot**
21:8 39:7

**53-footer**
21:17
**55-second**
116:14
**5811**
9:8,10 14:22
**5:00**
73:1
**5th**
48:17,20
72:4

---

**6**

**60**
21:4
**65**
21:4
**6:30**
91:2 92:15
**6th**
47:6,7,8,9,
11,17

---

**7**

**70**
62:16,19
**72**
41:8
**75043**
9:9
**7:00**
92:15

---

**8**

**80,000**
133:6
**8:00**
71:22

---

**9**

**9-minute**
121:6

**90**
13:18,23,25
84:1
**91**
13:19,23
**911**
42:9,10,20
69:5 70:5,14
95:11 107:7,
12
**92**
13:24,25
14:7
**93**
13:23
**9th**
141:4

---

**A**

**A-A-L-I-S-H-A**
65:11
**A-S-I-A**
17:19
**a.m.**
71:22
**Aalisha**
65:9 68:23
71:22 72:9,
14,24 73:3,
4,15 74:23,
25 75:2
76:9,11,19,
24 77:14,17
78:3,18
79:7,16,21
80:7,8,12
81:15
**Aalisha's**
73:12 81:22
**ability**
98:6,17
**able**
6:11 30:17
31:3 34:21,
25 37:22
41:12 42:2,4

48:15,16
49:22 55:3
58:5 61:23
66:10 68:3,4
70:10,13
78:4 81:21
86:13 94:11
97:7,17
100:7 107:11
113:5
121:10,12,
13,14 132:15
138:16
139:13
145:25 146:1
157:22,25
158:19
159:11
**above**
23:22 43:1
101:21
**absolutely**
20:10 78:2
82:24 161:22
**accepted**
55:8 147:6
**access**
60:23 108:25
115:8
**accident**
19:7,9 20:20
36:16,18
37:5,7 38:6
40:11 42:14
43:4 45:4,10
47:18,23
48:3,7 49:19
55:1,16
56:15 74:18
**accidents**
53:11 146:13
**account**
162:13
**accounts**
59:4,5
**accuracy**
73:9 134:19

**accurate**
6:11 8:23
36:18 63:16
68:15 72:4,
13 73:8
75:6,7,11
100:11
132:20
162:13
**accurately**
164:3
**accusing**
85:5
**acquire**
110:22
**across**
105:10 132:6
140:18 151:5
157:14
**Act**
62:11
**actively**
22:7
**add**
11:25 160:1
**additional**
13:8 28:11
44:9 122:19
**address**
9:7 10:2,9
26:19 29:12
50:8 51:21
**admitting**
79:21
**adult**
90:13
**adverse**
5:14
**advised**
72:25
**Advocate**
52:17
**affected**
146:3,4,6
147:18
160:13

**affidavit**
68:13
**African-
american**
131:2 132:10
**afternoon**
37:13
**age**
130:6
**agencies**
59:7
**agency**
58:20 150:11
**agent**
151:1
**aggressive**
79:24 80:2,4
**aggressor**
77:3 79:16,
22 82:9
**ago**
16:17
**agree**
101:5,6
102:14
**ahead**
67:20 68:9
69:15 90:15
97:25 109:24
130:22
148:18
159:16
163:13
**ailments**
87:13
**aimed**
100:13
**ain't**
122:9 130:15
**airbag**
66:16
**aisleway**
101:25
106:17
**Aktabowski**
121:2 123:5,
16,21 125:6,

10,19,24
127:9 129:13
131:3
134:15,17
**Alabama**
54:10,14
**Alaska**
54:15
**alcoholic**
6:8
**Ali**
49:4,5,11
50:5
**alike**
18:3
**alive**
161:3
**allegations**
157:2
**allege**
5:19 11:2
144:15
**alleged**
5:18,24 6:19
9:20,24
17:21 64:14
88:15 90:16,
25 92:19
94:18,21
117:17
127:16
130:3,8
131:18
132:10,16,21
134:6,9
145:20
146:1,2,4
155:2 158:1
**alleging**
36:6 62:21
63:15 77:23,
25
**allow**
7:25 48:19
82:13
**allowed**
53:20

**allowing**
96:20
**altercation**
65:5,15,16
**amazing**
41:15
**ambulance**
42:24
**ambulanced**
43:16,18
**amount**
147:3,5,9
161:4
**ample**
128:12
**angle**
134:20,23
135:11
**angles**
136:12
**angry**
79:23 80:4
**ankle**
86:19
**answer**
6:18 7:13
18:10 42:20
44:24,25
53:2 57:13
58:15 70:20
92:22
101:11,14
103:14
132:18
137:19
138:11,21
139:5,11
140:4
147:12,16,25
161:6
**answered**
53:18 115:20
116:11
162:10
**answering**
7:24 8:1
96:21 129:2

**answers**
7:6,10 67:22
**anticipated**
36:21 37:10
**anxiety**
87:10 147:1
148:3,9,14
150:1,3
**anxious**
165:7
**anybody**
17:8 84:13,
15 124:6
**anymore**
20:9 35:1
75:24
**anyone**
9:5 17:20
34:16 84:17
142:7 151:22
**AP**
73:16
**apart**
30:24 118:11
119:24
122:19
**apartment**
11:1 93:2
102:21
106:12
107:11,17,
21,25 108:2,
12,14 115:9
143:11
154:19 155:8
**apartments**
11:6 91:1,7
92:1,4,6,10,
13,18 93:5
115:10
126:13 136:5
155:9
**apologize**
13:2 53:1
105:16 108:5
139:23

**apple**
9:12 10:23
14:13 15:9
**apply**
40:16
**appointment**
26:4,7,11
27:21 28:3
30:16 31:2
32:2,8,15
34:2 51:3
89:5,18
132:3
**appointments**
27:25 29:11
33:25 34:3,
11
**appreciate**
33:12 51:8
111:24 125:1
**approach**
119:21
**approaching**
38:7
**approximately**
71:22 76:12
102:15
**April**
164:22,23
**area**
9:2,4 11:9
67:19 91:23
92:17 93:10,
20 94:3,22
111:1 121:11
142:19
150:23
153:22
**argument**
115:2
**Arlington**
10:1,18
11:11,13,15,
17 86:11
**arm**
24:20 25:4,
14 29:9 45:7

Bobby Hardrick
January 23, 2025

75:3 76:9,
19,25 81:22
90:10
**around**
39:20,22
63:19,24
66:5 76:10
77:16 79:7
85:4 91:1,25
92:14,15
100:12
101:1,8
102:11,20
103:9,16
105:21 124:9
125:6 134:22
135:9 153:12
159:7 165:8
**arrest**
64:7,23,25
65:3 69:6
71:5,8,10
75:17 79:19
80:3,14
82:18 83:5
84:4,5 85:5
**arrested**
63:25 71:23
72:8,25
73:1,18,19
74:21 75:1
76:8,17,23
77:15 78:4
83:20
**arresting**
78:15,17
**arrests**
81:2
**arrive**
92:12 107:17
**arrived**
91:3,21
92:17 95:7,
16 108:13
123:17
126:12
**Ashby**
112:11

113:18 115:8
118:1,3,10,
13 119:24
120:2 123:19
151:11
**Ashby's**
115:15,17
**Ashraf**
49:4,5,7,8,
11,24 50:1,6
**Asia**
17:17,18,20
65:6 73:20
77:8 78:5
79:6,8 82:2
95:5,8,10
129:19
130:20
134:5,25
135:11
142:2,3
158:19
**Asia's**
81:9
**asked**
41:22 42:14
44:5,6 48:8
52:22 58:10
65:18 75:16
85:18
115:16,19
116:5
117:13,18
135:19
145:22 151:8
152:16,17
159:2
**asking**
7:24 32:5
52:19 83:17
86:1 87:11,
12 88:9
93:24,25
98:15 108:18
117:20 118:9
121:18
124:13
125:14,21

138:6,10,13,
15,17,25
139:12,19,
22,23 140:1,
2 141:15
143:16 146:7
**aspect**
122:13
**assignment**
58:12,17,18,
22
**assistant**
31:16
**assisted**
57:15,22
**associate**
112:25 134:2
**Association**
5:13
**assume**
7:20
**assuming**
16:25
**athletics**
88:13,23
145:23
**Atlanta**
80:8,13
**attack**
77:6 82:4,7
**attempting**
157:10
**attempts**
125:11
**attend**
13:17
**attention**
38:1 71:4
135:19
**attorney**
5:11 6:18
7:14 10:4
37:17 53:4,
25 54:20
55:17 110:21
143:21
148:25

149:24
158:16
**attorneys**
53:19,24
74:8 149:21
**audibly**
55:19 96:1
98:18
**audio**
64:9,24
65:12,25
70:4,9,12
97:8,18
100:8 117:7
**August**
20:19,22
24:1,5,6,9,
22 25:9,12
26:6 29:2,4,
13 30:8,10,
16,25 31:7,
9,19 32:9
34:1,6,14,19
45:10,17
48:9 49:16
85:15,21
86:8 151:12
**authority**
60:19 150:18
**auto**
48:3
**automobile**
41:9
**available**
32:12 53:25
59:9
**average**
23:22
**aware**
31:25 109:16
142:15,21,24
**axles**
133:10

Bobby Hardwick
January 23, 2025

6

**B**

**back**
18:24 19:4
25:16 26:25
27:6 28:2
29:15 30:17,
20 31:14
33:1,6 41:9
42:19 44:3,
10,11 45:2,7
46:17 48:2
50:15,18,23
51:22 52:23,
24 57:24
63:21,22,24
71:1 72:21
76:10 80:11
85:7 86:15
87:4 91:17,
18,19 92:9
95:2 97:5,10
99:4,9
102:9,10
103:11,12
104:10,23
105:5,9,13,
22 109:24
110:2 111:9,
21 114:12
115:17,22
116:3,13
119:13 120:1
128:4,14
129:6 135:24
137:13 138:8
147:2,3,4,5,
10 150:23
158:9 160:22
161:13
**backing**
86:25
**backtrack**
49:16
**backtracked**
51:4

**backwards**
48:6
**bad**
27:1 32:23,
25 33:4
66:15 69:21
**badly**
145:6
**baffled**
102:7
**bag**
100:2
104:19,22
**bail**
80:19
**Baker**
17:7
**balcony**
95:14 101:21
107:5,9
108:17,20
134:21
**Baldwin**
5:2 129:1
**ball**
88:22 141:9
157:7,14
160:21
**ballpark**
133:5
**bandwidth**
15:14,19
**Bank**
5:13 153:22
**bankruptcy**
149:17
**bar**
161:24
**barbecue**
121:21
122:2,6
**barbecuing**
121:22
**barber**
132:3,4
**barricade**
81:12

**barricaded**
79:5
**baseball**
158:2
**based**
24:24 67:23
143:17
**basic**
29:7
**basically**
50:12 58:20
60:15,18,25
77:5 115:2
146:12
156:14 157:4
**basis**
9:17,20,24
17:14,21
22:11 62:22
100:21
151:25
156:10 164:4
165:12
**basketball**
13:15 14:1
88:21
**Bates**
71:4,16
78:17
**battle**
160:15
**Baylor**
49:8,12 50:2
**beat**
82:6 107:4,8
**beating**
82:7 95:9
**Beauty**
86:22
**bed**
81:16
**bedroom**
73:5,13
74:22,24
**began**
98:23

**beginning**
37:8 53:15
64:18 96:19
101:23
130:21
163:17
**behind**
22:11,15
25:23 39:12
40:18 81:15
93:9 135:20
**believe**
6:17 20:13,
14 23:21
26:15 27:11
28:21 33:22
44:14 47:20
54:7 55:2
56:22 59:6
60:12 72:22
82:8 83:15
84:17 87:5,
16 95:8
155:14
164:19
**belonged**
137:4
**belongings**
99:9
**belongs**
104:3 143:13
**belt**
43:8,14,24
**benefits**
22:6,9,17
23:2,9 25:6,
9 49:23
51:10
**Berkshire**
11:6,7 92:3,
6,9,12,18
93:5 115:9
126:13
142:22 155:8
162:23 163:1
**berserk**
79:7

Appx. 0196

Bobby Hardwick
January 23, 2025

besides
  75:18 84:13
best
  72:2 98:5,16
better
  15:16 65:12
  86:15
  125:22,23
  141:11,15
beverage
  6:8
big
  48:14 147:14
  156:4,7
bigwigs
  154:3
bills
  55:13
birth
  8:7
bit
  33:4 66:17
  71:12 98:14
  100:24
  109:12
  116:15
  132:24 134:1
  140:19
  148:19
  161:11
black
  130:9 132:25
  137:6
  152:11,12
  153:5
blade
  78:22
blank
  36:8
blew
  66:16
blind
  144:8
blizzard
  120:9
blood
  89:23

board
  60:16,24
  61:1,3
  105:18,21
Bobby
  5:6 8:6
  20:14 21:11
  56:9 66:22
  69:4 71:23
  72:8,25
  73:2,16,18,
  19 74:21
  75:1,2 76:8,
  18,23 77:15
  78:5 95:19
  112:3 121:1
  163:14,18
  164:16
Bobbycue
  122:3
bobtailed
  91:18 105:22
bobtails
  91:25
body
  27:23 44:7,9
  76:20,25
  77:1 95:19
  108:23 109:3
  112:3,18
  121:1 122:20
  123:3,5
  127:8,13
  129:12
  131:4,8
  134:16
  143:20
  161:2,3
bond
  80:19
bondsman
  80:22
bondsman's
  80:19
bone
  90:7
bones
  28:22,25

born
  8:12,14
  13:1,2
boss
  23:21 54:24
bottom
  68:25
box
  32:24 91:24
boys
  37:16
brakes
  40:17
braking
  40:23
branches
  149:16
break
  7:17 35:14
  36:3,5
  64:12,16
  66:9 97:21,
  23,24
  140:16,19,22
  142:25 143:3
  145:19
  146:11
  161:12,13,18
breaking
  64:25 90:9
breath
  76:11 97:23
  107:19
breathing
  130:17
brief
  65:14 84:7
  130:5,7
  146:3 153:2
bring
  71:4 123:19
brisket
  122:16
broke
  44:21 64:24
  66:17 90:10

broken
  28:22,25
  90:7 144:1
brother
  115:17,19
  120:15 129:9
  155:19
brought
  32:3 135:19
bruise
  78:21 79:4
building
  69:19 135:24
buildings
  93:9
bulldogs
  12:10,11,13,
  14
bullet
  109:15
bullets
  151:5
bumper
  41:17,25
  42:3
burning
  24:21
business
  37:17 57:17
  60:1 122:5
  156:13
busy
  135:23
buy
  161:23

------

C

C-A-V-A-R
  52:14
C-A-V-R
  52:13,15,16
C-O-N-S-T-A-
N-C-E
  16:2
cab
  21:9 41:16

Bobby Hardsick
January 23, 2025

calendar
  85:10
California
  104:24,25
  105:2,4,5,25
  112:14
call
  38:8 42:9
  46:17 52:12,
  18 59:21
  68:7 69:5
  70:3,5,14
  79:10,11,12,
  13 80:23
  93:13 95:3,
  4,10 103:25
  105:24
  107:7,12
  111:1 122:3
  135:23
  142:17,21
  143:2,4
  154:1
called
  27:2 42:10
  52:21 79:11
  80:6 93:11
  95:5,11
  119:8 136:3
  144:12,13
calling
  80:25 150:19
cam
  95:20 122:20
  123:3,5
  127:8,13
  129:12
  131:4,8
  134:17
  143:20
camera
  41:7 112:3,
  18 121:1
  129:17
  130:17
  152:18
cameras
  124:22

cancel
  70:3
cancer
  88:8
capture
  67:12
car
  27:23 36:16
  40:9,10,17,
  18 42:12,15
  53:11 66:15
  74:24 91:6,8
  92:2 94:25
  95:2 99:4,5,
  6,7,17
  101:24 103:3
  108:22,23
  109:17 111:3
  119:9 124:3,
  9 126:15,17,
  18,20 127:19
  150:24
  154:22 155:6
  156:12,15,
  21,22 157:9,
  14
card
  108:25
Cardinal
  86:12
care
  30:13 31:19
  47:4,16
  49:21 50:3
  55:4,7 57:25
  58:6 89:20
  144:7 149:14
career
  146:12,16,
  20,21
Carenow
  25:19,20,22
  26:5 29:2,3
  30:7,11,24
  31:23 34:2
  87:2
carried
  151:13

Carrier
  62:11
Carrollton
  29:24
cars
  37:22 40:15
  99:16 158:6
Carter
  121:2 123:4
  127:9 129:13
  134:15,17
case
  40:9 49:15,
  17 108:8
  144:11
cases
  144:2
casings
  109:15,22
  142:19
CAT
  28:12,24
catch
  97:23 149:24
caught
  74:17 145:4
caused
  31:8 148:2
causing
  15:20
cautious
  38:2
CDL
  61:19,20
center
  29:25 57:15,
  23 91:23
  92:3,5
central
  52:1
certain
  68:10 74:7
  116:3,5
certificate
  61:18
cervical
  51:25

challenge
  134:13,18
challenging
  111:23
chance
  120:14
change
  160:1
changed
  89:25 158:15
changing
  40:15
charcoal
  122:7
charges
  80:15 83:6
chased
  85:6
chasing
  158:6
cheating
  126:24
check
  28:9 34:24
  35:1 46:24
  144:8
check-up
  89:23
check-ups
  89:22,25
checked
  80:21
checking
  80:18,25
Chellette
  15:4 70:14,
  16,18 79:10,
  12 82:1
Chellette's
  99:18
Cherese
  71:23 72:9,
  24 73:3,4,16
  74:23,25
  75:3 76:9,
  11,19,24
  77:14,18,19

78:4,19

**Cherokee**
99:13 149:10

**chest**
73:3,12

**Chicago**
11:21,22,24
12:15 13:2
63:2,23
91:16,18
112:14 120:1
126:13

**Chick-fil-a**
111:7

**child**
16:16 32:23

**Children**
12:17

**Chinese**
125:11

**chips**
122:10

**choking**
77:5

**choosing**
129:7

**Chris**
148:7,10,20,
24 149:2,13
160:8,9
165:16

**Christmas**
105:7

**Cierra**
16:21

**City**
12:20 57:15
71:3

**civil**
144:2,13

**claim**
6:19 22:2
25:8 52:3
55:3,11
85:23,25
86:8,9,10

**claims**
85:13,14,16,
17,20,22,24
86:3,7

**clarity**
6:19

**classes**
61:17

**classified**
22:25

**clean**
128:24

**cleaning**
27:24 136:1

**clear**
53:2

**clearing**
23:11

**click**
112:8

**clients**
5:24 10:11
33:17,20
82:25 144:5

**clinic**
149:9

**clinics**
27:2

**clip**
113:18

**clock**
63:1

**clocks**
63:1

**close**
127:25
147:10
157:17

**closed**
127:18
128:16

**closer**
148:12

**clown**
139:7

**clusters**
37:11

**Coaction**
70:4

**code**
115:8

**Coe**
5:11

**college**
13:10,12
14:9 62:2

**collided**
38:24

**collision**
39:1

**combination**
46:23

**come**
23:13 28:2
36:22 42:16
47:15 49:14
82:10 105:5
108:11 111:9
113:12
116:13
120:11
121:21
123:22,24
124:3 136:5
140:6
142:17,21
143:4
146:15,18
147:3,4,5
154:20 155:6
156:18
159:25
161:13

**comes**
43:25 74:11
122:20 129:8
136:6 144:2

**comfortable**
97:22 98:12
125:4

**commercial**
61:25 144:7
146:14

**communicating**

123:15 125:5

**communication**
23:20

**community**
62:2 127:22

**comp**
25:6,8,12,15
31:25 32:25
48:10,17,25
49:14,16,23
50:1,6,11,12
51:2,4

**company**
21:5 24:23
37:4 59:24,
25 70:4
137:4,5,24
150:11

**Compass**
99:13,14,20
104:1,2

**compensated**
55:10

**compensation**
85:14,16

**compensatory**
144:14

**complainant**
71:22 72:9,
24 73:3,4,15
74:23,24
75:2 76:8,
11,18,24
77:14,17
78:3,18

**complaint**
29:8 75:8,
14,15 84:18
111:23

**complaints**
26:8 43:20
45:6

**complete**
14:5,15,18
48:24

**completely**
29:20 51:8

66:18,20
70:24 77:13
97:22 98:12
100:19
101:5,6
106:3
111:10,24
117:4 141:12
**complex**
11:1,4 28:1
94:8 115:9
155:8
**compounded**
45:13
**comprehension**
74:2
**computer**
66:1
**concerned**
42:12 51:9,
11 108:11
136:17
**conclude**
80:14
**concluded**
22:3,8 77:24
**conclusion**
22:11,16
83:7
**condition**
19:11 87:9
88:10,11
**conditions**
19:3 40:3
**conduct**
157:4
**cone**
69:24
**confession**
98:20
**conflict**
120:3 130:3
**conflicting**
71:1
**confused**
52:19

**Congratulatio
ns**
16:7
**conjunction**
149:13
**connect**
10:14 24:13
**connected**
24:17 82:14
**consistent**
62:10,11
98:12 106:7
122:22 123:8
**Constance**
15:7,16,25
16:2,12,16
18:6
**constant**
156:23
**constantly**
78:8 165:8
**Constitutiona
l**
52:17
**consultation**
26:7 29:2
34:1
**contact**
23:19
156:11,23
158:20 159:8
**context**
110:12
**continue**
49:23 90:22
100:5 126:7
131:15
132:12
**continued**
73:17 77:16
**contract**
58:19 60:17
157:12
**contracted**
154:12
**contracting**
60:15

**contractor**
60:18 157:13
**controlled**
47:14
**convenient**
132:7
**conversations**
53:3,19,24
156:13
**convicted**
83:1,3,16
**conviction**
80:14
**convictions**
83:12
**cool**
149:20
**cop**
118:6,12
**cop's**
152:18
**copies**
68:15
**copy**
67:7 165:22
**Corder**
15:4 70:14,
16
**cornea**
84:24
**corner**
152:13
**corporate**
149:18
153:22
**correct**
6:1 8:8,10,
11 11:2,3
16:3,4 22:24
23:9,10
25:4,5 41:6,
7 47:11,24,
25 51:18
58:21 61:6,7
62:1 65:1
73:25 74:1,
4,12,14

79:19 82:19
95:16,17
104:21
107:12
123:10
131:18
137:11
151:23,24
**correction**
98:25
**correctly**
71:25 72:11
73:6,21 75:4
76:13 77:19
78:23
**correspondenc
e**
153:23
**corresponds**
69:5
**corroborate**
31:22 81:10
155:10
**coughing**
18:10
**counsel**
67:1 69:7
95:21 96:7,
14 112:5,20
121:2 158:23
**counseling**
160:14
**counselor**
146:17
**count**
133:1
**counter**
73:21
**country**
105:10
**County**
36:25
**couple**
35:3,6 76:6
77:4 83:22
162:7

course
  20:4 38:3
  43:22 51:23
  141:4
court
  6:24 7:9
  15:18 84:18
  128:25 155:6
courtesy
  7:25 96:22
  129:3
courtroom
  147:14
cover
  161:20
coverage
  149:21
covered
  161:20
covering
  93:15
COVID
  31:1,3,5,8,
  11,15 32:4
coworker
  113:9 117:13
  123:20
cracked
  109:17
  143:1,6,13
cracks
  143:22
crash
  36:23
crazy
  111:5
crime
  83:1,3
  110:7,8,23
  142:17,21
  143:3
criminal
  108:8
crocodiles
  141:5,9,10
  155:24

cross
  110:10
  124:20
  158:9,11
Crossing
  159:23
crowd
  158:4
crushed
  41:24
crutches
  82:4
CSR
  5:3
cuff
  35:3
cull
  138:14,15
  140:17,25
curb
  99:25
current
  9:7 18:6
  53:4
custodian
  68:16
cut
  32:23,24
  33:4 66:17
  78:21 79:3
  144:24
cutter
  32:24
cutting
  15:11

——————————

            D
——————————

D-11
  163:5
D.C.
  9:2,4
DA
  80:23
DA's
  80:17

dad
  32:21 33:5
  114:5 142:14
daily
  59:13
Dallas
  5:5 9:21
  10:19,22
  11:8 29:19
  36:25 42:21
  43:1,2,19
  44:13 63:24
  66:24 67:3
  71:3 80:13
  87:4 105:15,
  16,23 114:9
  122:15 149:4
damage
  33:3,4 43:9
  142:20
damages
  144:12,14,
  15,18,22
  162:14
Danielle
  73:20 78:6
dark
  130:9 132:11
date
  8:7 18:23
  19:7,9 24:4,
  5 27:21 30:6
  56:15 63:15
  71:10 123:18
  128:11
daughter
  16:18,19,20
  17:17 64:8
  65:4,20,23
  68:24 72:14
  75:16,18
  76:5 77:8,11
  78:11 79:6
  82:4,5,7,13
  95:5 101:20
  104:3 107:4,
  11 108:10
  126:12

127:24
  129:16,18,19
  131:17
  132:16,20
  134:5,8,15
  147:18
  158:19
daughter's
  99:1,12
  101:24
  134:19
David
  14:12
Dawn
  5:2
day
  17:7 21:9
  27:12 34:20
  37:7,14,15,
  20,24 40:18
  58:5 62:9,
  17,18 80:11
  86:15 114:17
  119:9 120:6
  129:8,10
  146:11 158:4
days
  18:23 20:19
  24:7 32:16
  45:8 63:12
  80:10 83:22
  84:1
deal
  6:10,13
  16:20 22:8
  35:17 36:15,
  21 38:6
  40:13 51:16
  53:9,22
  54:15 58:25
  68:1,6,19,25
  69:25 86:18
  90:24 94:6
  97:10,15
  100:10
  104:18
  109:24
  111:12

Appx. 0201

112:22
117:10,24
121:17
123:12 127:1
129:5,21
143:19
148:23
158:22
**dealership**
156:17,18
**dealing**
27:5
**December**
105:9
**decide**
19:13
**decided**
105:22
**decides**
21:4
**decline**
42:6
**defend**
77:3
**defendants**
5:12 6:19
66:24 162:11
**defender's**
79:20 80:23
**defending**
77:5
**defense**
20:2
**defensive**
61:17
**defensively**
21:13
**definition**
19:19
**degree**
61:14
**deliver**
105:5
125:11,24
**delivered**
91:16 105:6
115:5

**deliveries**
86:24
**delivering**
24:11 86:22
**delivery**
91:14 105:1,
3 124:19
125:8,11
**delta**
19:17,18
**Demarge**
14:9,12
**demonstrative**
147:14
**denied**
48:10,25
**dentist**
27:22
**denying**
50:3
**department**
42:22,24
43:3 66:24
67:4,5 68:11
71:3
**depended**
63:10
**depending**
62:18
**depict**
164:3
**deposed**
6:3
**deposition**
5:3 6:14,16
17:10 53:16
55:21 66:22
69:4 81:9
93:19,22
94:1 95:19
96:19 97:2
106:9 112:2,
18 116:1
121:1 128:12
145:22 150:5
**depression**
87:10 147:1

148:3,9,14
150:1,4
**describe**
18:18 26:4
133:4 144:3
**described**
36:15
**describes**
70:16
**describing**
41:23 67:17
84:8 93:20
94:3 113:17,
21 117:14
131:18
**description**
36:18 65:14
71:13 84:7
130:3,5,7
132:16,21
134:5,6
146:4 153:2
**deserve**
22:6,9,16
**designated**
93:11
**destination**
24:19
**detach**
145:14
**determination**
22:9 23:18
**determine**
31:13
**determined**
23:7
**determining**
22:16
**device**
90:18
**devices**
90:1
**diabetes**
47:14 87:8,
17,20 88:4
**diagnose**
25:24 46:24

**diagnosed**
87:14 159:22
165:11
**diagnosis**
28:9 31:22
46:11,18
**dial**
42:20
**dictate**
140:11
**die**
101:19
102:10
**died**
120:21
**differences**
83:19
**different**
20:5,7 33:15
94:10 98:14
115:3 120:7,
9 122:25
123:7,9
124:22,24,25
131:12 132:3
135:11
140:16
146:16
149:16
160:19,21
**difficult**
7:8 91:18
133:2
**difficulties**
15:21 16:10
35:23 57:5,
11 58:11
**direction**
39:23 101:21
102:21 152:6
**directly**
159:13
**dis**
23:3
**disability**
34:17

**disagree**
75:22

**disagreement**
65:17

**disapprove**
75:8

**discharge**
30:12 32:7

**disclosures**
158:24

**disconnect**
24:15

**discovery**
64:13 96:10
143:21

**discuss**
36:7 84:14
96:7 144:22
160:25 161:1

**discussed**
32:4 86:4
150:6

**discussing**
15:24 104:14

**discussion**
15:22

**disease**
87:12,19
88:3

**diseases**
87:8

**dispatch**
56:25

**dispute**
65:18 73:8,
10 75:12
118:20

**disputing**
76:15,21
77:20

**disqualify**
23:1,8

**distance**
136:18,20

**distinction**
51:13 74:13
144:17

**district**
11:5,6,9
92:4,6,10,
13,18 93:5
115:9 126:13
142:22 155:8

**disturb**
154:20

**diving**
27:1

**dock**
24:18 86:20,
24

**docs**
163:1

**doctor**
25:11,12,17,
22 26:5,14
27:3 31:22
33:2 47:12,
13,15 48:19
50:1,6,11
51:20 89:15
148:14

**doctors'**
34:11

**document**
71:8

**documents**
68:10

**dog**
151:6

**doing**
7:5,12 20:24
23:22 39:25
55:20 61:23
62:4 84:20
104:25
106:16
112:14 116:1
131:10
154:21

**dollar**
147:3,8
161:4

**dolly**
24:13,14,15

**domestic**
69:6 82:10

**dominant**
33:9

**door**
79:6 81:14
95:10,12
107:4,8,9
131:3,8

**dot**
24:7,8
41:17,25
42:3 60:16

**dots**
10:14

**double**
21:18

**doubles**
21:10,14
24:12 39:6
41:23

**downgrade**
37:25 39:13

**downhill**
41:10

**downstairs**
107:6 111:1
118:17

**drafted**
140:24

**dreads**
131:20 153:8

**dress**
40:9

**dressed**
139:10

**dressing**
139:8

**drink**
97:23 161:23

**drive**
33:18 38:2
42:13 63:3
87:3 92:4
94:16 105:4,
25 115:1,3,4
118:21

120:10

**drive-thru**
46:7,10,11

**driver**
20:25 39:20
58:3,4,7,24
59:13 63:8
87:3 108:15
111:13
112:12
114:25
135:9,22
137:13
150:20

**driver's**
41:14 44:1
61:25 152:19

**drivers**
21:14 24:16
33:17 40:14
55:25 56:3,
12,20,24
57:2,16,20
58:2 59:9
137:14
139:16 144:5

**driveway**
93:9

**driving**
11:18 21:9
38:18 53:13
58:20 59:7
61:17,20
62:24,25
63:17 87:16
91:8,11
105:10
114:25
118:20,21
120:1 134:22
146:12,21
153:12

**drop**
126:12

**dropped**
77:15 105:20
126:16
157:7,14

Appx. 0203

dropping
  105:13
drove
  91:13 92:5
  144:8
drugs
  46:24
DTI
  19:16 20:8,
  24 21:2,7
  23:13,24
  24:23 25:4,9
  55:24 56:5,8
  57:3
duces
  66:23
dude
  101:3 112:13
due
  87:20 165:12
duly
  5:7
duties
  58:5,7
duty
  32:12,18
  86:14
DWQS
  67:4

        E

e-mail
  67:18
e-mailed
  127:3
earlier
  89:19 104:16
  114:17 125:4
  145:22 150:5
  151:20
easier
  140:24
easy
  33:13 158:5
eat
  46:9 60:21

Eats
  111:7,13
echo
  14:13,14
  15:9 117:6,9
Eden
  5:9,10 14:15
  15:14,18,23
  16:11 35:12,
  16,24 36:2,
  4,12 40:4
  56:5,11
  57:12 58:14,
  15 64:11,17,
  20,22 66:8,
  21 67:1,3,9,
  12,16 68:1,2
  69:3,10,15,
  17 70:10,13
  95:18,23
  96:8,14,15
  97:5,13,17
  98:10,11
  100:7 103:22
  104:8,13
  106:7 109:10
  110:6,18
  111:18
  112:1,7,17,
  22,23 113:7,
  17 114:2,21
  115:14
  116:21
  117:6,12
  119:11,12,
  18,23 120:24
  121:5,10
  123:14
  124:18
  125:14
  126:5,11
  127:4,7,12
  128:22,23
  130:2 131:1,
  17 132:15
  134:8
  140:13,15,
  21,23 158:25

159:14,18,20
161:17,19
162:3,25
163:8,11,15
165:13,20
editing
  124:23
education
  13:8 14:8
Edward
  54:20
EEOC
  21:23
effort
  24:19
efforts
  24:15
eight
  27:24 48:18
  76:13 86:14
eight-minute
  97:6,11
eighth
  33:24
either
  50:5 58:14
  82:6 83:6
  151:5
EKG
  28:12
elbow
  18:22 24:2,
  10 26:19
  29:9 31:9,
  15,20 32:3
  34:4,10 35:6
  43:23 44:3,8
  45:11 49:18
  78:21
Electronic
  165:23
ELMO
  147:14
emergency
  42:16,21
  45:21 46:18,
  25 47:3

emotional
  111:24
employed
  18:8,14 19:5
  61:15 160:17
employee
  137:11
employer
  18:16,17
  19:12,15
  22:21 23:13
  32:5 150:22
employment
  60:7
emptied
  99:23
empty
  39:7,8
  41:10,11
EMS
  42:21 43:2
encountered
  134:23
encountering
  79:24
end
  26:11 111:7
  133:14 135:6
  165:24
ended
  58:12,16,17,
  18,22 59:3,6
  84:23
engineered
  33:23
enjoy
  158:2,3,4
enjoyment
  158:15
enter
  106:11
  107:11 109:2
entered
  106:19
entire
  37:15 81:20,
  23

Appx. 0204

Bobby Hardsick
January 23, 2025

15

entirely
  113:12
entitled
  144:13
entity
  68:10 149:19
entrance
  94:19
equipment
  24:16 60:24
Eric
  95:20 123:2
escalate
  107:15
escalating
  79:17
Essay
  5:10 155:22
essentially
  123:8
establish
  110:20
  111:14 125:7
establishing
  125:3
Eve
  105:8 158:3
evening
  91:4
events
  123:10
  151:15
everybody
  53:14 157:6,
  20
everyday
  58:4,7
everyone
  140:25
evidence
  109:18
  110:21
evidentiary
  74:8
exact
  10:9 27:18
  33:5 53:14

111:4 129:9
131:11
161:25
exactly
  33:8 37:15,
  16 62:22
  74:16 79:13
  82:24 88:10
  99:10 100:14
  106:8 109:4
  131:9 139:12
examination
  5:8 10:5
  27:17 28:11
  29:1,8 162:5
examinations
  28:16 29:5
  30:23 45:16
  46:2
Excuse
  30:18 45:15
  81:19 102:4
exercising
  144:6
exhausting
  10:15
exhibit
  66:22,25
  67:23 69:4,9
  71:1,2
  95:19,22
  96:9 104:10
  110:2 111:15
  112:2,6,9,
  10,18
  119:14,19
  120:25
  121:4,6
  123:4,6
  126:7,22
  127:8,14
  129:12 131:5
  134:4,16
  142:3
  159:17,19
  164:10,11,
  19,20

exists
  155:17
exit
  108:20
exiting
  74:24 152:5
expect
  69:11 115:5
expecting
  120:11
  123:24
expedited
  144:21
experience
  20:6 40:14
  106:2 150:20
explain
  109:22
  146:24
explained
  135:2
explaining
  118:17,18
explanation
  51:9
extend
  73:12 129:2
extended
  73:2
extending
  96:22
extent
  28:22 29:9
external
  161:3
extra
  24:15,19
extremities
  51:24
eyes
  157:17

_____

          F

_____

face
  153:11

Facetime
  79:8,9
facility
  24:12 25:1,
  2,16 28:25
facing
  102:16
  153:13
fact
  77:23 86:21
  116:7 140:2
  147:13
fact-finding
  40:7
facts
  6:17 10:12
  44:19,22,23
  64:13 79:25
  115:16
  116:1,5,11
  122:23
  123:10
  162:14
factual
  151:25
factually
  74:4,14
fade
  131:25 153:8
failed
  144:6 157:7
failing
  139:23
failure
  53:16,17
  85:19 138:13
fair
  7:21,22
  93:19,25
  139:15
fairly
  164:3
Fairmount
  9:21 10:19
  17:22,25
false
  141:16

Appx. 0205

familiar
  11:8 52:13
  82:12 114:23
  153:21
family
  33:8 65:18
  72:19,20
  146:6
fancy
  156:19
fantasy
  33:22
far
  6:21 7:23
  43:11 58:5
  68:17 94:6,
  12 99:8
  119:4 136:5,
  15 156:21
Fargo
  5:13 119:9
  153:22,24
  154:8 156:8,
  9,23 157:1,
  6,8
fast
  40:2,15
  41:3,8 42:6
  109:12
  126:22
  130:14 144:8
fast-food
  46:6
fast-forward
  119:19
faster
  19:3
father
  57:4,8,21,25
  58:6 65:20
  72:20 77:11
  79:18
  151:12,13
father/
daughter
  65:16

favorite
  17:6
February
  50:16 51:3
Federal
  62:11
Fedex
  21:16 24:11
feeder
  38:8,11
feel
  20:5 45:5
  125:4 127:5
  160:24
feeling
  31:7 111:25
  147:7
feels
  74:9 133:4
feet
  41:8 94:14
fell
  106:23
felt
  44:15
female
  26:14
field
  102:19
fight
  155:21
fights
  89:12
figure
  27:15 75:10
  118:24
  136:19
file
  21:22 52:7
  54:25 70:5
  79:25 80:15,
  18,20,24
  81:1 163:14
filed
  22:1 55:2
files
  163:2

filing
  84:18
filled
  59:12
film
  124:23
films
  131:10
final
  151:13
financial
  51:17
find
  22:5 59:23
  80:17,23
  105:5,21
  109:15
  146:16
  163:11
finding
  91:17
fine
  94:5
finish
  7:24 8:1
  96:21 129:1
finished
  12:19 25:13
  32:8 46:1
finishing
  75:10
finna
  73:5
fire
  22:24 42:24
  43:2 142:20
firearm
  100:13
fired
  20:1 58:21
  59:2 100:15
  127:17
  136:14
fireworks
  158:3
firing
  59:11

firm
  20:3 52:11
  112:25
  149:17
  150:12
first
  5:7 6:14
  18:22 26:7
  39:10,13,15
  41:2 61:19
  86:11 92:23
  94:18 101:18
  102:6 118:14
  122:25
  123:17,20
  128:20 134:2
  136:13 137:2
  144:2 150:17
  151:14
fish
  156:4
five
  9:23 35:14
  76:12 85:7
five-minute
  161:12
flabbergasted
  124:2
flabbergastin
g
  151:16
flashback
  158:7
flatbeds
  158:14
flights
  106:25
floor
  77:15 102:6,
  7,21 134:22
  153:13
Florida
  17:9,11 25:1
flow
  37:22
Fluoxetine
  148:12,15

Appx. 0206

Bobby Hardsick
January 23, 2025

fob
  108:24,25
focused
  51:18
folder
  163:1,2,8
folks
  18:14 21:2,
  5,6,11,13
  30:11 53:10,
  13 54:18
  96:10 100:20
  122:19
  147:14
  153:23
  154:13
  155:21
folks'
  131:12,14
follow
  26:16 27:20
  28:5,8,10
  30:12 46:12,
  14 47:4,16
follow-
appointment
  32:14
follow-up
  28:2 31:1,3,
  11 47:12
  89:18
followed
  31:4
following
  71:18 116:17
  117:17
  129:24
  145:21
follows
  5:7
food
  110:6,8,10,
  23,25 111:3
  124:21
  125:11,25
footage
  95:20 112:3,

18 113:2
121:1 122:20
123:3,5
124:24
127:8,13
129:13 131:4
134:17
143:21
151:10
football
  133:3,14
  158:2
force
  84:12
forces
  42:8
forearm
  73:2,12
form
  64:19
formally
  93:22
formed
  60:3
Fort
  24:12
forth
  57:24 72:22
  135:24
forward
  41:12 42:4
  43:14,24
  44:2 48:5
  77:3 98:1
  104:14
  109:12
  126:22
  130:15
  144:23
found
  22:21 23:2
  28:18 53:12
  54:8 83:13
  142:17
four
  60:6 85:7
  100:15,16

102:15
103:15
106:15,19
four-door
  38:22
four-wheeler
  41:9
fractures
  28:22,25
fracturing
  84:23
frame
  34:8,9
  118:17 160:2
frank
  10:23 154:5
freely
  147:12
freezes
  15:20
freight
  24:11,18
  115:5
friend
  115:18
friendly
  128:23
frightened
  45:5 107:3
front
  79:6 93:1,2,
  8 94:7,11,15
  100:2,12
  117:16
  118:3,5,7,12
  121:22
  129:17 133:9
  136:14,15
frustration
  111:25
full
  8:4 97:18
functioning
  89:24
functions
  59:13

fussing
  96:25 97:3
future
  51:3 127:5

_____

G

G80
  91:9 92:7,9
  93:4 94:20
  98:24 99:17,
  20,22 104:16
game
  155:17
  160:22
games
  158:2
garage
  98:23,24
  99:1,2,4,5,
  6,10,20,21,
  22 100:2
  109:1 121:23
  126:15,17,18
  127:19,25
  128:15
Garland
  9:8 14:23
  25:21,23
  26:5 29:18
  30:7 56:25
Gary
  29:17 47:5
  149:8
gas
  33:19
gate
  92:21 93:2,
  8,9 94:7,11,
  19,21
  108:21,22,23
  109:1 115:8
  134:24
  135:1,2,10
  136:6,9
  153:13

Appx. 0207

Bobby Hardsick
January 23, 2025

**gates**
150:17
**gave**
24:15,19
26:13 27:6
30:11,19
45:20 78:12
116:11 135:6
156:11,14
**general**
13:15,16
146:9,10
**generally**
146:2
**generating**
18:14
**generation**
134:1
**Genesis**
91:9 92:7,9
93:3 94:20
98:24 99:6,
9,17,20
104:16
**George**
14:14
**Georgia**
11:25 12:1,
3,4,12,15
**getting**
24:17 31:4
49:13 61:18
75:25 99:9
103:2
118:17,19
119:25
125:2,20
127:19
**girl**
70:25 145:4
155:20
**girlfriend**
20:1,4
70:17,22
89:3 129:11
145:9

**girlfriend's**
141:4
**give**
6:11,17,24
7:6,10 19:23
38:2 45:22
46:21 65:14,
25 76:4 78:9
84:7 87:21
101:11
116:1,2,5
130:5,7
133:1 138:10
139:6,11
140:4
147:15,24
148:16
152:17 153:2
154:19
156:17
**giving**
98:2 115:14
118:11
130:20
132:18 139:5
143:11 157:9
**glass**
109:17
**God**
39:7 41:11
79:23 102:13
107:19
128:11
147:21,22
**goes**
33:1 74:21
76:17 77:13
78:3
**going**
6:14 7:20
19:3 24:18
27:3,22,23
30:17 31:6
33:10 34:17
37:24 39:23
40:2 41:4,10
42:5,8
44:16,20,24

46:4,19,21
48:19,23
50:1,7 61:21
62:16 65:20,
22,24 67:21
69:15 71:1
73:5,13
77:11 79:7,
14,22 82:4,
5,6,7,13
84:18 89:3
90:18 91:15
96:16 97:5
100:4,22
101:4,23,24
102:5,9
103:1,4,18
105:25
106:3,14
109:5,24
110:2 112:7,
17 113:24
114:18
115:12
116:1,2,4,5,
12,13,15,17
118:22,23
119:12,13,18
120:8,17
123:22
124:15 126:7
127:5,7,21
128:17,18
129:6
130:14,22
131:15
132:4,5,12,
23,25 133:17
134:3,25
135:9 140:10
141:16
144:21
145:3,4,6
146:10
148:13,21
151:14 153:9
154:7,11,15,
17 155:13
156:3 158:4

159:4,7
161:14
163:15,16
165:1
**gold**
56:4
**golf**
141:3
**good**
5:10 6:10,
13,21 7:23
16:20 22:8
31:14 32:25
33:11 35:17,
19 36:15,21
38:6 40:13
44:5 47:10
50:20 51:16
53:9,22
54:15 58:25
65:13 67:25
68:1,6,19,25
69:25 70:1
82:15 85:18
86:18 90:24
94:6 97:10,
15 100:10,21
104:18
109:24
112:22
117:10,24
121:17
122:6,15
123:12 127:1
129:5,9,21
133:8,12
136:22
140:15,19,20
141:3 143:19
148:23
158:22
161:15
**goodness**
123:15
**goofed**
74:15
**gosh**
54:23 113:13

Appx. 0208

gotcha
44:17
grab
74:25 154:22
grabbed
44:3 75:2
81:22
grade
90:10
graduate
12:21,23
graduated
12:2,5
gray
130:9 132:25
great
7:5,12 147:4
161:22
green
30:19
grew
115:16
grip
76:12 100:21
grocery
32:22
ground
6:14 96:20
109:23
guess
21:12 28:7
44:20 59:4
61:1 69:20
71:11 87:21
112:9 117:15
guessing
10:6 30:11
61:4,8 83:1
89:19 100:18
107:16
149:14
guilty
83:9,13
gun
100:22
127:22 137:1

gunfire
128:16
gunshot
107:7 108:16
136:2
guy
42:10 101:7
102:8 110:11
114:8,11,14
116:7
135:10,21,22
141:11
152:16
153:10 159:5
161:22
guys
16:5,11,14
17:24 21:24
36:2 37:17
38:4 54:9
64:11 104:14
108:12,14
119:25
149:20

—————————

H

—————————

hair
144:24
153:7,10
haircut
145:6
hairline
132:7
half
74:14
halfway
106:23 107:1
hall
101:16
106:20
hallway
106:17,25
107:1
hand
32:23,24
33:9

handed
152:19
hands
73:17 137:1
hanging
107:2 131:23
happen
38:6 52:8
85:4 148:4
151:7
happened
6:20 18:21
24:9,21
26:25 52:21
65:19 71:14
99:10 116:6
117:3 120:2
121:13 124:6
146:14,25
151:18
156:22
159:10
happening
130:16
hard
41:17 113:13
129:10
145:18
146:19,22,24
147:8,24
157:17 161:7
162:17
Hardrick
5:6 8:6
15:7,19,25
35:10,13
36:4 52:25
56:21 57:6,
12 63:25
64:22 66:2,
12 67:17
68:2 69:10,
18 70:13
71:2,23,24
72:9,10,24,
25 73:2,4,6,
16,18,19
74:22,23,25

75:1,2,3
76:8,18,19,
23,25 77:14,
16,17,18
78:4,5,6,19
93:23 96:15
97:8,13,17
100:7 103:22
104:13 106:9
110:6 112:3
113:7,17
114:2 115:14
116:21
117:8,12
121:7,10
122:2 123:14
126:11,23
127:9,12
128:24 130:2
131:1 132:15
138:24
139:19
140:23 151:9
161:19
162:7,17
Hardrick's
15:14 66:22
69:4 73:3,20
76:9,11
95:19 121:1
hatchback
38:21
haul
63:18 104:20
105:12
112:14
head
39:21 44:10
45:3 78:20
85:4 102:11
143:2
Headquarters
24:25
heads
7:7
healed
48:18 51:7
160:22

**Health**
  30:2 31:7,19
  32:1,9 34:3
  47:17,23
  49:12 149:3,
  7 160:5
**healthcare**
  29:4 149:15
**hear**
  35:15,16,18
  36:11,12
  41:8,13
  56:9,21
  57:7,9 58:16
  70:10,14
  97:8,18
  100:8 113:5
  115:3,25
  122:21
  132:16,18
  134:11
  155:22
**heard**
  24:20 40:25
  54:17 64:25
  82:1 106:13
  107:6 108:16
  134:12 136:2
  151:8
**hearing**
  16:9 117:6,9
**hears**
  165:7
**hearsay**
  155:16
**heart**
  145:19
**heat**
  33:14 46:22
**heavy**
  130:17
**height**
  132:24
**Hello**
  104:7 109:9
  142:10

**help**
  27:7 47:1
  128:25
  140:25 163:7
**hey**
  23:14 25:25
  37:16 55:12
  59:11 64:17
  68:14 70:24
  74:10 141:10
**hide**
  116:3
**high**
  12:2,4,5,18,
  19,23 13:6,8
  26:24
**highway**
  19:4 21:16
  37:1 38:8,13
  39:25 115:5
  116:9
**highways**
  18:24
**hill**
  37:25 39:13,
  24 40:1 41:5
  42:5,6,8
**hire**
  52:7
**hired**
  154:12,13
  157:12
**Hispanic**
  123:3
**history**
  80:1,3 89:9
**hit**
  38:15 40:20
  41:5,17
  127:6 136:3
**hitting**
  77:5
**hold**
  61:25 77:16
  83:25 107:2
  115:22

**hole**
  141:4
**holes**
  142:19
**holiday**
  63:20 91:15,
  17
**holidays**
  105:18,19
**Holliman**
  121:19
  122:17
  143:10,14,19
**home**
  57:14 101:25
  102:1,2,18
  105:7,8
  111:6 121:21
**homework**
  153:18
**honest**
  162:13
**hoodie**
  130:9 131:23
  137:6,18
  138:7 140:8
**hoodies**
  158:5
**hoping**
  95:23
**hospital**
  27:1 43:16,
  18 90:4,6
**hot-shotter**
  60:3
**hot-shotters**
  21:2,6
**hour**
  19:3,8 36:16
  37:8,11,12,
  21 38:3
  111:6 115:4
**hours**
  62:5,16,23
  86:15 113:1
**house**
  72:23 93:11,

  13,14,19
  94:2,7,11,
  17,20,22
  95:12 135:25
  136:2 141:4
**household**
  33:6
**housing**
  93:6
**Houston**
  27:2 37:13
  38:8 54:11
  86:21 87:2
  105:14
**Hubbard**
  15:13 36:1,
  11 56:9
  64:15,17,21
  66:5 67:2,6,
  10,15,25
  69:8,14,16
  74:9 96:8,12
  112:21 121:3
  127:2
  140:13,20
  158:23
  161:15 162:6
  163:1,3,6,7,
  10,13,18,22
  164:9,12,14,
  18,21
  165:15,18,
  21,23
**huge**
  33:23 155:21
**huh-uh**
  7:8
**human**
  33:23
**hunker**
  108:13
**hurdles**
  74:8
**hurt**
  18:15 26:25
  42:17 43:22
  44:8 45:1,2
  48:1 55:12

Appx. 0210

hurting
  45:7
hurts
  45:6
hypertension
  6:7 47:15
  87:9,10,18,
  19,20,24
  88:4,12
hypervigilant
  165:8

―――――――――

         I

―――――――――

I-20
  37:25 38:4,
  10 39:23
Ibuprofen
  26:22
ice
  46:22
idea
  20:6 113:10
identified
  121:18
identity
  158:17,20
igloo
  10:23 19:18,
  20
II
  6:6 87:14,
  15,17 88:12
ill
  57:4,8
Illinois
  8:9,13,16,
  18,20,24 9:4
  11:14,20
  13:3,4,5
  84:1,3 85:1,
  2 91:4,5,10,
  13 104:20,23
  105:6,12,23
  115:17 122:8
image
  129:17

images
  157:18
immediately
  102:20
  117:17
  128:15
impact
  39:11,16
  41:3,13
impacted
  145:21
impaired
  34:18
impeding
  76:10
implanted
  90:1
important
  27:16
improving
  28:8
in-cab
  41:7
in-person
  55:19
inaccurate
  76:2
incarcerated
  83:21,24,25
incarceration
  83:20 84:2
incident
  5:19,20,25
  9:17,20,24
  11:2 17:14,
  21 24:1
  35:10 36:7
  62:21 63:15
  64:14 67:14,
  17 77:4
  81:21,23
  84:8,22
  88:14,15
  90:16,25
  98:7 118:19
  119:4,23
  145:20

146:2,4
  148:2 158:1
  164:4 165:2,
  12
incidents
  67:13 120:1
includes
  104:18
income
  18:15 33:5
inconsistenci
es
  98:15
inconvenient
  111:12
incorporated
  60:4
independent
  60:18
Indian-based
  149:9
Indiana
  24:25 25:1
Indianapolis
  25:1
indicate
  137:3
indicating
  137:10
indictment
  83:6
indie
  131:10
individual
  38:14 113:20
  117:15
  118:2,14,15
  121:18
industrial
  28:1
industry
  21:12 62:7
  68:7
inflamed
  46:21
inflammation
  46:22

information
  115:15 116:2
  148:17
  158:20
infractions
  77:21
ingenuity
  33:23
initial
  26:6,9,10
  28:14 29:14
  45:6 158:24
initially
  61:19
injure
  44:9 86:18
injured
  18:9,11
  25:14,16
  32:17 34:13
  43:4,23 44:7
  45:9 51:6
  86:11
injuries
  20:22 23:23
  26:20 31:20
  34:9,14,19,
  23 35:21
  36:5 43:15
  47:21 48:8,
  12 50:8 79:2
injury
  18:18 20:19
  29:12 31:9,
  15 32:3
  34:1,7 35:8
  40:8 48:11
  52:3 85:13,
  20 86:3,7
inside
  108:14
inspections
  33:19
instance
  74:12
instinct
  102:17

Appx. 0211

instruct
  27:20
instruction
  53:7
instructions
  30:12 32:8
  46:13,22
instructs
  7:14
insurance
  20:2 52:5
  55:6 70:4
  149:21,24
interacting
  46:23
internal
  51:25
interrogatories
  162:11
interrupt
  52:25
interrupting
  53:1
intersection
  38:7
interstate
  37:1
intervene
  82:2
intervened
  78:6
interventional
  50:7
interview
  71:13
investigate
  36:22
investigating
  98:7 142:16
  152:25
investigation
  22:20
investigations
  125:16

Invisalign
  27:25 28:1
involuntarily
  19:12,23
  58:9 61:5
Involuntary
  19:14
Iowa
  9:6 11:15,
  16,19 62:4
island
  129:16
issue
  15:11
issued
  71:9
issues
  64:10

---

**J**

jail
  65:22,23
  75:18 77:12
  82:11,13
Jameis
  17:8
jammed
  111:11
January
  5:19,25 6:20
  56:8,13,18
  63:14 67:12
  70:21 87:13
  88:1,4,21,24
  89:10,12,16
  90:4,7,16,25
  98:13 105:9
  123:18 124:3
  142:23
  145:21,24,25
  150:2 165:6
jarring
  18:2
JCTL
  56:19 59:14,
  18,25 60:4,8

61:10,12
  63:8
Jean-mario
  112:4,19
  131:4
jeans
  130:12
Jeep
  99:13,14,19
  103:23,25
  104:1
job
  7:5,12 20:1,
  8 21:25
  23:22 32:18
  41:18 43:9
  48:15 56:23,
  25 58:19
  59:8,17,20,
  23 60:13
  63:18 69:21
  86:13
jobs
  61:15
John
  12:19,20,23
join
  57:3
Josh
  114:22
Joshua
  112:11
  113:18
  114:10
  115:8,15,16
  118:1,3,10,
  13 119:4
  123:19
  134:21
  135:4,5,18
  151:11
  152:8,9
  153:4
Joshua's
  135:1
Jr
  5:6 8:6

71:24 72:9
  73:2,17,19
  75:2 76:18,
  24 77:16
  78:5
Jr.'s
  73:18
July
  31:2
jump
  33:18 146:20
jumped
  85:7 91:6
jumping
  64:13 81:16
jurors
  17:3
jury
  149:25

---

**K**

Kansas
  13:11,17
Keel
  5:12 139:16,
  21 150:10,
  12,13,15
  151:1 152:1
  157:4 164:1
keep
  17:4 32:18
  33:9 67:21
  77:7 87:21
  97:25 106:3
  109:5 113:24
  114:18
  115:12
  124:15
  129:11 134:3
Kelsey-
seybold
  27:2
key
  108:24,25
keys
  73:20 74:5,

Appx. 0212

24,25 101:20
126:12,16,20
**kidneys**
87:22
**kids**
16:11,14
**kill**
60:22 95:11
107:5
128:13,17
**killed**
102:2
107:20,22
128:14
147:24
**kind**
46:8,10
60:22 68:16
75:11 84:12
87:20 96:19
100:12,21,23
102:16
105:18
106:12 109:2
110:21
111:19
122:18
124:25
131:9,19
145:21
146:19 147:8
148:13
161:20 162:1
**kitchen**
73:21 129:16
**knee**
82:3
**knees**
106:23
**knew**
40:21 79:13
156:13 159:3
**knife**
89:9
**knocked**
131:2,8

**knot**
78:19 79:3
**know**
5:20 7:3,17
10:7,13
12:10 15:11
17:3 19:20
24:4,23
27:15 29:8,
21 36:7
37:18 38:2,
14,18,20
39:20,21,22
40:9 41:5,7
42:13,18
43:10,11,22,
24 44:17
45:4 46:6,17
48:5,9,15,21
51:24 52:2,
20 53:20,23
61:24 63:19
64:17 65:19
66:6,8 68:3
71:11 74:11
78:13 79:1
80:21 81:17
82:3,23
83:17 85:8
88:18,20
89:24 93:13
95:13 99:3
101:14 103:3
104:18
105:13,17
107:6 108:8
110:25
111:13 113:7
114:22
118:25
119:10
121:19,20,
22,25 124:6
127:4 130:18
132:5 133:5
135:9,17,18
137:25
138:3,4,8,
11,21 139:9,

15,20,24
141:11,20
142:7 143:7,
23,24 144:3
145:23,24
146:10,19,
23,24,25
147:2,7,10,
18,20 148:4
150:22
151:1,10,14,
18,20,22
152:23
154:5,11,16,
18,19,21,23,
25 155:1,16
156:19
157:19
158:6,11
160:14 161:5
162:17 163:3
**knowing**
53:23 81:1
98:12 116:7
124:2,9
147:1
**knowledge**
10:11 40:24
**known**
154:6

──────────

**L**

──────────

**label**
78:17
**labeled**
71:16
**labrum**
26:1
**lady**
18:23 19:8
26:14 36:16
38:17 40:1
42:11 52:4
110:9 121:11
124:19
125:8,11,24
129:17

**Lancaster**
25:2,4
**lane**
38:10,11,23,
25 39:1,3
**lanes**
40:15
**Langston**
13:18,20
14:1,5
**law**
10:15 20:3
52:10 68:9
82:11 112:25
149:17,18
150:12
**lawsuit**
5:24 9:17,
20,25 17:14,
22 52:7
54:25 55:2
62:22 63:16
84:14,21
144:1,13,16
146:1 150:11
158:20 164:4
165:12,16
**lawsuits**
144:12
**lawyer**
20:2 52:7,11
53:10 54:23
147:13
**lawyers**
101:12
**lay**
151:13
**lead**
83:20
**leading**
101:12
165:13
**lean**
114:4
**learn**
87:23
122:13,15

Appx. 0213

5

learned
  122:7
learning
  115:1 118:21
leave
  11:22,24
  12:15 20:12
  57:2 58:1
leaving
  19:11 24:16
  108:16
led
  23:20,21
  24:9 79:19
Lee
  8:6 71:23
  72:8,25
  73:2,16,18,
  19 74:22
  75:1,2 76:8,
  18,23 77:16
  78:5
leery
  135:22
left
  11:25 15:23
  43:25 76:19,
  25 77:22
  78:20,21
  86:20,24
  94:25 99:7
  101:16
  127:15
  128:15 151:4
  152:4 161:11
leg
  86:19
legal
  68:7 74:8
  83:19 154:21
leggings
  71:24 72:5
lens
  110:13
  131:12,14
letter
  23:19 157:1,

letting
  23:16 77:6
leukemia
  88:8
liability
  40:10 55:9
  144:3,6,10,
  18
license
  61:25 152:19
lie
  103:1 116:12
  155:13
life
  8:20,22
  27:15 79:22
  146:10,24
  147:22
  157:16
  158:15 161:9
lift
  28:8
light
  30:19 32:12,
  18 86:14
  144:9
Likewise
  162:4
limit
  37:23
limited
  28:21 45:22
  67:13
line
  67:22
linebacker
  152:14
lineman
  133:13
lines
  67:22
lingo
  24:13
link
  112:8

list
  34:24
listen
  120:15
listening
  126:25
literally
  48:20 80:25
  91:19
litigation
  27:15 108:6
  149:18,20
little
  6:22 15:19
  23:6 26:25
  33:4 71:12
  83:18 91:23
  98:13 100:24
  109:12
  116:15
  121:11
  122:10
  132:24 133:4
  134:1 140:19
  142:12
  144:21 156:7
  161:11,16
live
  8:17,24
  11:19 13:3
  14:22,25
  16:22 17:13,
  16,20 33:12
  37:13 102:5
  107:1 129:7
  147:19
lived
  8:9,20 9:1,
  23 13:3
  129:7
lives
  16:23
living
  9:16,19
  15:24 17:24
  57:15,21,23
  146:19 147:2

LLC
  60:5,6
load
  60:16,21,23,
  25 61:2
  63:10 91:15,
  17 105:5,6,
  18,20,21
loaded
  42:1
loads
  60:24 62:19
  66:1 105:20,
  22
locate
  124:3
located
  5:5 25:20
  100:12
locked
  30:6
locks
  43:25
log
  69:5 70:5
Logan
  148:7,10,20,
  24 149:2,13
  160:9
Logistics
  86:12
long
  13:20 56:5,
  20 59:14
  60:10 87:5
  88:22 105:2,
  11 108:1
  123:23
longer
  59:9 66:10
  131:21
  144:20
  145:10 146:1
  157:25
look
  18:3 21:24
  23:14 25:25

54:9 96:3,4
103:2 116:3,
4 133:13,14
134:20
136:6,9,22
137:25 138:5
139:24,25
**looked**
40:22 130:5,
8 136:25
152:13
**looking**
40:16 59:4,5
94:25 109:18
117:3 127:20
134:24,25
137:2 138:3
139:6 141:6
142:25
152:18 156:7
160:22 165:8
**looks**
54:14,18
114:5 158:8
165:5
**lost**
35:13 104:8,
9
**lot**
10:15 15:20
18:3 21:13
27:5 33:16,
17 44:18
45:21 63:2
93:4 99:3
101:23 122:2
123:23
130:16,17
135:10
142:22 144:4
148:1 151:5
152:20
156:10
158:14 159:7
**loud**
154:5 165:7
**low**
15:15,19

27:6 105:19
**lower**
71:12
**loyal**
132:4
**lucky**
133:25
**lumbar**
51:25
**lymphoma**
88:8

---

**M**

**made**
9:17,20,24
17:14,21
22:8 62:22
71:17 79:10
80:12 85:13,
20 100:25
120:16
125:15
142:15
150:24 164:4
165:12
**magic**
132:8
**magnify**
28:23
**mail**
22:13,14
93:6,11,13,
14,19,21
94:2,4,6,11,
17,20,22
95:1
**mailbox**
127:23
**mailboxes**
93:14,16
94:3
**maintain**
61:24 77:16
96:23
**majority**
54:18

**make**
6:25 25:8
46:25 47:13
51:14 53:1
55:3 60:19
66:3 79:18
86:2,4 89:23
98:24,25
99:11,22
101:25 102:1
116:3,4
122:24
124:22
128:16
138:17
139:4,20
144:14,18
146:21
150:19,22
160:15
162:16 163:4
**makes**
7:8 40:4,6
60:20 67:24
86:5 100:4
111:4 122:17
126:21
128:12
131:12
**making**
86:6,7 105:1
114:12 123:7
125:10,18
154:6
**malfeasance**
74:19
**malfunctioned**
24:14
**malfunctioning**
24:20
**man**
32:19 33:1,
2,11,16
55:12 59:11
70:24 74:10
111:20
122:4,8

127:4 130:17
145:18
155:24
**manage**
27:7,10
**management**
51:1,20
155:5,9
**manager**
154:25
**March**
64:6 65:1
67:17 70:21
71:9,11,21
72:3,4 82:18
**mark**
34:24 66:21
69:3 78:22
95:18 97:6,
11 104:11
111:16
112:2,9,17,
24 113:14
116:14
119:15
120:25 121:6
126:22 128:4
129:14
130:15
134:4,16
145:16
159:16,19
164:9,18
**marked**
66:25 69:9
95:22 96:9
112:6 121:4
123:3,6
131:5 142:3
164:11,20
**marker**
109:13 110:3
119:19 125:8
126:6 127:8
**marriage**
18:6 146:17
160:13,14

Appx. 0215

| | | | |
|---|---|---|---|
| **married** | **Meaning** | **messed** | **misconduct** |
| 16:5 18:5 | 78:15 | 55:12 66:16 | 22:22 23:1 |
| **Marshall** | **means** | 145:12 | **misreading** |
| 12:19,20,23 | 5:4 21:18 | **met** | 74:18 |
| **Martha** | 115:4 | 5:16 | **missed** |
| 160:12 | **meant** | **Methodist** | 24:5 77:19 |
| **Mary** | 44:6 103:4 | 43:19 44:12 | 133:25 134:3 |
| 10:24 13:10 | **mechanism** | 47:18,22 | **mission** |
| 14:13 | 40:8 | **Miaya** | 40:7 |
| **Mary's** | **media** | 121:19 | **Missouri** |
| 13:12,17 | 69:25 163:4 | 122:16 | 8:14,15,17 |
| **matter** | **medical** | 143:9,14,19 | 13:2 |
| 86:21 140:16 | 11:5,6,9 | **microcomputer** | **model** |
| **mattress** | 29:25 34:13 | 14:19,20 | 99:11 |
| 86:25 | 48:16 51:17, | **microphone** | **mom** |
| **mattresses** | 18 68:11 | 117:7 | 32:24 |
| 86:22,23 | 87:9 88:10, | **middle** | **moment** |
| **Mayfield** | 11 90:1 | 81:14 93:6,7 | 26:3 48:10 |
| 17:7 | 92:4,6,10, | 106:16 | 96:5 111:21, |
| **MC** | 13,18 93:5 | 136:21 | 25 114:3,7 |
| 60:17 | 115:9 126:13 | **midway** | 120:16,20,22 |
| **mean** | 142:22 155:8 | 93:8 94:9 | **moments** |
| 17:4 18:13 | 164:16 | **mile** | 15:20 39:17 |
| 21:14,22 | **medication** | 61:2 | 44:17 80:5,6 |
| 29:7 37:3, | 6:5,6 26:18, | **miles** | 120:3 129:6 |
| 18,21 41:3, | 21 27:7,10 | 92:3 115:4 | **money** |
| 15 52:25 | 32:13 46:16 | **military** | 85:17 147:5, |
| 58:19 62:18 | 66:12 87:20, | 87:6 | 7 |
| 78:11,25 | 21 | **mind** | **months** |
| 82:4 83:22 | **medicines** | 45:9 118:22 | 80:18,20,22 |
| 85:3,6,10 | 27:19 | 120:12,17 | 81:1 |
| 93:22 100:19 | **medium** | 124:4,8,11 | **morning** |
| 101:15 104:9 | 153:10 | 145:2 151:15 | 5:10 37:12 |
| 105:5 106:7 | **meet** | **minimize** | 72:3 |
| 108:8 111:13 | 110:25 | 69:16 | **mother** |
| 113:11 | **memo** | **minute** | 80:5 |
| 114:21 | 157:5 | 104:11 113:1 | **motion** |
| 115:22 | **mention** | 126:6 149:7 | 28:20 44:2 |
| 116:25 | 82:1 | 159:12 | **motor** |
| 117:19 119:7 | **merge** | **minutes** | 62:11 129:8 |
| 122:21 | 38:12 | 17:10 35:14, | **mountain** |
| 129:16 | **merged** | 25 39:17 | 69:20 120:8 |
| 130:7,18 | 31:12 | 126:6 127:14 | **mouth** |
| 132:5 133:5, | **merging** | **miracle** | 129:8,11 |
| 21 141:12 | 38:10,11 | 40:19 41:20 | 159:13 |
| 147:18,21 | **messages** | **mirror** | **move** |
| 151:10,14 | 23:21 | 40:16 | 10:18 11:11, |
| 153:19 | | | |

Appx. 0216

13,16,19
41:12 42:2
67:19 94:21
97:25 99:5
**moved**
8:17 11:15
86:11 98:22,
25 101:24
**movement**
97:7 127:24
**movements**
42:18
**moving**
8:9,21,22
98:23 99:21
124:9 144:23
**MRI**
28:12,24
**MRIS**
27:3
**multiple**
24:25 34:11
122:24
131:11
**muscle**
27:5,9,11
**mute**
16:8
**mutual**
94:2
**mystery**
124:23

———————————

**N**

**name**
5:2,10 8:4
10:21 11:4
15:6 16:20
25:17 38:14
52:10,11
53:24 65:8
99:18 114:10
115:15
121:20,25
122:16
123:16 138:7

148:4 152:7,
9
**named**
150:10
**Nancy**
10:25 15:8,9
**National**
5:13
**Native**
30:2 31:7,19
32:1,9 34:2
47:17,23
149:3,7
160:4
**natural**
7:6 102:17
**nature**
21:1 40:8
52:1
**neck**
44:3,9,11
45:2,7 48:1
50:15,19,22
51:22,25
77:17 78:21
**need**
7:17 10:13
11:25 27:25
33:3 34:17
35:24 47:1
50:7 55:12
66:5,9,12
70:2 72:17
90:18 96:3,7
97:20,22
103:14 145:5
165:21
**needed**
28:10 32:10
58:3,4,6,7,
24 79:23
104:19
161:20
**needing**
51:12 96:4
**negligently**
154:13

**neighbor**
135:13,14
151:8
**neighbors**
120:15
121:20
147:20
**nerve**
33:4
**nervous**
52:1
**neuro**
51:23,24
**neurosurgeon**
51:3,20
**never**
21:11 23:19
54:17 81:22
83:8,10 90:5
120:6 137:13
145:2,18
151:10
**NFL**
140:6
**nice**
133:4
**night**
25:13 63:23
66:14 90:3
157:18
**nine**
80:18,19,22
81:1
**ninth**
33:24
**no-fault**
20:20
**nod**
7:7
**noise**
165:7
**nonfeasance**
74:19
**nonresponsive**
98:10 119:11
120:24
128:22

**normal**
6:6 147:10
**notarized**
68:16
**note**
32:6
**notes**
69:23 82:17
95:24 126:23
127:3 160:1,
3 161:12
**notice**
39:10,11
92:19 109:14
**noticed**
39:13,15,17,
19 41:2
81:11 92:25
94:18
**nuance**
83:19
**number**
52:19 60:17
152:17
158:24
**nurse**
30:21 31:18

———————————

**O**

**O-L-L-E-N-W-**
**E-I-D-E-R**
29:22
**oath**
6:23 82:23
155:13
**object**
64:19 89:10
**objection**
67:18,20
96:12 98:10
112:21
119:11
120:24 121:3
128:22
165:13

**objections**
  64:19 67:1
  69:7 96:9
  112:20 121:2
**objective**
  79:2 110:21
**observed**
  78:18
**obstructed**
  94:12
**occupying**
  39:1
**occurred**
  5:25 11:2
  36:18 39:2
  63:15 71:10
  76:15 77:24
  88:14,15
  90:25 118:1
  119:24
**October**
  34:22 47:7,
  9,11,17
  48:17,20
**octopus**
  9:13 10:24
  15:8
**offended**
  111:19
**offered**
  147:6
**offhand**
  81:5,6
**office**
  33:13 34:21
  79:21 80:17,
  19,23 86:14
  111:6
  153:20,21,25
  154:4
**officer**
  68:11 78:1
  95:20 98:3,
  16,20 109:19
  112:4,19
  113:8 115:19
  118:10

119:21 121:2
122:25
123:2,3,4,
15,16,21
124:19
125:6,10,18,
23 127:9
129:23
130:21
131:2,3,4
134:15,17
135:7,19
136:16
143:2,12
151:8 152:19
**officer's**
  71:13 73:9
  125:16
**officers**
  78:16,17
  84:23 85:7
  98:7 109:14
  110:1 113:22
  121:12,16
  122:17,18
  123:17
  139:10
  141:24
  142:16
  143:1,20
  152:24
**official**
  20:3 21:6
**oil**
  33:19
**okay**
  7:9,11,15
  8:2,3 10:3,
  8,9,17 12:9
  17:2,12
  27:13,18
  28:5 29:20
  35:16,20,22
  36:14 38:14
  45:24,25
  49:7 52:10
  53:6,20
  64:21 65:3

66:7,12,13,
19 69:15
70:6 71:2,18
75:9,13
76:7,17
81:4,7,25
82:16,21
88:6,11
90:3,21
93:18 94:1
96:1,6,15,
22,25 97:15,
20 98:2
100:5 101:5,
14 103:20
104:5 106:4,
13 109:6,7,
11,21 110:3,
4 112:13,17
113:15,20,24
115:12
116:10,13,18
117:1,3,10,
24 119:15
120:5 121:6
125:22
126:8,9
127:9 129:3,
4,11,24,25
130:19,22
131:22
132:13
136:24
137:21 139:9
141:1,15,17,
18,23 142:2,
7,13 143:18
144:23
145:1,8
146:9 148:1,
18 149:2
150:5,8,9
153:15,16
154:2 156:1
160:7 161:11
162:9,19
163:3,13
**Oklahoma**
  9:1,3 12:20

13:3,6
16:23,24,25
17:4 57:15,
16,19,20,22,
24 72:10,14,
17
**Olive**
  133:17,19,23
**once**
  75:9 91:11
  111:11
  127:18
  154:16
**one**
  8:1 15:11
  16:15 18:19,
  22 21:17
  37:3,13
  54:19 56:7,
  22 59:1
  60:2,7 63:1
  66:10 77:21,
  22 81:4,13
  83:19 88:17
  96:20 101:1
  122:17 123:4
  131:10 132:5
  135:18
  137:16,22
  138:16
  139:13,25
  143:1 147:25
  150:7 152:23
  154:7 159:2,
  21 163:5
  164:14
**ones**
  28:12 30:24
  86:3 149:20,
  22
**open**
  6:24 52:3
  101:22
  102:19
  108:23
  112:8,16
  162:24,25

**opened**
95:12 98:22
131:3
**opens**
108:21
**operating**
37:2 41:15
**operation**
144:7
**opinion**
85:4
**opinions**
17:4
**opportunity**
13:7 95:6,15
128:13 161:1
**opposed**
41:9 42:7
**opposing**
6:18
**opposite**
102:20
**order**
26:19 27:10
29:12 33:9
68:9 99:20
107:13
110:6,8
111:3 155:6
**ordered**
110:10,23
**ordinary**
100:18 144:6
**orientation**
61:17
**original**
119:13
159:21
**originally**
31:2
**ortho**
51:23
**orthopedic**
50:11
**orthopedic's**
34:21

**Osman**
159:14,16
160:4 164:21
165:3
**OTR**
59:22
**outline**
69:13
**outside**
33:7,8 38:25
79:7 88:14,
23 93:6
106:12 107:8
121:21,22
134:24 136:6
**overbroad**
23:6
**overnight**
90:5
**override**
156:18
**oversee**
157:11,13
**overseer**
156:4
**overworking**
87:22
**owner**
60:2
**Oyl**
133:17,19,23

---

**P**

---

**p.m.**
37:9 72:10,
15,18 73:1
**page**
68:20 69:1
71:5,16
74:10 78:18
**paid**
22:7 60:21
61:1 115:6
**Paillant**
112:4,19
119:21 131:4

**pain**
26:16 27:6,
7,9,10
46:19,20
51:1,19 66:1
**painful**
127:4
**paint**
116:4
**pallbearer**
151:12
**pallet**
86:20,24
87:1
**panel**
17:3
**pants**
106:23 107:2
130:10,11
137:6,18
138:7
**park**
91:20,24
99:2 111:1
114:13
**parked**
91:6,12,22
92:2,25
93:3,4 94:19
**parking**
92:17 93:4
94:8 99:3
101:22
135:10
142:22 151:5
159:7
**parks**
99:3
**part**
40:10 53:16
61:24 73:24
74:3 77:19
85:19 108:6
116:16 117:2
119:13,20
129:14,21,23
138:13

**144:2,11**
147:7 149:15
150:21
156:12
157:15
162:16 165:1
**participate**
88:13
**parts**
44:7,9 75:11
76:7 144:1
**pass**
162:3
**passcode**
108:25
**passed**
151:12 156:3
**passenger**
42:11
**passengers**
92:8
**past**
9:23 145:15,
16
**patience**
125:1
**patients**
45:21
**patio**
135:25
136:1,4,6
**patios**
136:12
**pattern**
80:1
**pavilion**
93:6,12,14,
15,20 94:2,
7,11,17,21,
22
**pay**
38:1 55:13
146:21 154:7
**paying**
51:10
**payroll**
21:7

Appx. 0219

Bobby Hardwick
January 23, 2025

30

**PCP**
29:15,16
46:12,15
48:21 49:10
50:3 148:11
149:8

**peace**
68:11 98:7

**penalty**
68:13,15

**pending**
22:3,4

**people**
79:24 82:8
84:10 123:9
144:4 147:19
152:24
154:19 158:5

**perception**
135:1

**perfect**
9:16 40:4,6
45:1 50:25
60:20 61:13
62:5 76:6
98:21 107:14
112:16
126:21

**perform**
29:5 45:12,
16 58:4
86:13

**performance**
19:25 23:17

**performed**
23:14 28:16
29:3 30:24
145:23

**performing**
46:1

**perimeter**
124:20

**period**
63:7 105:3

**perjury**
68:14,15

**permanent**
33:3

**permission**
154:18,20
155:5
156:11,14
157:9

**person**
71:23 72:8,
25 73:1,18,
19 74:21
75:1 76:8,
18,23 77:15
78:5 123:25

**personal**
10:11 40:24
50:3

**personally**
151:11

**personnel**
45:22

**perspectives**
124:25

**phone**
22:13 52:18
68:4 95:7,8,
11 116:22
117:14,16
118:3,14
158:24

**phones**
159:10

**photographs**
71:14 78:25

**physical**
18:19,20
29:1 34:12,
22,23,25
48:9,21,24
49:1 89:13

**physically**
19:1 134:22

**physician**
30:13 31:19
47:5,17
89:20 149:14

**pick**
15:23 128:18

**picked**
88:22

**picking**
129:7

**pickleball**
89:3

**picks**
105:19

**pickup**
88:20

**picture**
116:4 134:21

**pictured**
133:18

**pieces**
125:1

**pinned**
76:19,25

**place**
9:8,10,13
14:23 67:20
118:15
122:14,15
160:2

**places**
158:4

**plainly**
151:17

**Plains**
13:10

**plaintiff**
66:22 69:4
95:19 112:3
120:25

**plaintiff's**
53:10 54:23
95:21 112:4,
19 147:13

**plan**
49:25

**platinum**
55:25 56:3,
4,11,20,24
57:2,16,19
58:1 59:9

**play**
49:14 70:4
89:3 96:16
103:18 127:7
157:19
163:9,12

**played**
70:9,12
97:4,12,16
100:6 103:21
104:6,12
106:5 109:8
110:5,16
111:17
113:6,16
114:1,20
115:13
116:20
117:5,11
119:17,22
121:9 123:13
124:17
126:4,10
127:11
130:1,25
131:16
132:14
133:15 134:7
163:21

**player**
70:1 112:8
163:4

**playing**
88:20 106:4
109:5 113:24
114:18
115:12
120:17
124:16 126:7

**please**
7:3,6,13 8:4
56:2 98:1
146:3

**plenty**
40:13

**plug**
90:18

Appx. 0220

Bobby Hardrick
January 23, 2025

point
49:13 158:18
pointing
134:24
points
124:24
131:11
police
36:20,22
38:16 40:2
42:24 65:17
66:24 67:4,5
69:5 71:3
73:9 77:10
79:11,12,14
80:6 84:9
95:4,5,7,10,
16 98:3
103:23
107:17
108:13
109:14
110:11
113:8,21
115:15
117:17
118:4,5,12
124:20
129:23
130:21
135:12,15,23
136:4 143:20
150:19,22,24
Pollard
54:20
poor
74:2
pop
24:20
Popeye
133:21,23
Popeye's
133:19,21
portion
36:25
portions
96:18

position
58:23 59:1,
3,7,8 78:1
137:15,21
positions
133:3
potential
17:3
potentially
79:19
pounds
133:6,7,9,10
power
151:6
practice
29:18,24
149:2 160:4
practices
149:8
practitioner
30:22 31:18
pray
102:1
praying
102:8
precise
39:23
predicated
67:23
preexisting
143:23
prejudice
17:2
prescribe
27:4 32:13
46:16,20
prescribed
27:4,8 148:8
prescribing
148:12
prescription
45:23
prescriptions
26:16
presented
26:8

preserve
67:20
President
153:21,25
154:4
press
80:15 83:6
127:7
pretty
27:1 30:6
32:25 39:24
41:8 48:6
60:20 66:15
68:7,13
106:8 109:19
121:19
136:22
prevent
73:4,12
previous
119:20
previously
8:9
price
161:9
primary
30:13 31:6,
18 47:4,16
89:20 149:14
prior
9:24 11:19
55:23 150:1
probably
63:4 91:25
161:7
problem
10:10 90:20
110:15
152:20
problems
151:9
procedure
50:8,17,22
proceeded
73:19
PROCEEDINGS
165:24

process
24:17 83:4
87:12 88:3
100:23 101:7
108:7 120:21
124:8
processed
103:1
processing
102:16
124:10
produced
66:23 68:10
95:20 96:10
112:4,19
143:21
professionals
51:12
professions
33:15
program
14:5,15
48:24
progressing
34:24
projectiles
142:20
promise
44:16 74:18
83:18 97:3
130:15
prompted
11:13,16
12:15 13:5
57:2
property
92:21,25
108:20
114:14 116:8
142:20
protocol
42:13 142:25
143:3
provide
8:4 25:6
32:19 49:22
68:12 132:16

138:12 146:3
158:19
**provided**
23:8 46:14
141:24
148:23,24
**provider**
32:16 68:11
**providers**
29:4,5
**providing**
51:10 98:6
129:22
132:20
134:5,6,15
**PTSD**
87:10 159:22
165:2,12
**public**
79:20 80:23
**pull**
21:14 24:12,
14 84:9
86:23 104:10
126:15,17,18
127:14,25
128:1 164:15
**pulled**
18:12 21:9,
10 24:1
76:10 99:6
**pulling**
21:8,17,18
24:10 39:6
41:23 44:2
60:24 86:25
135:2 164:12
**punch**
78:4,7
**pups**
24:12
**purpose**
31:6
**purposes**
93:18,21
**push**
42:4

**pushed**
43:13
**put**
26:14 33:7,8
50:12 73:17
98:24 99:5,
20 124:5,25
147:3,8,11,
13,15,21
148:14,16
161:4 165:5
**putting**
161:9
**puzzle**
125:1

———————

**Q**

———————

**qualification**
23:3
**qualifying**
23:4
**quarterback**
17:6
**question**
7:2,13,20,24
8:1 23:5
36:22 37:10
42:20 44:6
50:21 53:14
56:21 57:13
60:13 61:4
77:20 83:18
85:9,19,20
86:2 92:22
94:10 96:21
98:13,15
101:13
103:14
115:21
117:15,21
118:10,11,13
126:2 129:2
132:19
137:8,20,21
138:10,14,
15,23,24
139:15,23

140:3,17,18
141:14
147:12
153:15
156:6,8
**questions**
6:18 53:3,18
67:21,22
69:13 70:6
71:18 74:7
101:13
115:20
116:17
124:14
129:24
140:24,25
157:17 162:7
**quick**
64:12
**quickly**
40:19 112:10
**quite**
10:8
**quote**
119:25

———————

**R**

———————

**radiological**
28:11 45:16
**radius**
92:1
**rain**
120:9
**raised**
8:15,16
**ran**
18:24 19:2,4
36:17 39:14
59:24,25
84:6,9 85:6
95:9,12,13
102:11
106:10
108:16
128:14,16
136:4 144:9

**random**
151:4
**randomly**
84:9
**range**
28:20 88:16
**raw**
124:24
**Ray**
67:7 113:4
**re-ask**
137:20
**Re-read**
76:22
**reach**
21:23
**read**
61:3 71:16,
24 72:1,11
73:6,21
74:16,21
75:3,14
76:6,13,17
77:8,14,19
78:22
**reading**
74:2,15
75:10
**reads**
36:20 73:7,
15 74:16
75:5 76:7,14
78:24 100:14
**ready**
64:13 90:22
**real**
40:15 64:12
**realize**
124:11
**rear-end**
39:4
**rear-ended**
39:16
**rear-ending**
41:24
**rearview**
40:16

**reason**
6:10,12
19:23,25
20:3,5,7
22:15,19,20
23:3 25:23
41:22 64:7
65:3 74:6
84:2 86:1
121:17
122:23 124:1
134:13,18
142:18
145:22
**reasons**
22:22 23:15
**recall**
9:6 26:23
27:12,18
44:24 64:4
72:21,23
82:20 83:15
86:6 87:25
88:5 89:11,
17 108:3
114:23
116:24
132:23,24
**recalling**
125:20
**receive**
43:15
**received**
34:4 52:18
55:5 85:17
**receiver**
133:15
**receiving**
23:1
**recent**
64:5,23,25
**recently**
52:20
**recollection**
72:2 131:19
**recommended**
146:15

**record**
8:5 15:22
35:25 68:16
73:9 74:18
126:5 128:25
145:4 159:23
162:17
**records**
67:14,16
68:13,15
69:6 148:19,
24 164:16
**recourse**
21:21
**recover**
159:11
**recovered**
157:15
**recovering**
31:15 32:4
**recovery**
5:12 139:16,
21 147:9
150:10,12,
13,15 151:1
152:1 164:1
**Recovery's**
157:4
**red**
78:22 144:9
**reduce**
146:15
**reference**
134:3
**referral**
50:14,16
51:19
**referred**
48:9,22
49:3,4
50:11,21
51:1
**referring**
51:21
**regarding**
115:7

**Regional**
29:24
**regular**
47:3 89:22,
25 100:21
159:24,25
**regularly**
47:12 89:20
**related**
34:10
**relates**
34:18 72:3
77:22
**relationship**
21:1,7 70:18
**relaxer**
27:5,9,12
**relevant**
10:12 27:16
**reliable**
110:20
111:14
125:3,7
**rely**
154:9
**relying**
151:25
158:17
**remember**
10:2,6,8,9
24:2 25:17
26:18 27:8,
14 30:8
52:10 54:24
62:22 82:18
86:7 90:9,24
96:18 98:2
114:7
116:21,24
128:24
130:4,11
132:22 150:5
152:9
**remind**
128:24
**reminder**
128:23

**reminding**
142:14
**remotely**
5:3
**reopen**
49:15,17
**rep**
12:11,12,13,
14
**repair**
50:13
**repeat**
14:10 56:1
57:12 58:15
**rephrase**
137:20
**replay**
97:7 110:12
116:15 128:4
**replayed**
98:18
**replied**
42:19
**repo**
119:9,10
124:10
156:12,15,18
**report**
36:20 38:16
40:2 150:20,
22,24
**reported**
25:12,14
47:21,22
**reporter**
5:2 7:9
14:10 15:10,
18 56:1 57:6
128:25
165:21
**reporting**
5:3
**repossess**
154:14
157:10
**repossessing**
155:2

Appx. 0223

repossession
137:5,23
150:11
represent
5:11 21:13
33:17 40:13
53:10 63:14
68:6 122:16
123:1 131:1
143:9,25
150:6,12
representing
53:5,13
143:17
represents
150:12
request
35:2 50:12
68:9 158:16
require
58:1
required
19:3
reserve
165:20
reserving
64:18
reset
62:17
residence
10:2,19,22
residents
154:20
resign
58:8
resist
82:6
resistance
42:3
resisting
84:4,5 85:5
Resolvion
5:12 153:15,
17,18 154:7,
9 156:1
respect
32:21

respectful
161:21 162:1
response
78:13
responses
66:23 67:4
68:20 71:3
responsibilit
y
49:18,19
52:6 55:8
rest
85:8 86:22
105:8 151:13
restaurant
46:6,9
restrained
43:14,24
44:2 48:6
restraining
48:5
restricting
76:20,25
restriction
28:8
restrictions
26:13,14
32:6,11
result
43:4 47:22
54:25 55:11
148:9 157:25
results
46:4
retaliate
20:17
retaliated
20:21 23:25
Retaliation
20:15,16
retaliatory
21:22
retired
21:3
retrieve
72:5 94:4

retroactively
49:22
return
7:25 31:4,16
32:5,11
157:12
revelation
114:6
review
161:12
revolver
109:20
rewind
116:15
rewound
119:14
right
5:23 6:21,22
7:5 8:7
10:8,12,16
12:14 17:5
19:20 21:3
23:6 24:4
25:24 27:7,
16,22 33:6,
8,14 35:1,20
37:12,19,20
38:12 40:6,
12,18,24
43:25 45:23
47:1 48:14
51:15,18
53:8 54:9
55:20 60:8
61:10,22
62:12 64:22
67:25 69:18,
22 70:8,25
71:21 74:4,
15,20 75:3,
19 76:7,9,15
77:9,18,21
78:1,20,22
82:24,25
83:5 84:20
90:15,17,21
91:5,15,16
94:15 97:10

99:25
100:11,12,
13,19,23,24
101:14,16
102:2 103:23
104:10
106:1,6
109:1,4
111:8 112:1
113:3 114:3,
4,18 115:24
116:14,22
118:6 119:18
122:14,21
124:23
125:9,25
126:1 129:5
131:10,14,25
132:1,2,6
133:2 134:4
137:2 138:9,
25 139:13
140:23
141:13
143:15
145:17
146:22
148:13,17
149:23,25
150:10
152:18,22
153:1
155:17,18,25
157:20
159:1,3
162:16,20
163:15,18
164:8,14,15,
18 165:1,18
Rights
52:18
risked
33:9
road
38:9,11 42:7
59:19,20,22
80:10,12
105:9,10

114:9 122:1
159:23
**roadway**
94:17
**Robert**
10:24 14:13
**Rochelle**
71:22 72:9,
24 73:3,4,16
74:23,25
75:3 76:9,
11,19,24
77:14,17
78:4,19
**role**
56:23 59:9,
17 60:14
150:8
**rookie**
114:24
**room**
38:2 45:22
46:18 71:24
72:6,7 73:18
79:6,8 81:12
**rotator**
35:3
**roughly**
13:22 37:24
60:12 100:11
102:12,14
104:22 125:6
**rounds**
106:11,14,15
**route**
60:25
**routine**
47:3
**routinely**
47:15
**row**
93:7
**rule**
155:16
**rules**
6:15 96:20

**run**
18:25 19:1
101:8,19,21
102:20
108:22
**running**
84:10 94:25
95:2 99:8,16
100:16
101:15,16,
17,18 102:2,
8,23 103:8,
17 106:17,25
108:17
135:9,24
164:7
**runs**
103:9 147:7
**rush**
19:2,8 36:16
37:8,11,12,
21 38:3
111:5

———————

**S**

———————

**S-A-V-O-Y**
9:14
**S-E-R-T-R-A-**
**L-I-N-E**
149:6
**S-H-R-U-E-G-**
**E-R**
54:4
**S-H-U-N-N-A-**
**R-A-H**
54:7
**safe**
13:23 88:23
**safety**
42:10 43:7,
12 62:11
**Saida**
159:14,16
**Sam**
9:12 15:8

**sat**
87:4 105:21
**satisfied**
157:4
**Saturday**
145:6
**Savoy**
9:8,14 14:22
**say-so**
78:13
**saying**
23:5 49:18
68:14 74:11
75:7 77:5
92:14 99:8
106:8 108:24
110:9,10
113:11 117:3
118:22,23
119:3 124:1
125:13,20
128:3,5
139:2 143:15
146:13
147:22 154:5
**says**
71:21 72:8
83:9 141:5,6
**scales**
133:3
**scan**
28:12,24
**scared**
107:3 114:25
**scene**
42:23,25
95:7,16
110:7,8,23
114:3 123:17
131:12
142:16,17,21
143:3 152:25
159:12
**schedule**
27:21 32:14
63:12,13

**scheduled**
31:11
**scholarship**
13:16 14:2,4
**school**
10:15 12:2,
4,5,18,20,24
13:6,9 26:24
61:19,20
62:1 88:14,
24 145:23
**Schuerger**
52:12 54:1,
2,4,5,8
**scope**
67:14
**Scott**
49:8,12 50:2
**scrambled**
106:24
**scrambling**
106:22,24
**scratches**
78:20 79:3
**scratching**
84:24
**screeching**
40:25
**screen**
54:10 65:24
68:3,21
69:11,17,23
70:1,11 71:6
95:24 96:3,4
97:8 104:9
121:14
129:15
130:21
163:16
**scroll**
71:12
**sculpted**
69:19,20
**seat**
41:14 43:8,
14,24 44:1
59:12

Appx. 0225

Bobby Hardsick
January 23, 2025

Seattle
  120:8
second
  65:25 74:14
  90:19 101:1
  102:6 144:11
  162:18
seconds
  76:12 110:19
  126:6
section
  93:7
sedan
  38:21,22
see
  23:5 27:12
  28:7,24 30:8
  33:15 36:10
  39:24 48:4,7
  55:10 63:19,
  21 68:2,4,5,
  8,20,22
  69:11,17,19,
  22,24 70:2
  71:5 75:20
  89:15 94:11
  95:24,25
  97:7 98:8
  99:25 100:25
  102:24,25
  103:8,13,22
  108:24
  110:14 111:8
  113:13 114:5
  115:25 118:6
  120:12,23
  121:11,13,14
  122:9 123:17
  124:8 126:23
  127:14
  129:14,16
  134:9 135:5
  136:9,25
  138:8 139:22
  141:24 142:4
  148:22
  149:11
  151:18,21

157:18
158:7,25
162:22,23,24
163:14,19
164:15,21,23
seeing
  69:12 70:1
  75:21 122:21
  148:3 158:5
  159:24
  162:20
  165:15
seek
  21:21 79:23
sees
  160:12
selection
  162:22
self-
employment
  61:10
sell
  156:12,21
  157:9
selling
  156:15
semi
  18:24 36:17
  37:3 39:24
  40:20 42:4,
  12 91:12,13,
  20,22
semis
  91:24
send
  22:12 75:18
  77:11 87:3
  127:6
sense
  6:25 40:4,6
  60:19,20
  67:24 86:4,5
  100:4 111:4
  120:16
  124:22
  126:21
  128:12

131:13
138:17 139:4
sensitive
  97:21
sensors
  108:22
separate
  30:23 118:10
  119:24
  122:18
September
  19:6,9 20:22
  35:9,22
  36:6,19
  47:6,7,19,23
  50:9 52:23
  54:25 55:16
  85:15,21
  86:9 95:21
  96:11 112:5,
  20 143:22
seriously
  157:3
Sertraline
  148:16 149:6
Sertralon
  148:16
services
  42:16
set
  63:12 64:12
setting
  27:24
seventh
  33:24
several
  152:24
shake
  7:7
shape
  111:8
share
  65:24 95:23
sharing
  54:10 163:16
sharp
  89:9

she'll
  155:21
sheet
  71:5,8
shell
  21:4 142:19
Sheriff's
  42:22
sheriffs
  36:24 43:2
shirt
  110:12 138:6
shock
  45:5 100:20
  107:3 116:25
  120:11,23
  124:12,13,14
  128:6,8
shoot
  101:4 102:9
  103:8
  127:21,22
  128:18
shooter
  92:19 93:1
  94:18,21
  108:17
  127:16
  130:4,8
  131:18
  132:10,17,21
  134:6,10,23
  136:13,20
  141:20,25
  142:4,8
  151:20,21,22
  152:1 153:11
  159:8 164:2
shooting
  100:17,20
  101:7 102:22
  106:10
  110:23
  117:17 118:1
  150:19 151:2
shoots
  101:6,8,14
  102:12,14

Appx. 0226

Bobby Hardsick
January 23, 2025

37

103:10,11,15

**shop**
27:23

**shopping**
91:23 92:3,5

**short**
35:13 46:24
64:11 66:10
97:24 140:16
153:4,5

**shorter**
131:20

**shorthanded**
45:21 46:5,
10

**shot**
5:20 95:3
102:1,19
103:2,15,16
106:14,15,19
109:14 110:7
111:20
120:12,20
123:25
124:4,12
127:20
146:23
147:23
157:16 165:5

**shots**
34:25
100:15,16
101:7,15
102:15,23
106:19
127:17
136:14

**shoulder**
18:22 24:1,
10,21 25:25
26:19 29:8
31:9,14,20
32:3 34:4,10
35:2 43:23,
25 44:8
45:8,11
49:18 50:13
78:22

**show**
61:2 68:8
93:16 133:21
160:1 163:4,
14

**showed**
42:23,24,25
48:4 122:18,
19

**showing**
117:2

**Shunnarah**
52:12 54:1,
3,7,8

**shut**
129:11

**shuttles**
21:8

**siblings**
80:5

**sic**
9:10 21:15
54:5

**side**
53:12 76:1,2
78:20,21
81:14

**sidewalk**
93:1 136:21

**sideways**
136:5

**sight**
43:10

**sign**
141:3,7

**signal**
104:9

**similar**
81:11

**single**
33:5

**sir**
5:10,16,21
7:4 8:5
9:15,18 10:8
11:7 14:21,
24 15:3

17:15 18:4
20:14 22:10
35:19 44:16
51:14 53:7,
20 55:22
56:14,16
66:12 68:21
69:23 70:6
71:16,18
75:4,13
76:23 83:24
84:16 85:9,
18 90:22
93:25 95:15,
24 96:8,18
97:20 98:11
100:5 103:6,
14 109:6,16
110:19
112:23
116:14
119:13,18
126:8 128:9
129:3 130:23
131:5 134:9
137:20
142:11
143:25
155:14
159:13,20
160:16
161:21
163:9,12

**sister**
155:22

**sit**
45:24 46:2,9
55:17,18
86:14 101:2
112:25
121:21 159:4

**sites**
33:20

**sitting**
33:13 42:15
107:16
118:25
121:22

161:23

**situated**
93:4

**situation**
46:25 51:6
79:17 82:9
102:16
105:12
107:15 108:4

**six-mile**
92:1

**skills**
74:2

**skin**
130:9 132:11

**skinny**
130:9 132:25
133:24
152:13

**skip**
163:13

**slacks**
130:12

**sleeping**
165:6

**slipped**
87:1

**slow**
38:10,25
142:12

**slows**
24:17

**small**
78:19 79:3
116:16
131:24

**Smith**
39:21 61:18

**smoke**
122:15

**smoking**
122:13

**sold**
157:15

**solo**
63:8 92:11

Appx. 0227

Bobby Hardwick
January 23, 2025
38

someone's
  145:19
Son
  16:18
sooner
  16:24 17:1
  26:25
sort
  40:10 50:7
  61:14 83:7
  151:17
sound
  5:23,25
  36:17 63:16
  67:24 71:9
  72:4 131:18
  132:19
sounded
  41:16
sounds
  83:17 127:12
  133:12
  140:20
  161:15
space
  98:24 99:22
spark
  100:25
speak
  55:17,18
  84:23 95:6,
  15 107:11
  135:12
  152:16 155:9
  159:2
speaking
  44:19,22,23
  85:10 116:22
  118:2 123:9
  142:9 146:2
  151:11
  153:20
special
  61:13,16
specialist
  48:22 49:2

specific
  24:5 56:23
  59:17,20
  63:18 77:23
  85:11
specifically
  7:14 71:4
  144:5
speculate
  10:13
speed
  37:23 39:25
  40:22
spell
  9:11 10:21
  17:18 54:2
  65:10
spelled
  16:2 29:21
spelling
  29:21
spent
  84:1 90:3
spine
  51:25
spoke
  45:6 85:25
  121:15,16
  123:5 135:14
  152:24
  154:25
sport
  13:7
spot
  144:8
spouse
  15:1,2,6,24
St
  13:10,12,17
stairs
  101:16
  102:8,9
  106:15,22,
  24,25 111:9
  128:14
stairway
  121:11

stamp
  123:18 125:8
stand
  107:8 158:4
standing
  32:2 89:5
  93:1 95:2
  100:11 118:6
  127:16
  129:15
  135:10
  136:14
stands
  52:17
start
  7:24 21:5
  36:10 61:10
  64:13 96:21
  113:8,11
  119:14 121:5
  129:2,13
  130:22
  163:15,16
started
  24:21 61:20
  87:15 97:6
  103:7 106:22
starting
  36:5 49:14
  117:25
  150:18
state
  17:9,11
  78:18 81:13
  82:10
  120:11,23
  124:12 126:5
stated
  19:25 23:18
  40:1 73:5
  114:11
  142:18
statement
  73:24 76:4,
  21 77:25
  98:8 118:12
  122:17,25
  123:2 125:9,

15,17,18
  129:22
  130:20
  134:14,19
  143:12
statements
  71:17 79:18
  98:2,6
  123:7,8
  141:24
states
  54:12
stating
  134:9 157:1
stay
  90:5 111:15
  129:12
stayed
  10:1 17:17
  107:21
  122:22 154:3
staying
  9:21 57:20
Steel
  57:1
stenographic
  5:4
Stinson
  134:21
stood
  79:6 94:23,
  24,25
stop
  19:13 37:22
  40:5 110:18,
  19
stopped
  14:7 61:8
store
  32:22
stories
  71:1
story
  76:2 122:21
straight
  38:12 42:7
  64:12 93:7

Appx. 0228

Bobby Hardsick
January 23, 2025

39

strange
  47:13 151:7
street
  9:21 10:19,
  21 17:22
  106:16 132:6
  136:21
stress
  145:15
  155:19
stretches
  66:11
strive
  61:9
struck
  67:24
stuck
  106:12 111:5
study
  13:14 14:18
stuff
  27:4 33:14
  41:1 71:15
  85:11 87:13
  97:21 98:23
  99:22
  104:13,15,
  18,22 113:9,
  11 117:13
  145:25
  149:21
  154:14
  155:10
style
  122:6
subcontract
  154:18
subcontractor
  157:13
Suborn
  9:10,11
subpoena
  66:23 67:13
  155:7
subpoenaed
  69:5

subpoenas
  67:3 68:7
substance
  53:19,23
suddenly
  21:4 27:24
  40:23
sued
  84:13,15,17
suffered
  23:24 26:20
  29:12 34:10,
  19 35:9,22
  36:6 144:15
suffering
  43:21 149:25
  150:3
suing
  84:18
suitcase
  72:7
Suits
  68:9
summer
  162:10
super
  133:23
supervisor
  25:15 142:24
support
  138:18
supported
  68:13 143:20
supposed
  41:25 43:12,
  15 157:13
sure
  10:4 26:23
  27:25 39:24
  46:25 47:14
  53:21 54:12
  67:2 71:20
  80:3 86:2
  89:23 90:13
  109:19
  111:2,20
  113:12

116:19
119:16
122:20
137:12
162:18
surgery
  33:3 34:17
  35:2 50:8,22
  82:3
surprised
  41:24 74:17
surroundings
  165:9
suspect
  143:10
suspenders
  43:7,9,12,14
SUV
  38:21
sweatpants
  130:12,14
  140:8
sweats
  130:13 137:7
swelling
  28:21
swim
  141:5,6,9,11
  155:24
swing
  90:12
switched
  159:10
switching
  122:22
swivel
  39:21
swollen
  25:14
sworn
  5:7
symptoms
  25:24 51:20
system
  39:22 52:1
  61:18 149:15

T

tablet
  16:8 68:4
  95:25 96:16
tackle
  27:1
take
  35:13 49:19
  55:20 61:16,
  17 64:11
  66:9,10,11
  73:20 81:9
  84:11 97:20,
  23,24 108:1
  112:7 117:21
  140:15,19
  155:6 157:2
  161:11
  162:18
taken
  6:5 36:3
  64:16 140:22
  161:18
takes
  111:21
taking
  19:22 26:19
  46:23 49:17,
  21 57:25
  58:6 82:17
  99:19 104:15
  135:21
  151:16
  156:21 159:6
talk
  5:18 23:23
  31:20,21
  35:8,10,21
  36:5,13 46:3
  90:15 120:14
  135:20
  145:13,20
  150:8 151:17
  165:2
talked
  64:18 67:7

Appx. 0229

**talking**
5:20 17:10
55:19 64:23
70:25 84:12
88:16,17
91:11 92:24
96:1 117:16,
25 118:3,9,
13 120:23
124:12
125:23 140:7
154:5 158:11
**talks**
152:19 165:2
**taller**
132:24
**tandems**
133:10
**tape**
103:23
110:11
124:20
135:20
**taper**
153:8
**teaching**
115:2 120:9
**team**
62:24,25
112:12
133:14 155:9
**tear**
26:1
**tears**
35:3,6
**technical**
15:21 16:10
35:23 57:5,
11 58:11
61:14
**technically**
85:10
**technician**
14:19,20
**tecum**
66:23

**teenager**
90:13
**teeth**
66:16,17
**telephone**
155:17
**tell**
6:23 7:19
10:4,7,10,
12,16 21:3
22:12,15
23:16 25:23,
24 26:11
27:22 28:2,
5,10,18,20
32:10 33:16
34:16 41:3
43:20 44:19
46:14,15
50:6 53:13
54:24 62:12,
15 72:13
77:18 79:10
82:25 114:4
120:19
122:21
126:23
128:10 132:2
139:9,13
140:4,5
141:8 147:15
155:13,21
**telling**
23:24 24:2
41:2 51:12
53:18 59:10
62:1 74:3,13
75:25 76:3
77:9 102:17
104:16 106:9
124:19
135:15
140:14
141:10,19
148:2 155:3
158:18
**tells**
17:8

**temporary**
46:18
**ten**
17:10 76:13
**tenants**
93:20 94:4
**tendon**
35:4
**term**
93:19 94:1
**terminated**
19:12 21:25
22:21 59:6
61:5
**terminating**
23:25
**termination**
21:22 34:5
**terms**
40:10
**terrible**
132:7
**testified**
5:7
**testify**
58:23 59:1
137:16,22
**testifying**
6:24 10:11
**testimony**
6:11,23
73:11 79:16
81:10 114:19
138:19
141:23
151:19
155:10
**Texas**
5:3,4,5
8:10,12,21,
23,25 9:4,8,
22 10:1,5,18
12:8 14:23
16:22 18:23
25:2,4,21,23
26:5 27:2
29:18,19

30:2 31:6,19
32:1,9 34:2
47:17,23
54:11,19
57:18,21,24
82:10,11,12
91:3,10,13,
15,19,21
114:13 122:6
149:3,4,7
160:4
**Texas-based**
24:23
**text**
23:20
**thank**
16:8 23:11
30:4 39:7
41:11 66:13
69:16 96:14
102:13
114:19
128:11
147:21,22
153:7 161:17
162:2 164:12
**thankful**
161:2,4
**thanking**
107:19
**Thanks**
140:21
**therapist**
48:21 146:17
148:3,6
165:16
**therapist's**
148:4
**therapy**
34:12,22,23,
25 48:9,24
49:1 146:13
**thigh**
44:1
**thin**
153:3,4,5

Appx. 0230

**thing**
28:1 29:20
33:5 41:5
53:9,14
67:11 70:2
75:24 76:1
77:9 84:20
97:1 108:7,8
109:1 111:5,
10 119:8
129:10 140:9
155:24
156:24
157:21
**things**
52:1 84:24
120:9 151:15
154:21
157:18,19
**think**
9:3 12:11
15:14,18
19:20 20:11,
21 21:24
23:14 26:24
35:12,24
44:5,20,21
46:3 54:19
55:6 58:25
61:21 64:9,
12,23 67:6,
10 75:25
77:22 80:10
85:18 90:9
92:22 106:1
108:4 119:7
120:13,14
122:5 124:5,
18,20,21
129:21
133:16
137:19
138:13
139:18
140:13,16,
18,24 147:25
150:13,14,15
153:17

154:13
155:15 156:9
157:6
158:23,25
161:13,19
**thinking**
102:10
114:3,6
120:20,21
141:7 159:5
**third**
90:10 102:7,
21 134:21
153:12
**Thompson**
5:11
**thoracic**
51:25
**thought**
20:7 114:6
127:18
131:21
**thoughts**
20:11 146:11
**three**
76:12 106:25
122:18
146:13
**throat**
76:10 81:22
**thrown**
48:5
**thrusting**
77:2
**tight**
133:14
**time**
9:17,19
13:16 17:13,
21 19:5
20:18 26:16
28:13 34:8,9
37:5,7 39:6,
15,25 58:7
62:25 63:3,
7,20,22
66:9,21 67:7

69:3 70:19,
20 72:21,22
79:22 83:23
86:23 90:24
92:12,15,16
95:18 105:8,
18 108:21
110:3 111:2,
5 112:7,8
114:24 115:6
116:7 117:21
118:1,17
120:25
122:25
123:18,20,23
124:4,10
125:6,8
127:6 128:19
140:15
148:13
151:16 152:2
154:15 156:8
159:18 160:2
161:10 165:6
**timeline**
110:20
111:14
125:3,7
**times**
64:3 77:4
81:15 101:10
103:8,10,11,
15,16 140:17
155:20
**tires**
40:25
**tissue**
28:23
**title**
56:23 59:17,
20 60:13
**today**
5:14 6:5,8,
10 58:23
59:1 84:14
96:13 97:2
98:13 108:6
132:3

137:16,22
161:1
**told**
5:23 20:8,12
32:25 44:12
46:3,11
47:18 48:1,3
53:15 55:6
72:9 73:16
77:9 79:12
80:21 89:19
95:10 107:5
109:19 110:1
117:12
121:12 125:4
136:16
142:24 154:8
155:11
156:14
**Tom**
10:25 15:8
19:18
**top**
69:19 154:16
**torch**
156:4
**total**
29:11 33:25
34:6 64:3
103:15
**totally**
160:19
**touch**
154:3 156:10
**touched**
114:9
**tow**
101:22 103:9
108:15,17
119:8 120:12
124:2,8
127:14,15,25
128:1,5,15,
16 134:10,22
135:8,22
137:4,13,23
141:25
142:4,8

Bobby Hardsick
January 23, 2025

150:20
151:3,4,21,
23 153:12
155:1 158:6,
7,8,13
159:6,9

**town**
58:6 64:8
80:10,11
91:5,19
99:2,4 100:3
104:23 119:1
120:19 132:4

**tractor-**
**trailer**
21:9

**traffic**
19:8 36:16
37:11,12,20,
21,23,24
111:6

**trailer**
18:24 19:4
24:18 39:14
41:17,18
86:25

**trailers**
21:8,15,17
24:14

**train**
120:7 146:11

**training**
61:14,16

**transcript**
165:22,23

**transfer**
14:3

**transferred**
13:18

**transitioning**
57:14,22

**Transportatio**
**n**
19:16

**trauma**
52:2

**travel**
57:24 104:19

**traveled**
92:9

**traveling**
38:4,23
100:2

**treat**
49:23

**treated**
30:7 34:15
150:1

**treating**
49:11 148:19

**treatment**
34:4,13
45:11 48:16
50:4,7 51:11
148:9

**tree**
100:12

**trespassing**
154:23
155:3,4

**trial**
6:25 83:7,
10,14

**trick**
90:12

**triggers**
146:11,15
158:14

**trip**
91:4 104:20
113:21
126:14

**trouble**
165:6

**truck**
11:18 20:25
21:14 24:13
36:17 37:3,4
39:20 40:14
41:14,15
55:12 60:2
63:22 87:3
91:6 101:22

103:9
108:15,18
111:2
118:18,21
119:8 120:12
124:2,9
127:14,15,25
128:1,5,15,
17 134:10,22
135:8,22
137:4,13,14,
24 141:25
142:4,8
146:12,16,22
150:20
151:3,4,22,
23 153:12
158:7,8
159:6,9
164:1

**truckers**
62:13,15
106:2

**trucking**
21:5,12
33:17 53:11
56:19 59:14,
18 60:8,9,
10,14 61:5,
9,11 62:7
63:9 122:5
144:4

**trucks**
33:18 42:13
53:13 87:16
91:24 155:1
158:6,13

**true**
6:11 68:14
78:1,6 86:9
107:18
137:17,19,24
141:16,20,
22,25 142:1,
4,6 154:23

**trunk**
99:23 104:15

**trust**
97:2 146:23

**Trusting**
146:23

**truth**
6:23

**truthful**
98:5,16
100:10
132:21

**truthfulness**
134:14,18

**try**
21:21 24:15
33:12 65:24
108:3,11
116:4 140:17
144:21
146:15,16
147:24
150:23
160:14

**trying**
16:8 22:5
32:18 40:9
42:17 44:16
51:13 57:10
61:22 69:21
72:4 75:10
77:7 79:7,10
81:12 82:2
85:3 90:12
98:14 107:2,
15,19
110:10,19,20
118:24
120:13,21
122:13
124:5,7
125:7,24
136:19
138:18
139:20,24
140:10
141:8,14
144:3,18
146:18 147:9

Appx. 0232

**Tuesday**
63:16
**turn**
100:25 101:8
102:20
103:10,11
**turnaround**
105:23,24
106:3 136:25
**turned**
63:23 102:11
103:16
**turns**
103:9
**TV**
68:8
**twice**
103:2,15
111:11
**two**
13:22 21:15,
17 37:11
59:16 60:12
63:1 80:10
85:14,21
87:15 100:16
101:6,8,10,
14 102:15,22
103:8,10,11,
16 106:11,14
123:9 144:1
160:8,10
**two-week**
47:12
**type**
6:6 28:1
33:15 38:20
41:1 45:12
50:22 87:14,
15,17 88:12
105:10
117:13
130:11
138:11,21
139:11,15
140:11
**types**
29:5 144:2

**typical**
104:19

---

### U

**U-TURN**
101:1 103:3,
7 106:16
**Uber**
111:7,13
**uh-huh**
7:8 123:11
**ultimately**
107:10
**umbrella**
10:25
**uncle**
21:3
**underneath**
41:18 103:23
**understand**
5:13 6:13
7:3,20 21:19
32:7 35:9
37:21 40:7,
11,20 44:7
50:5 51:8,
13,15 53:7
57:7 58:25
59:14 61:22
66:18,20
68:17 70:24
77:13 86:1
97:21 98:11
100:4,19
105:11 106:3
108:5 111:10
115:24 117:4
123:6,10
124:15 131:5
135:14
136:11,17,19
138:24
140:1,25
141:12
143:12
144:17

160:24
**understanding**
6:16 41:1
70:17 75:25
79:15 88:7
94:2 98:21
110:22
117:19
125:5,9,15
165:11
**understood**
7:21 58:8
143:17
**unemployment**
21:23 22:1,
2,6,7,9,16
23:2,4,8
**unidentified**
117:15
118:2,14
**uniform**
137:3,10,14,
17,23,25
138:3,5,6,7,
12,18,21
139:7,9,11,
16,17 140:3,
9,10,11,12
141:20
151:21
**uniforms**
137:12
139:21
140:6,7
**unit**
9:8 14:23
17:24
**United**
43:19 44:12
47:18,22
**University**
12:7 13:19,
20 14:6
17:9,11
**unloading**
86:19,22
**unnecessary**

42:18
**unpack**
40:24 75:12
**unsatisfactor
ily**
23:15
**unsatisfactor
y**
19:25 23:16
**untrue**
86:9,10
137:17,20,24
141:21,25
142:5 154:24
**UPS**
21:16
**upset**
111:22
**upstairs**
95:9 101:25
106:10
**Urquiza**
95:20 123:2
**USA**
60:9,10,14
61:5,8
**UT**
12:7

---

### V

**vantage**
124:24
131:11
158:18
**varied**
62:18 63:10
**varies**
62:9
**vehicle**
18:25 19:2
37:2 38:18,
20,24 39:10,
14 40:22
41:2 42:20
73:20 92:4
94:20 98:22

Appx. 0233

99:1,12
109:2 143:7,
13 144:7
146:14
**vehicles**
98:22 154:14
155:2
**velocity**
40:21 41:8
42:7
**veneers**
66:16
**veracity**
111:23
134:14,18
**verbal**
7:6,10
**verbally**
65:16
**vest**
43:7,13
**vests**
43:12
**Victim's**
52:18
**Victor**
9:12 29:22
**video**
36:10 48:4
70:2 79:21
96:18 97:4,
6,12,16
100:5,6,14
102:24,25
103:1,19,21
104:6,12
106:4,5,8
109:5,8,14
110:5,16
111:17
113:6,14,16,
24 114:1,19,
20 115:12,
13,23
116:16,20
117:5,7,11,
24 119:17,

20,22 121:5,
9 123:13
124:16,17
126:4,7,10
127:11
128:2,3
129:15,22
130:1,22,25
131:15,16
132:12,14
134:7 135:6,
8,16,17,21
142:3 143:5,
24 151:10
152:10,16,
17,18,20
153:12
159:9,11,12
162:16,21,23
163:9,19,21,
22,25 164:1,
6
**video-
recorded**
135:8
**videos**
122:24
130:16 159:8
**videotapes**
98:9
**videotaping**
159:6
**view**
110:12 152:5
**vigilante**
107:15
**violence**
69:6 82:10
**virtually**
6:23
**visible**
43:10 79:2
**visit**
26:10 28:14
29:10,14
31:12 46:24
65:5

**visiting**
64:8 80:8
**visualization**
48:7
**visualize**
48:7
**VLC**
69:25 112:8
**voice**
16:9
**Volkswagen**
38:19 41:6
**Vollenweider**
29:17,21
30:9,15,19
31:13 47:5
149:8
**volume**
15:17
**voluntarily**
19:13 121:16

———————

**W**

———————

**wait**
96:5 149:7
**waiting**
42:16 107:17
114:15
**walk**
66:5 92:20
101:3 109:3
119:7 123:24
127:23
**walked**
124:20 135:6
156:16,20
**walking**
74:22 84:10
151:6
**wall**
114:4
**walls**
142:20
**want**
7:7 10:5,12
17:2 24:16

26:15,21,22
30:21 35:8,
21 37:8
40:23 46:9
53:1,2,20,23
54:4 63:22
64:11 68:19
71:4,15,16
76:6 79:18
80:9 82:22,
25 84:4
86:19 87:15
88:18,20
91:1 92:14
93:16
101:19,21
102:19
105:24
109:12
110:25
111:9,14
112:1,2,10,
23 113:12
121:5 122:4
126:5,21
128:24
129:12,13,23
140:3 142:25
143:1,3
144:5,22,24
145:13,19,
20,24 150:6,
7,21,22,23
152:23
153:9,14
154:18,19,21
162:16
164:18
**wanted**
26:16 40:20
46:8 111:14
128:13 143:2
145:10
**wanting**
120:7 135:23
**Washington**
9:2,4

Appx. 0234

Bobby Hardsick
January 23, 2025

watch
  17:7 113:1
  129:23
  149:24
  162:17
watched
  40:18 101:20
  108:20
  116:16 142:3
  152:21
watching
  119:21
  125:12
  135:21
water
  66:11 97:23
  141:11
way
  34:25 41:14,
  23 43:11
  53:17 59:1
  67:21 83:7,
  13 103:4,5
  114:12
  115:17
  116:3,5
  125:22,23
  137:16,22
  138:16
  139:13,25
  141:15,16
  146:18,19
  147:2 157:14
ways
  146:7
weaned
  148:15
wear
  132:1
  137:12,14
  138:5,22
  140:7
wearing
  130:6,12
  137:17,23
  138:18
  141:20
  151:20

weather
  31:8 120:7
Weatherford
  5:4
week
  17:7 62:5,
  18,20,21,23
weekdays
  63:5,11
weekend
  63:17
weekends
  63:6,11
weekly
  80:22
weeks
  48:18
weigh
  133:6
weight
  108:23 130:6
  132:23
  133:1,4,11
  153:3
weird
  149:22
Wells
  5:12 119:9
  153:21,24
  154:8 156:8,
  9,23 157:1,
  6,8
went
  12:1,7,19
  13:10,18,22
  14:9 17:9
  25:11,16,18
  27:1 28:15
  29:14 30:7,8
  32:1 33:6
  36:8 41:4
  42:19 43:19
  45:25 46:7
  47:6,11
  52:23,24
  61:10,18
  62:1,2 65:22

71:23 74:25
  86:15 87:2
  89:20 91:6,
  16 95:1,9
  96:19 98:18
  105:20 123:1
  134:23 152:5
  156:21
west
  39:23
whale
  156:7
whatsoever
  53:17 83:12
  155:23
white
  49:8,12 50:2
  152:11
wide
  88:16 101:22
  133:15
wife
  160:13
wind
  120:9
windshield
  143:1,7,13,
  23
Winston
  17:8
wishing
  35:10 36:7
witness
  5:5 14:12
  15:16 17:9
  56:3 57:9
  66:7 73:20
  78:5 142:9
  143:10
  152:5,7
  158:17
  162:3,4
witnessed
  128:19 143:4
witnesses
  79:9 114:11

woke
  25:13
wondering
  54:17
wonders
  33:24
wood
  122:10
worded
  59:3
words
  22:23 60:21
  156:19
wore
  43:12
work
  12:16 25:16
  29:15 30:17,
  20 31:4,14,
  17 32:5,11,
  12,17,19,20,
  24 33:1,6
  43:11 52:23,
  24 59:7
  60:16,17
  61:23 62:6
  63:5,11
  72:18 73:1
  86:15 89:23
  137:23
  139:10 148:1
worked
  32:22
workers'
  25:6,8 32:25
  48:25 49:23
  50:6,10
  85:14,16
working
  18:15 19:13
  25:3,9,13
  32:17,19
  37:5 45:9
  48:13 54:21
  55:23,25
  56:5,8,11,
  18,19,20,25
  57:19 59:15

Appx. 0235

60:4,10 61:8
62:23,24
63:8,17
86:12 118:20
152:1 160:23

**workman's**
25:12,15
31:25 48:10,
16 49:14,16
50:1,12
51:2,4

**works**
32:21 132:7
149:13

**world**
33:25

**worry**
27:17 159:4

**worth**
24:12 60:7
147:22

**wounds**
89:10

**Wow**
24:7

**wrangle**
148:18

**wrap**
76:9 85:4
122:4

**wreck**
40:9 66:15

**wrecks**
53:11

**wrist**
84:24

**write**
7:9 22:13

**wrong**
22:23 103:4
122:9 144:4
150:13,14,16
153:17
154:10
156:2,9
157:8

**wrongfully**
21:24

**wrote**
165:9

---

## X

**x-ray**
28:23,25
45:18,19

**x-rays**
28:14,15,19
29:3

---

## Y

**yard**
43:11

**yards**
94:13,14

**yeah**
10:3 12:7,10
16:9 19:21
20:14 21:20
26:9 27:18
34:9,11
35:15 36:1,
12 37:15
39:8,19
41:21 45:11,
18 48:3,12
49:9,11
50:16 51:8,
23 52:9
54:8,14
56:22 57:14
60:23 61:12,
21 62:2,8,
14,16,19
64:15,20
65:14 66:3,8
67:6,15,25
68:22,24
74:6 77:13
81:8,13,21
82:15 83:4
84:21,25

86:5 88:10,
11 89:8,21,
23 90:11
91:14 93:24,
25 94:5,14
96:17 97:14
101:10
102:14,25
105:23 106:1
107:23,24
109:10
110:14,15
112:15
117:21 118:8
121:15 122:3
130:10 131:6
132:11,19
133:20,23
134:12
136:23
139:1,3,5
142:11
143:16 146:8
147:17
148:5,11
149:12
154:25
157:24
158:11,13
160:16,20,21
164:23

**year**
12:23 56:7,
22 60:7
85:11 86:16
87:23,25
134:2

**Year's**
63:20,21
105:8 158:3

**years**
9:23 13:17,
22 16:17
21:4 59:16
60:12 87:15
88:16 142:14
160:8,10

**years'**
60:6

**yellow**
9:13 110:11
135:20

**yesterday**
34:20

**you-all**
81:20

**you-all's**
48:15

**young**
18:23 19:8
36:16 38:17
40:1 42:11
52:3 129:17

**younger**
134:2

---

## Z

**zoom**
40:18

Appx. 0236

```
 1              THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3
    BOBBY HARDRICK                 )
 4                                 )
                    Plaintiff,     ) CIVIL ACTION
 5                                 ) NO. 3:24-CV-00014-D
    v.                             )
 6                                 )
    WELLS FARGO BANK NATIONAL      )
 7  ASSOCIATION; RESOLVION, LLC;   )
    KEEL RECOVERY, INC.            )
 8                                 )
                    Defendants.    )
 9

10

11  *************************************************************

12           ORAL DEPOSITION OF DANIEL FIELHAUER

13         APPEARING REMOTELY FROM DALLAS, TEXAS

14                   FEBRUARY 15, 2025

15  *************************************************************

16

17

18     ORAL DEPOSITION OF DANIEL FIELHAUER, a witness

19  produced at the instance of the Plaintiff, was taken in

20  the above-styled and numbered cause on the 15th day of

21  February 2025, from 9:35 a.m. to 3:02 p.m., before Dawn

22  Baldwin, CSR in and for the State of Texas, appearing

23  remotely from Parker County, Texas, reported by machine

24  shorthand pursuant to the Federal Rules of Civil

25  Procedure.
```

EXHIBIT
**F**

```
 1              A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3
        John C. Hubbard
 4      JOHN C. HUBBARD, LLC
        P.O. Box 953
 5      Birmingham, Alabama  35203
        E-mail: jch@jchubbardlaw.com
 6

 7

    FOR THE DEFENDANTS:
 8
        Essay Eden
 9      THOMPSON, COE, COUSINS & IRONS, LLP
        4400 Post Oak Parkway, Suite 1000
10      Houston, Texas  77027
        E-mail: eeden@thompsoncoe.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 0238

1                    **T A B L E   O F   C O N T E N T S**

2                                                                  **PAGE**

3      APPEARANCES.....................................   2

4

5      DANIEL FIELHAUER

6          Examination by Mr. Hubbard...................   5

7

8

9      Signature and Changes...........................  48

10     Reporter's Certificate..........................  50

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      E X H I B I T S

 2    Exhibit       Description                          Page

 3    Exhibit 1    Progress Report                        19

 4    Exhibit 2    Keel Recovery Employee Policy &        24
                   Procedure Manual
 5
      Exhibit 3    Video                                  31
 6
      Exhibit 4    Video                                  34
 7
      Exhibit 5    Order to Repossess Collateral          40
 8
      Exhibit 6    Agent Statement of Fact Form           41
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 0240

```
 1                P R O C E E D I N G S
 2              THE REPORTER:  My name is Dawn Baldwin,
 3    Texas CSR 4906.  I am reporting the deposition remotely
 4    by stenographic means from Weatherford, Texas.  The
 5    witness is located in Dallas, Texas.
 6                       DANIEL FIELHAUER,
 7    having been first duly sworn, testified as follows:
 8                       EXAMINATION
 9    BY MR. HUBBARD:
10        Q.  All right.  Good morning.  My name is John
11    Hubbard.  I'm an attorney for a Mr. Bobby Hardrick who
12    has filed a lawsuit against Keel Recovery and some other
13    entities related to an incident that happened back in, I
14    believe, January 3, 2023 at the Berkshire Medical Center
15    Apartments.  Can you tell us your name, please?
16        A.  Daniel Fielhauer.
17        Q.  Mr. Fielhauer, what is your position at Keel?
18        A.  I'm a driver for -- at that time I was a driver
19    for the southern Dallas area.
20        Q.  What are you now?  Is it a different position?
21        A.  I'm still a driver.  I'm just a driver for the
22    Oklahoma/Sherman area now, so the northern Texas area.
23        Q.  Are you still in the Dallas area?
24        A.  I live in the Dallas area, but --
25        Q.  Your, kind of, job is more in Oklahoma now?
```

 1      A.    Yeah.  My job, I repo cars in the
 2   Oklahoma/Sherman/Denison area.
 3      Q.    Yeah, I understand.  Have you ever given a
 4   deposition before?
 5      A.    No.
 6      Q.    All right.  I have to ask, are you on any
 7   medicine or any substance that would prevent you from
 8   answering truthfully today?
 9      A.    No.
10      Q.    I didn't think so.  All right.  Well, since
11   this is your first deposition, if you need to take a
12   break, please just let me know and we'll take a break.
13   I don't expect to be here for an extended period of
14   time.  But it doesn't matter, if you want to take a
15   break, just please let us know.
16      A.    Okay.
17      Q.    So where did you grow up at?
18      A.    I grew up in -- I was born in Warsaw, New York,
19   but I grew up right here in Pleasant Grove, in Texas --
20   in Dallas.
21      Q.    When did you get to Texas?
22      A.    We've been here since '88.
23      Q.    Did you go to high school in Dallas?
24      A.    Yes, H. Grady Spruce.
25      Q.    How about after high school, any more

1    education?

2        A.    No.

3        Q.    Did you do any trade schools or anything like

4    that?

5        A.    No.

6        Q.    Have you had any kind of -- any informal

7    education related to the repo or recovery industry?

8        A.    I mean, every year we take -- we take a

9    continuing education class through the Texas Department

10   of Licensing and Registration (sic).

11       Q.    What all does that cover?

12       A.    Just basic towing, acknowledgement of, like,

13   how to tow a vehicle, how to approach an individual or

14   anything like that, how to handle situations and how to

15   tow professionally.

16       Q.    You had to take a test during that?

17       A.    Yeah, it's a test every year that you take.

18       Q.    I'm guessing you've passed the test every year?

19       A.    Yeah.  You get like a little license like this

20   right here (indicating).

21       Q.    All right.  What is that?  Is it -- what is

22   that license for?

23       A.    It's just a legal towing -- State of Texas, a

24   tow operator, consent tow.  It's got my license number

25   and all that on there.

1    Q.   Do you have to have that to tow -- to recover a

2  car?

3    A.   Yes.  Yes.

4    Q.   So if you don't have it, then you can't recover

5  cars?

6    A.   No.

7    Q.   All right.  Have you ever been arrested?

8    A.   Oh, yeah, a couple times.

9    Q.   What were they for?

10   A.   A lot of stuff when I was younger.  Like adult

11 stuff or younger stuff?

12   Q.   Anything over 18.

13   A.   Domestic violence, assault charge, stolen

14 vehicle, buying stolen goods.  I have a sexual assault

15 charge where a girl accused me of rape on there.

16   Q.   All right.  Can you tell us a little about the

17 domestic violence charge?

18   A.   It was me and my girlfriend.  We was drunk --

19 out in public being drunk and doing stupid things.  She

20 tried to run me over with a car, so I smashed her

21 windshield in.  I think I was like 21, 22.  Now I'm 44,

22 I think it is.

23   Q.   Do you remember what the actual charge was?

24   A.   It was -- I want to say it was just domestic

25 violence because me and her were fighting.  I didn't

1   go -- yeah, I did go to jail that day.  Yeah, I went to

2   jail that day.

3       Q.   How did that turn out?  Were you convicted?

4   Did the charges get dropped?  What was the end result?

5       A.   They gave me six months, 180 days, on probation

6   and then released me.

7       Q.   Do you know if you were found guilty or pled

8   guilty or --

9       A.   I pled no contest.

10      Q.   All right.  The stolen car one, what happened

11  there?

12      A.   I bought a vehicle from an individual and it

13  was stolen.

14      Q.   How did that turn out?

15      A.   15 months state jail.

16      Q.   So you took -- I guess you took a plea deal or

17  pled guilty or something?

18      A.   Yeah, I pled guilty.

19      Q.   Were all these in Texas?

20      A.   Yes, sir.

21      Q.   All right.  What was the last one, the sexual

22  abuse?

23      A.   Sexual assault.

24      Q.   Yeah, what happened?

25      A.   This girl said I forced her into having sex and

1    all that.  And the attorney I had wasn't a really good

2    attorney, so he ended up giving me -- got me three years

3    TDC.

4        Q.   What is that?

5        A.   Texas Department of Correctionals (sic).

6        Q.   Did you plead guilty or no contest?  How did

7    that one end up?

8        A.   I pled no contest because my criminal record.

9    Trying to go in front of a jury was just suicide.  They

10   could have gave me like 20 years for it, so I pled out

11   for the three years that he got me.

12       Q.   Other than those three, anything else?

13       A.   I don't remember.  I mean, it was years ago.

14       Q.   So nothing in the past decade?

15       A.   No, not in the last 10 years -- 10, 15 years.

16       Q.   All right.  After high school, what has been

17   your employment history?

18       A.   I've -- I worked for a plumbing company for a

19   little bit after I got out of high school.  Actually, I

20   worked for a grocery store in Houston for about four

21   years.  When I left to come back -- left Houston to come

22   back to Dallas, I started working for a plumbing

23   company.  And after the plumbing company, since '02,

24   I've been doing towing.  I worked for a company called

25   AJ's.  He used to do private property towing.  That's

1  towing out of apartments.  And I've been doing repos and

2  towing since then.

3      Q.  When did you start in the tow and recovery

4  business?

5      A.  2002, like April of 2002.

6      Q.  Has it pretty much been -- you know, you're a

7  driver, you go out and physically go and get the cars?

8      A.  Yes, sir.  I mean, private -- private property

9  is a little bit different than repossession.

10 Repossession is that they know that they're behind on

11 the notes, so they know you're going to eventually come

12 and get their car.  Private property is just like pretty

13 much when you park illegal like in fire lanes or in

14 illegal spaces or anything like that, you have a tow

15 company that comes in there and tows the cars out of the

16 parking spots.

17     Q.  Do you do that -- any of that now or are you

18 just recovery for --

19     A.  I just do -- I just do recovery work.  I do

20 repossessions.

21     Q.  When did you start at Keel?

22     A.  I started there four years ago.

23     Q.  From now, I mean, this year?

24     A.  Well, I just -- I just came back.  I took a

25 leave of absence because I had problems with one of the

1    managements up there.  But I came back, and I've been

2    back for almost a year now.

3        Q.   So when you first started with Keel was four

4    years ago?

5        A.   Yeah.  I started right after COVID.  So that

6    was in 2020.

7        Q.   What happened with the manager that you took a

8    leave of absence?

9        A.   Me and her just didn't see eye to eye on

10   things.

11       Q.   Like what?

12       A.   The business -- the business relationship was

13   just toxic.  I didn't want to be -- I didn't want to be

14   in that relationship with her.

15       Q.   Why did you decide to come back?

16       A.   The owner called me and asked me to come back

17   and told me things was going to be different.  So far

18   they've been pretty good.

19       Q.   How many vehicles would you say you recover a

20   month with Keel?

21       A.   A month?  Probably anywhere between 90 to 120.

22       Q.   How -- go ahead.

23       A.   No, you go ahead.  I'm sorry.

24       Q.   How often would you say law enforcement is

25   called, you know, when -- for one of these recoveries?

1      A.   Maybe once or twice a month.  In Dallas -- in

2  Dallas, I probably never called law enforcement but

3  maybe once a month.  But up there in Oklahoma, they get

4  called maybe once or twice.

5      Q.   Is it you calling or the person --

6      A.   The debtor calls.

7      Q.   How often do you call?

8      A.   I don't ever call.  I have all the proper

9  paperwork and all the legal terms and all that to redeem

10  the vehicle, you know.  I have no reason to really talk

11  to law enforcement unless they get physical.

12      Q.   All right.  I know kind of part of the recovery

13  business is someone goes around scanning license plates;

14  is that right?

15      A.   Correct.

16      Q.   Do you do that?

17      A.   Yes.

18      Q.   What else is there other than -- I guess I'm --

19  as an overview, someone is going out and scanning

20  license plates and then you get a hit and then someone

21  physically goes out to get the car and then takes it to

22  an auction lot.  Is that kind of a correct overview of

23  the business?

24      A.   Well, what happens is, like, if -- if a camera

25  car scans a car, they get this number -- this thing pops

1    up on the screen.  And when it does that, it gives you a

2    number to call to redeem the vehicle -- the information

3    on the vehicle.  Well, they e-mail you the information.

4    They give you permission to repossess the vehicle.  That

5    e-mail is pretty much all you need in the state of Texas

6    because the state of Texas is a non-help state on

7    repossession.  So once -- once you get that paper,

8    you're legally okay to repossess the vehicle.  And after

9    that, after repossessing the vehicle -- like I said,

10   every car, they call the police and all that, so they

11   know the car has been repossessed.

12        Q.   What do you mean by a non-help state?

13        A.   Like a repossession, like they -- everybody

14   says you need a writ.  But in repossession, you really

15   don't need a writ because, I mean, if you ask -- if you

16   sat down and asked the judge for a writ for every repo,

17   the judge wouldn't be able to do his job.

18        Q.   Okay.  So you mean non-help is you don't need

19   to get the Court involved before you take it?

20        A.   Correct.  Correct.

21        Q.   Where do you take the cars after you recover

22   them?

23        A.   They go to Van Alstyne to our lot at 13907

24   Highway 75.

25        Q.   Is that for all lienholders, like not just

1   Wells Fargo, but everyone?

2        A.    That's everybody unless it's TitleMax.  If it's

3   TitleMax, it goes to a place over in Grand Prairie at an

4   insurance auto auction.

5        Q.    Is that communicated to you in every repo order

6   or you just know, or how do they let you know where to

7   take it?

8        A.    It's usually in the updates on the -- on the

9   file because we -- when we -- when we get the repo

10  order, we get like a bunch of paperwork and stuff like

11  that in our e-mails, and it shows that -- like in the

12  updates where it goes or where it gets dropped off at

13  and stuff like that.

14       Q.    Who sends that?

15       A.    The lienholder sends that.  They send it to the

16  office.  They send it to the office, and the office

17  uploads it onto our system.  We have a system called

18  Clearplan and a system recalled RDN that we do that

19  with.

20       Q.    Does it go through Resolvion or does it go

21  straight from, like, Wells Fargo to you?

22       A.    It goes through Resolvion first and then it

23  goes through -- because Wells Fargo is actually the

24  lienholder.  Resolvion is the -- like the forward

25  companies that we work through.  We have like LPS and

1   LPR and all that.  That's just forward companies that

2   handles, I guess, the paper trail through the -- through

3   this case and all that.  And then like I said, Wells

4   Fargo is just the client or the -- like, Resolvion is

5   the client.  Wells Fargo is the lienholder.

6       Q.   Right.  Then there's other companies like

7   Resolvion called LPS, LPR?  I'm sure there's several.

8       A.   Yes, MVTRAC.  There's, like, a bunch of -- like

9   seven or eight different repo companies like that.

10      Q.   Do you or do you know if anybody at Keel talks

11  to those companies?

12      A.   All the girls in the office pretty much talks

13  to them unless it's like LPS.  LPS, when we -- we have

14  like a website we go through.  LPS, MVTRAC and I think

15  ARS, they all go through like a website.  So once we put

16  the information, we put the VIN number, we put the

17  location, we'll put the coordinates and stuff where we

18  got the car from, it goes to -- it goes to them and it

19  goes straight into our system.  But any other one,

20  they've got to contact the lienholder or the client and

21  stuff like that where they can upload it into the

22  systems.

23      Q.   Are you paid a regular salary or just for per

24  car?

25      A.   We get paid per car.  We get paid per car.

```
 1      Q.   So if you don't take any cars, you don't get
 2  paid?
 3      A.   Correct.
 4      Q.   How about the people that scan, do the license
 5  plate scanning, does anyone just do that and not do the
 6  physical recovery?
 7      A.   They get paid -- the camera cars, they get paid
 8  a percentage off our repossession.  So we get paid $85 a
 9  car.  When a camera car finds a car, they take $15 off
10  that, so we get paid $70 a car.
11      Q.   Let's say you show up to take a car and for
12  whatever reason you can't take it.  The people object or
13  whatever reason and you have to leave.  Do you get paid
14  for leaving without it?
15      A.   No.  No.
16      Q.   When you start your shift, do you have a list
17  of cars you're going after?  Are you going out and
18  scanning, looking for cars?  What's the daily schedule
19  like?
20      A.   I have a -- I have a program called Clearplan.
21  Clearplan is like -- we have over 1,400 accounts.  Some
22  accounts have, like, five or six different addresses.
23  What it is, it's like a map of Texas and it has like red
24  triangles on it.  All the red triangles are new accounts
25  and stuff like that that we can go run accounts all
```

1    through Dallas and Fort Worth and Sherman and the

2    Denison area and stuff like that.

3        Q.   When you say an account, is that like a

4    specific car you're looking for?

5        A.   Yes, sir.

6        Q.   So are you -- it's telling you which cars to go

7    pick up or are you picking which cars to go pick up?

8        A.   It's telling me which cars I'm looking for and

9    what I need to do with it and all that.

10        Q.   Right.  Based on what area you're in or wanting

11    to work in?

12        A.   Yes, sir.  It will give me the make, the model,

13    the lienholder, the client and stuff like that, what

14    color it is sometimes.  Sometimes it has the tags.  If

15    it has the out-of-state tags, we don't have tags -- we

16    don't have -- we can't run out-of-state tags.  So if we

17    don't know the tag, we just leave them blank.

18        Q.   I'm sorry, you might have told me this earlier,

19    but you do the -- do you do any of the license plate

20    scanning or is that just for the camera car?

21        A.   I do also in the truck.  I have a system in the

22    truck that scans plates.

23        Q.   Are you doing that while you're looking for

24    the -- you know, the car you're after at the time?

25        A.   Hold on.  My phone fell.  I'm sorry.  Yes, my

1  systems stay on the whole time I start my truck to the

2  time I go home.

3      Q.  So that's pretty much just scanning the whole

4  time?

5      A.  Yes.

6      Q.  All right.  Let me see if I can pull a document

7  up for you.  All right.  Do you see this?

8      A.  Yes.

9      Q.  Progress report?

10     A.  Yes.

11     Q.  All right.  I'm going to mark this as

12 Plaintiff's Exhibit 1.

13             (Exhibit 1 marked.)

14     Q.  (BY MR. HUBBARD)  Can you tell me what this is?

15     A.  That's a repossession order through the client.

16 They tell you the make, model, the VIN number, who the

17 client is and the debtor's name and all that.

18     Q.  All right.  And this -- this one is related to

19 the Genesis G80 that you were looking for on

20 January 3rd, 2023, right?

21     A.  Correct.  I was never looking for that vehicle.

22 My cameras went off on the vehicle.

23     Q.  What do you mean by that?

24     A.  I patrol them apartments.  Them apartments, I

25 go in -- when I worked -- when I worked Dallas, I went

1    through them apartments every night.  And my camera went

2    off on that car, but I was looking for another car in

3    the apartment complex.  And that's the car that I got

4    that day was that other car.  And then I came back -- go

5    ahead.

6        Q.  So going -- this looks like it's from

7    December 30, 2022.  It says, Agent called in live DRN

8    hit.  Spoke with Daniel.  Advised order dispatched.

9    What does that mean?

10       A.  Whenever I called in, they gave me the order

11   and they sent me over there, and all I had to do was

12   just pick the car up.  But I never picked the car up

13   because I got the other car in the apartment complex.  A

14   couple days later I came back and tried to locate that

15   car.

16       Q.  What is a live DRN hit?

17       A.  It's just a live camera hit like we was just

18   talking about, the camera that scans the cars.

19       Q.  All right.  So if I'm understanding, another

20   agent called in that hit, and then someone at Keel

21   talked to you to go get the car?

22       A.  No.  I hit the -- I hit the car on my cameras.

23       Q.  Okay.  And then you called in and they told you

24   you can take it?

25       A.  Yes.

1      Q.   All right.  So when you got there on

2 December 30, 2022, what happened?

3      A.   You're talking the day all this happened,

4 right?

5      Q.   No.  I'm still talking about 12-30-22.

6      A.   Okay.  The day I scanned that car, like I said,

7 I was in there looking for another car, I think a Lexus.

8 I don't quite remember what the car was, but I'm pretty

9 sure it was a white Lexus.  So I ended up picking the

10 white Lexus up and I was supposed to come back for that

11 car.  But by the time I took the car to Van Alstyne and

12 come back, I was too tired, so I just went ahead and

13 went to the house.  And I come back the next morning and

14 it was not there.  So I think I came back a couple days

15 later and that's whenever all this incident happened.

16      Q.   Right.  So was this at 3 -- this -- still on

17 the progress report on 12-30, it says 3:19.  Was that in

18 the morning?  Is that the time?

19      A.   No, this was in the afternoon.

20      Q.   3:19 in the afternoon?

21      A.   The way -- the way RDN is, it's always two

22 hours behind because they're in a different state.  Does

23 that make sense?

24      Q.   Yes, I understand.  All right.  Between you

25 going --

1      A.    Go ahead.  I'm sorry.

2      Q.    I mean, if you want to finish your answer, you

3    can.

4      A.    Well, on that order date, it said 12 -- 12-30,

5    and the incident happened on 1-23.  So, yeah, the 12-30

6    is whenever I got the other car.

7      Q.    Right.

8      A.    And that's when I got the hit off the car.

9      Q.    So between 12-30 and January 3rd of the next

10   year -- so I guess we're looking a week or two -- did

11   you go back to Berkshire apartments between then?

12     A.    Yeah.  I go back -- like I was telling you, I

13   go to that apartment almost every night on my way home

14   because I always cut through that little district area

15   because the motel is right there and you've got the

16   Parkland Hospital right there and you've got a bunch of

17   good places where I can scan to get my -- every day we

18   have to have like a -- when we run cameras, we have to

19   have like a camera count.  So every day, every vehicle

20   that got cameraed on, it got -- at least told 10 -- or

21   scan 10,000 cars.

22     Q.    Did you go back specifically looking for the

23   Genesis?

24     A.    No, I did not.

25     Q.    Just whatever you could pick up, right?

1      A.   No.  Whenever I scanned that car, like I say, I

2    went back the next morning after that.

3      Q.   Right.

4      A.   So if it was the 30th, I went back on the 31st

5    looking for the car that morning when I was on my way to

6    work.  The car wasn't there, so I never -- I wasn't

7    particularly looking for that car or anything like that.

8      Q.   What are your usual work hours?

9      A.   I work 8:00 to 8:00.

10     Q.   8:00 in the morning till 8:00 at night?

11     A.   Yeah, normally.

12     Q.   Are there people that work the opposite, work

13   all night?

14     A.   No, there's nobody that works all night.

15     Q.   Do you know if there's another shift after

16   yours?

17     A.   Yes.  There's a guy that works at nighttime

18   named Berdis (phonetic) that works up there, but he

19   works in the McKinney area.  I was the only one that

20   worked in the Dallas area.

21     Q.   So in the zone that the Berkshire apartments

22   were in, how many -- how many drivers were dedicated to

23   that area by Keel?

24     A.   Just me.

25     Q.   Just you at that time?  Not now --

1    A.    Yes.

2    Q.    -- at that time?

3    A.    Just me at that time.  Yeah, just me at that

4  time.

5    Q.    I understand.

6            (Exhibit 2 marked.)

7    Q.    (BY MR. HUBBARD)  All right.  I'm showing you

8  Plaintiff's Exhibit 2.  Do you know what this is?  I

9  don't know if I can zoom in on it or make it any easier

10  to see.  I'll represent to you it says the Employee

11  Policy & Procedure Manual.  Does that look right?

12    A.    Yes.

13    Q.    All right.  If we turn over to what has been

14  stamped as page 93, there is a disciplinary action

15  section.  Are you familiar with the disciplinary action

16  under this policy?

17    A.    Yes, on the theft and time off and all that.

18    Q.    Right.  It looks like there's a verbal warning

19  section, an employee suspension and termination section,

20  you know, for various things?

21    A.    Correct.

22    Q.    Have you ever been disciplined under this

23  policy at Keel?

24    A.    No, because I don't steal out of cars.  I don't

25  do drugs.  I keep my truck pretty clean.  Threaten

1    another individual.  I don't -- I don't threaten

2    individuals at the job, customers.

3        Q.  Have you ever been written up for any

4    discipline at Keel?

5        A.  No.

6        Q.  Have you ever had any verbal warnings or

7    anything at Keel?

8        A.  I've never had no problem with her other than

9    the problem I was having with her when I left here.

10        Q.  And that was business-related, not customer

11    complaints or police involvement or anything?

12        A.  No.  It was -- I had a semi hit my repo I was

13    towing back to the yard, and she was trying to say it

14    was my fault and all that.  So, I mean, I was just -- I

15    was in a bad mood that day, and I just decided to leave.

16    I had a semi come over in my lane and hit my repo.

17        Q.  I understand.  How often do -- are there --

18    does the debtor or the person you're taking the car

19    from, how often do they call and complain to Keel about

20    something you've been involved in?

21        A.  Oh, I don't know.  I don't -- I'm not part of

22    that thing.  That would be something the office would

23    have to discuss.

24        Q.  As far as you know, you can't recall any times

25    that has happened?

1    A.   I mean, she's told us a couple times when

2  people call complaining, but nothing like -- I mean, not

3  like it's every day or anything.  It's just every now

4  and then.

5    Q.   But as far as you know, you've never been

6  disciplined or told you did something wrong by Keel?

7    A.   Not that I can remember.

8    Q.   All right.  If we go over to page 97 -- let me

9  find where I'm -- the paragraph I'm looking for.  All

10  right.  Under Recovery Procedures, I've highlighted a

11  sentence that says, If police are called to the scene,

12  this is considered a breach of the peace and we lose the

13  right to repossess.  I know we talked earlier about

14  police involvement.  Is it your understanding that if

15  police ever come, you lose the right to repossess the

16  car at that time?

17    A.   Yes.  Yes.  That's in Dallas, breach of peace.

18  Other cities are not like that, though.  Just the city

19  of Dallas is.

20    Q.   Do you know why it's just Dallas?

21    A.   I don't know.

22    Q.   Do you know if this employee manual is just for

23  Dallas employees or is this for all Keel employees?

24    A.   This is -- this is for all Keel employees.  You

25  sign this whenever you get hired.

1    Q.   So under Keel policy, if the police are ever

2  called to the scene, it is considered a breach of the

3  peace and you lose the right to possess outside of

4  Dallas?

5    A.   It's based on the police, I guess.

6    Q.   What does that mean?

7    A.   I mean, if the police tell you to take the car,

8  I mean, you can just take the car.  I mean, it ain't

9  nothing -- you know, you've got to go by what the police

10  say.

11    Q.   But if the police says you can take it, can you

12  take it?

13    A.   Yeah.

14    Q.   Is there any policy about going into gated

15  neighborhoods?

16    A.   No.

17    Q.   So like the Berkshire neighborhood, it has a

18  gate on it, right?

19    A.   Yes.

20    Q.   And the gate is for, I guess, people that live

21  there.  They can hit the button and open the gate, and

22  you've got to have one of those key fobs or whatever to

23  open it, right?

24    A.   The gates -- the gate was always -- always open

25  every time I went through there.  They have two gates.

1   They have a front gate and they've got a back gate over

2   there.

3       Q.   All right.   Just under Keel policy, do you know

4   is it okay to enter an apartment complex like that

5   without permission if you have to, like, follow another

6   car in or something like that?

7       A.   What do you mean?   Like, is it okay to do it?

8       Q.   Right, under company policy.

9       A.   I mean, I don't think they have a policy on

10  that on the company deal.   I mean, when you sign -- when

11  you sign a car for repossession, you pretty much give

12  the consent for -- when the car is up for repossession,

13  they can go on your property to repossess the vehicle.

14      Q.   Do you know -- go ahead.

15      A.   I don't think there is a policy or anything

16  like that because, like I said, you know, even when

17  they've got no trespassing signs like that, I mean,

18  there's a fine gray line of what we can do and what we

19  can't do as long as it's in the driveway and not in the

20  yard or anything like that.   We can't damage their

21  property or anything like that.   But if we're just going

22  in their driveway to repossess the vehicle -- repossess

23  the debt, I guess we call it --

24      Q.   Right.

25      A.   But if you damage their property, I mean,

1  that's a whole different side deal right there.

2      Q.   Did you ever talk to anyone or do you know if

3  anyone at Keel ever talked to anyone about specifically

4  giving you-all permission to enter the apartment complex

5  at Berkshire?

6      A.   Got permission from Keel?

7      Q.   No, I'm sorry, permission from Berkshire.

8      A.   No.

9      Q.   On January 3rd, the night of the incident, do

10  you know if the gate was open or closed that night?  Do

11  you remember?

12     A.   I want to say when I pulled up, the gate was

13  open.  But when I left, the gate was closed because I

14  had to sit there and wait for the gate to open up.

15     Q.   So when you pull into Berkshire and it's closed

16  and you want to go in, how do you get in?

17     A.   I usually just sat there and waited.

18     Q.   Waited for what?

19     A.   For a vehicle to go in there.

20     Q.   And then you -- how do you get in from there?

21     A.   I just follow the car in.

22     Q.   All right.  On page 99, it says under

23  Complaints, the employee must complete an

24  incident/accident report providing specific details of

25  their involvement with the customer or case in question.

1    Do you know if there was an incident or accident report

2    filled out for the incident that happened on

3    January 3rd?

4        A.    No.   We never heard anything about this until

5    almost a year later -- or I think it was actually --

6    actually not even a year later.   It was, like, maybe

7    seven months later we heard something about this.   The

8    cops never reached out to us or anything.   I mean, there

9    was no investigating officer or nothing that reached out

10   to us or to me personally.

11       Q.   All right.   So I'm going to go to a video.   Let

12   me see if I can pull this up.   Is the video showing on

13   your screen?

14       A.   Not yet.

15       Q.   Let me see if I can figure out how to share it.

16   There we go.   Maybe this works.   All right.   Do you see

17   the video I'm trying to play?

18       A.   Yes.

19       Q.   Is it -- I mean, I know it's a surveillance

20   video.   Is it clear enough that you can tell what's

21   going on?

22       A.   Yes.

23       Q.   I want to mark this as Plaintiff's Exhibit --

24   am I on 4, I believe?   This might be 3, Plaintiff's

25   Exhibit 3.

1          (Exhibit 3 marked.)

2     Q.   (BY MR. HUBBARD)  I'm going to go to time stamp

3  8:23:21.

4               (Video played.)

5     Q.   (BY MR. HUBBARD)  I'm trying to pause it, but

6  it's not wanting to pause right where I pause it at.

7  Can you tell on the very -- when I'm looking at it, it's

8  at the top left corner of my screen.  I'm not sure where

9  it is for you.  But can you see a -- it looks like a

10  truck going around the corner?

11     A.   Yes.

12     Q.   Do you know if that's you?  It looks like a tow

13  truck.  Do you know if that's you?

14     A.   Yeah, that's me in the white tow truck.

15     Q.   So what were you doing at this time?

16     A.   I was scanning the apartment complex.

17     Q.   So on January 3, 2023 at 8:23 p.m., as of now,

18  did you know the Genesis that was there?

19     A.   I knew it could have been there because, like I

20  said, I scanned it a couple days before then.  But them

21  apartments are patrolled by many other repo companies

22  and many towing companies, so I wasn't for sure.  I can

23  still hear you-all.  I'm sorry.

24     Q.   You can go ahead if you're able to talk.

25     A.   No, I'm good.  I'm good.  Let me -- I'm sorry.

1   Yeah, I'll scan an apartment complex like I normally do.

2   Like I said, I normally scan them before I go home

3   because they're on my way to the house.  That's all I

4   was doing.  But like I say, I knew the Genesis could

5   have been there, but I wasn't for sure it was going to

6   be there.

7        Q.   I'm going to move it over to 8:25:09 time

8   stamp.  All right.  Do you see?

9        A.   I can't hear you-all.

10       Q.   Can you hear me?  Are you able to hear me now?

11            MR. EDEN:  Hey, Daniel, are you there?

12       A.   I can't hear you-all.  Hold on just a minute.

13       Q.   (BY MR. HUBBARD)  All right.

14            MR. EDEN:  Hey, Daniel, can you hear us

15   now?

16            THE WITNESS:  Yeah, I can hear you now.

17       Q.   (BY MR. HUBBARD)  All right.  So I'm going to

18   keep playing Exhibit 3.

19            (Video played.)

20       Q.   (BY MR. HUBBARD)  I know there's some dead

21   time.  So at 8:25:30 -- can you see the video still?  Is

22   the video still on your screen?

23       A.   Yeah, it's still on the screen.  Sorry.

24       Q.   All right.  You can kind of see this -- the guy

25   in the hoodie here on the sidewalk, correct?

1    A.   Correct.

2    Q.   Do you know if that was the Genesis or is the

3 other car the Genesis?  Is the one in the --

4    A.   I'm not -- I'm not really sure, to be honest

5 with you, because I'm too far away from it.  But that

6 kind of looks like a Nissan from right here.

7    Q.   Right.  And then there's that car pulling out

8 of the garage?

9    A.   Correct.

10    Q.   Can you see the -- is that you coming in the

11 back up there?

12    A.   Yes.

13    Q.   All right.  You're still just scanning, looking

14 for plates at this point?

15    A.   Yes.  Yeah, that could have been the Genesis

16 right there.  It looked like it from the side view.

17    Q.   I understand.  I'm not trying to, you know,

18 lock you down.  I'm just asking.  All right.  Do you

19 know where you're going at this point?

20    A.   It looks like I'm heading out the gate.  I

21 scanned that one side right there.

22    Q.   All right.  So is that where the gate is?

23    A.   No.  No.  The gate -- the gate is like if you

24 go towards where them gentlemens are at, to the left and

25 to the right -- or to the right and to the left.  I'm

1    sorry.

2        Q.   So at 8 -- let's see, let me go to the end of

3    the video.  So at 8:26:24 -- 25, it looks like you make

4    a turn and you go off the screen.  Do you know how

5    far --

6        A.   It's just a little cul-de-sac right there and

7    it's got probably about eight cars right there.

8        Q.   Right.  Okay.  Do you know how long before that

9    was before the shooting happened?

10       A.   I don't know.

11       Q.   Do you know if it was 10 minutes, 20 minutes,

12   an hour, one minute?

13       A.   I wasn't there -- I wasn't in there very long.

14       Q.   Right.  It was just a little cul-de-sac?

15       A.   Yeah.

16       Q.   So did you turn around and then come out and

17   that's when the other video starts, do you know?

18       A.   I didn't know there was another video.  This is

19   the only video I've seen so far.

20       Q.   All right.  Let me pull up Plaintiff's

21   Exhibit 4.

22                 (Exhibit 4 marked.)

23       Q.   (BY MR. HUBBARD)  Let me see if I can share it.

24   All right.  This is Plaintiff's Exhibit 4.  Since this

25   is the first time you've seen it, I'm just going to let

1    it play all the way through.  It's pretty short.

2                    (Video played.)

3        Q.  (BY MR. HUBBARD)  All right.  Does that appear

4    to be your truck?

5        A.  Yes, that's me in the white truck.

6        Q.  And then right after that, it appears the guy

7    in the hoodie is -- shoots at the other guy in the

8    street?

9        A.  No, I'm up there towards the gate right now.

10       Q.  I understand.  I'm just talking about what the

11   video shows, not what you saw right now.

12       A.  Yeah, I'm -- when he raised his arm, I'm up

13   there already by the gate because the gate is right

14   there.  You make that curve, I mean, it's like -- within

15   a couple seconds, you make that gate turn.

16       Q.  Right.  I understand.  I'm not asking you

17   what -- where you were at the time.  I'm just asking,

18   watching this video right now, obviously you go past the

19   two guys.  But just watching the video, does it appear

20   like the guy in the hoodie shoots at the other guy?

21       A.   It appears that.  He raised his arm up and the

22   other guy falls, it looks like is what happened.

23       Q.   All right.  You said you were headed -- where

24   were you -- so you go past the guy in the hoodie and you

25   make that turn.  Where are you going at this point?

1    A.    Out the gate.

2    Q.    Were you alone in the truck that night?

3    A.    Yes.

4    Q.    Are you always alone when you're working?

5    A.    Yes.

6    Q.    Do you know if that's written down in any of

7    those --

8    A.    It's in -- it's in that manual deal you just

9    showed me.  You're not supposed to have no riders unless

10    it's approved.

11    Q.    You mentioned some -- some -- I guess some

12    systems you use.  I can't remember the name of them.

13    But is it written down anywhere who you -- you know,

14    what you did that night or where you were that night or

15    who was with you or who was not with you?  Does that

16    make sense?

17    A.    It don't -- there's no way to really show who

18    was with me.  But like I say, no one -- I had no one

19    ride with me because I'm a loner.  I mean, you can

20    ask -- you can ask all the drivers, I don't -- I

21    don't -- I don't communicate with too many people.  They

22    all know I'm a loner.  But, I mean, there is a tracker

23    on the truck that shows where we was at and what we had

24    been doing all that night.  There's no -- like no camera

25    inside the truck or anything like that.  There was one

1  specifically on that truck because that truck was a new

2  truck at that time.

3      Q.    There is a tracker on this truck?

4      A.    There was a tracker on that truck, correct.

5      Q.    Do you remember which property you were at

6  before you came to Berkshire?

7      A.    I was probably at the Kroger right there by

8  there or tracking them -- or scanning them other

9  apartments right there by the Parkland Hospital and

10  stuff like that.

11      Q.    Did Mr. Hardrick ever say anything to you?

12      A.    No.  No.

13      Q.    Did he seem to know you were there?

14      A.    No.  I've never talked -- I've never talked to

15  anybody in those apartments.

16      Q.    I understand.  Did you know he was there?

17      A.    No.

18      Q.    Did the man in the hoodie, did he ever talk to

19  you?

20      A.    No.

21      Q.    Did you know he was there that night?

22      A.    No.  I was more focused on scanning cars and

23  stuff like that, trying to get another car.

24      Q.    So if we start the video at 10 seconds, he

25  shoots and then he runs.  Is that the direction of the

```
 1  gate the way he runs?

 2      A.   Yes.

 3      Q.   And that's the gate you were leaving out of?

 4      A.   Yes.

 5      Q.   Did you hear the gunshot?

 6      A.   I heard a gunshot at the gate.

 7      Q.   Did you ever see -- the guy in the hoodie, did

 8  you see him running towards the gate?

 9      A.   No.  I was probably already outside the gate.

10  It don't take long for that gate to open.

11      Q.   Right.  Did you ever see him at all after

12  you --

13      A.   No.

14      Q.   -- drove by?

15      A.   I don't even actually remember seeing him

16  standing there when I drove by.

17      Q.   Did you call the police when you heard the

18  gunshots?

19      A.   No.

20      Q.   Is there any reason you didn't?

21      A.   It didn't bother me.  I didn't have no

22  gunshot -- I didn't have no bullet holes in the truck or

23  anything like that.  I didn't hear no bullets hit my

24  truck.

25      Q.   Right.  Did you go back and check on anyone?
```

1      A.    No.   In that -- in that area, I mean, to be

2    honest with you, it's really common in that area for

3    gunshots because, I mean, it's right there by the

4    Parkland Hospital.   It's kind of like in the -- it's

5    right there on the border of crackville and right there

6    on the border of the nice area.   So, like, if you go

7    like a block over, you're in like a -- the complex and

8    the projects and stuff.   I mean, it's right there on the

9    border of the bad area.   So it's real common for

10   gunshots and stuff in that area in Dallas.

11      Q.    Do you know where you went after you left?

12      A.    I went home after that.   I probably went

13   through downtown.   I scanned through downtown.   I went

14   through Deep Ellum, scanned through Deep Ellum, and then

15   I went to the house.

16      Q.    What part of town were you living in at that

17   time?

18      A.    I still live in the same house.   I live over

19   here off of -- in southeast Dallas.   I live, like, south

20   of the -- southeast of the fair -- State Fair.

21      Q.    Did you inform anyone at Keel that there was a

22   gunshot that night?

23      A.    No.   I mean, in this kind of business, it's

24   common.   Like I say, you hear gunshots all the time.

25   So, I mean, I've been shot at a couple times.

1      Q.   So I'm guessing -- if you didn't tell Keel, did

2  you ever tell law enforcement or Resolvion or Wells

3  Fargo about the gunshot?

4      A.   No.

5      Q.   Were you ever disciplined for anything that

6  happened on January 3rd?

7      A.   No.

8      Q.   Do you know if there was any investigation from

9  Keel or Wells Fargo or Resolvion to try to figure out

10  who the guy in the hoodie was?

11      A.   No.   Like I said, we didn't hear nothing until

12  months later, about seven, eight months later after

13  this.

14      Q.   All right.   Let me show you Exhibit 5.

15          (Exhibit 5 marked.)

16      Q.   (BY MR. HUBBARD)   Do you recognize what this

17  is?

18      A.   It looks like the same thing as we looked at

19  before, but it's just in the client version.   It looks

20  like a repossession order.

21      Q.   So what does this tell you?

22      A.   It tells you the client's name.   It tells you

23  the lender's name.   It tells you what they get paid for

24  recovery.   It's pretty much all the -- this is pretty

25  much what the office gets.   The other one that you

1    showed is what I pretty much get through e-mail.

2        Q.   All right.  So you, the driver, do you get this

3    repo order or does this just go to the office?

4        A.   No, I don't -- I don't see this one.  This

5    one -- this one like this, it goes to the office because

6    I don't see what they get paid per repo.

7        Q.   And this -- as far as you know, this was sent

8    by Resolvion.  It appears that the lender or the client

9    is Wells Fargo Bank, correct?

10       A.   Correct.  I mean, it shows you the make and

11   model of the car and stuff like that.

12       Q.   Does anyone at Keel communicate all these

13   procedures or policies that you're expected to follow?

14       A.   No, I don't think so.

15       Q.   Like --

16       A.   We signed -- we read that booklet -- we read

17   that booklet when we get hired.  We take a drug test and

18   stuff like that.  And that's pretty much it.  We don't

19   have no continuing education classes or anything like

20   that.  We have driver meetings every now and then, but

21   that's just to discuss about how our week goes and stuff

22   like that, how we can better our performance and shit.

23       Q.   All right.  Last exhibit.

24            (Exhibit 6 marked.)

25       Q.   (BY MR. HUBBARD)  Have you ever seen this, the

1    Agent Statement of Fact Form?

2        A.    No.

3        Q.    Do you know who this person is, Jessica,

4    that --

5        A.    She's the office manager.

6        Q.    And this appears to be regarding the Genesis

7    that you were looking for on January 3rd?

8        A.    Correct.

9        Q.    All right.  So it looks like 12-30 -- this is

10   Plaintiff's Exhibit 6, if I haven't said that already.

11   It looks like 12-30-22, got the hit off the DRN cameras.

12   That's that progress report we talked about earlier?

13       A.    Uh-huh.

14       Q.    And then 1-3-23, you ran the address again.

15   What does that mean?

16       A.    It's just like an update, I guess, running it.

17       Q.    All right.  The detailed description addressing

18   the complaint/claim or incident against your office,

19   have you ever seen this?

20       A.    Hold on a minute.

21       Q.    Let me show you -- I'll show you the signature

22   too.  It's not signed by you, I don't believe.  I just

23   want to -- it's signed by Jessica, your office manager.

24   Yeah, take a look at that.

25       A.    Yeah, I think this was my statement she asked

1  me about after I left.  She called me at my other job

2  and asked me about this.

3      Q.  What was your other job?

4      A.  I worked for another repo company for a bit.

5  Yeah, I think this is the statement she asked me about.

6      Q.  And this was signed -- she signed it on

7  1-10-23.  You mentioned earlier you didn't talk to

8  anyone for several months.  How does this fit into that?

9      A.  No, we didn't talk to nobody for several months

10  after -- this -- this is not dated right because she

11  called me -- this was dated on 1-10.  When is it?  Yeah,

12  this is not dated right.  That date is wrong on that.

13      Q.  When do you think this was?

14      A.  Because I was working -- I was working at the

15  other place for about six, seven months when she called

16  me.  So --

17      Q.  So you didn't talk to Jessica about this

18  incident --

19      A.  No.

20      Q.  -- until several months afterwards?

21      A.  Correct.

22      Q.  Do you remember what month it was?

23      A.  I'm going to say probably about June, July,

24  maybe August time.

25      Q.  Who were you working for at the time?

1       A.   I was working for my friend that works for

2   Williams Recovery.

3       Q.   Is it Williams Recovery?

4       A.   Yes.

5       Q.   Do you still do any work for them?

6       A.   No.  I'm still friends with him.

7       Q.   When you read this statement, do you agree with

8   it?  Are these your words that you wrote down or is this

9   her interpretation?

10      A.   Let me finish reading it.

11      Q.   Let me be more specific.  That was kind of too

12  big of a question for you.  When we get to this point,

13  when the driver got to the gate to leave, the debtor

14  shot off a gun into the air, did you tell -- did you

15  tell her that?

16      A.   I said I heard a gun.  I didn't say the debtor

17  shot the gun off.

18      Q.   Do you know why it would be put in here that

19  the debtor shot the gun off?

20      A.   That would be her own words.

21      Q.   Just to be clear, you never saw Mr. Hardrick

22  shoot the gun and you never told anyone he shot the gun?

23      A.   No, I did not.  I did not.

24      Q.   Do you have any idea why it would be dated

25  incorrectly?

1    A.    I do not, unless she was trying to cover her

2  own ass, because, I mean, this is only, what, seven days

3  after it happened.  I never heard anything until a

4  couple months after that.  Like I said, maybe six, seven

5  months after that, I heard something about this.

6    Q.    I understand.  The part where the driver is

7  prohibited from carrying a firearm, do you ever carry a

8  weapon or firearm?

9    A.    No.  I'm a convicted felon.  I don't carry no

10  firearm.  I've got kids.  It's not worth going to jail

11  over a gun.

12    Q.    All right.  Let me go over my notes real quick.

13  We might be close to being done, or at least my part.

14  All right.  I think I know the answer to this, but did

15  you ever write down anything related to the incident on

16  January 3rd?

17    A.    I don't know.  I could pull it up and see if I

18  did write anything in the update.  Let me log into my

19  computer here.

20    Q.    Yeah.

21    A.    Do you know the last six of the VIN number on

22  that?

23    Q.    7797.

24    A.    The last six.

25    Q.    I'm sorry, I did the last four.  227797.

1      A.    I don't know if you-all can see this, but this

2    is the system we've got.  This is called RDN.  Every

3    repossession order, it pops up like this on here.  So

4    whenever we do an update, we just go here to update and

5    we put our update in.  But right here, it shows all,

6    like, the updates and stuff like that.  Jessica did the

7    update.  Vicki did an update.  This is the client, ALS.

8    They wanted an update.  I never did an initial update on

9    it.

10     Q.    I understand.  So there's nothing in there

11   about what happened on January 3rd?

12     A.    No.  No, because like I said, it was a live

13   hit.  So I never really got the car in possession, so

14   there was no reason for me to do an update on it.

15     Q.    Would that system show any indication why that

16   incident report may have been backdated?

17     A.    No.  This is -- this is the only the stuff I

18   see on my side because -- the driver's side.  So the

19   company side is a whole different side of this.  There's

20   like a whole different program for them.  This is only

21   for the drivers to see.

22     Q.    All right.  Sir, thank you for talking with me

23   today.  I know it's your -- your off day.  I know that

24   means a lot to you.  So thank you for talking with me.

25     A.    Yeah, no problem.

1          MR. HUBBARD:  That's all I have, Mr. Eden.

2          MR. EDEN:  We'll reserve.

3          THE REPORTER:  Mr. Eden, did you need a

4   copy of the transcript?

5          MR. EDEN:  Yes, ma'am.  We will like an

6   e-tran with the exhibits.

7                    (END OF PROCEEDINGS)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CHANGES AND SIGNATURE

 2   DEPOSITION OF:  DANIEL FIELHAUER

 3   DATE OF DEPOSITION:  FEBRUARY 15, 2025

 4   PAGE   LINE           CHANGE           REASON

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____
```

```
1        I, DANIEL FIELHAUER, have read the foregoing

2   deposition and hereby affix my signature that same is

3   true and correct, except as noted above.

4

5        _____
                 DANIEL FIELHAUER
6

7

8

9

10

11  THE STATE OF _____)

12  COUNTY OF _____)

13

14        Before me, _____, on this
    day personally appeared DANIEL FIELHAUER, known to me
15  (or proved to me under oath or through
    _____) (description of identity
16  card or other document)) to be the person whose name is
    subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
    consideration therein expressed.
18        Given under my hand and seal of office this
    _____ day of _____, _____.
19

20

21        _____
                 NOTARY PUBLIC IN AND FOR
22               THE STATE OF _____
                 COMMISSION EXPIRES: _____
23

24

25
```

```
 1            THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
 2                    DALLAS DIVISION

 3
    BOBBY HARDRICK                )
 4                               )
            Plaintiff,           ) CIVIL ACTION
 5                               ) NO. 3:24-CV-00014-D
    v.                           )
 6                               )
    WELLS FARGO BANK NATIONAL     )
 7  ASSOCIATION; RESOLVION, LLC;  )
    KEEL RECOVERY, INC.          )
 8                               )
            Defendants.          )
 9

10

11  ************************************************************

12              REPORTER'S CERTIFICATION

13  ************************************************************

14

15       I, Dawn Baldwin, a Certified Shorthand Reporter

16  duly commissioned and qualified in and for the State of

17  Texas, do hereby certify that there came before me,

18  remotely, on the 15th day of February 2025, the

19  following named person, to-wit: DANIEL FIELHAUER, who

20  was duly sworn to testify the truth, the whole truth,

21  and nothing but the truth of knowledge touching and

22  concerning the matters in controversy in this cause; and

23  that he was thereupon examined upon oath and his

24  examination reduced to typewriting under my supervision;

25  that the deposition is a true record of the testimony
```

DAWN BALDWIN, CERTIFIED SHORTHAND REPORTER   (817)613-6567

1  given by the witness.

2       The amount of time used by each party at the

3  deposition is as follows:

4       John Hubbard..............01 Hours, 01 Minutes
        Essay Eden................00 Hours, 00 Minutes

5

6       I further certify that I am neither attorney or

7  counsel for, nor related to or employed by any of the

8  parties or attorneys in the action in which this

9  proceeding was taken, and further that I am not a

10 relative or employee of any attorney or counsel employed

11 by the parties hereto, or financially interested in the

12 action.

13       CERTIFIED TO BY ME on this the ____ day

14 of_____, 2025.

15

16

                      _____
17                    DAWN BALDWIN, Texas CSR
                      Expiration Date:  10/31/25
18                    U.S. LEGAL SUPPORT, Firm #122
                      16825 Northchase Drive, Suite 900
19                    Houston, Texas  77060

20

21

22

23

24

25